# SEALED NEW ACTION





# SEALED NEW ACTION

G-2 (01/05)   SEALED CASE COVER SHEET (NEW ACTION)

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

# THIS DOCUMENT IS CURRENTLY

# IN CAMERA DOCUMENT

# AND

# IS RESTRICTED FROM

# PUBLIC VIEWING

1  **KERSHAW, CUTTER & RATINOFF, LLP**
2  C. Brooks Cutter (SBN 121407)
   John R. Parker, Jr. (SBN 25776)
3  401 Watt Avenue
4  Sacramento, California 95864
   Telephone: (916) 448-9800
5  Facsimile: (916) 669-4499
6  E-mail: bcutter@kcrlegal.com
        jparker@kcrlegal.com
7

8  **THE LAW OFFICES OF MYCHAL WILSON**
9  Mychal Wilson (SBN 236189)
   2425 W. Olympic Blvd. Suite 4000-W
10 Santa Monica, CA 90404
   Telephone: (424) 252-4232
11 Facsimile: (310) 424-7116
12 Email: mychal@mychalwilsonesq.com

13

14         **IN THE UNITED STATES DISTRICT COURT**

15           **CENTRAL DISTRICT OF CALIFORNIA**

16                    CV15-1212 JAK ASx

17 [UNDER SEAL]              Case No. _____

18              Relators,

19         v.                **COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL**
20 [UNDER SEAL],

21

22              Defendant.     **TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730**

23

24                            **DO NOT ENTER INTO PACER**

25                            **DO NOT PLACE IN PRESS BOX**

26

27

28

FILED
CLERK, U.S. DISTRICT COURT

FEB 19 2015

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

PAID

FEB 19 2015

Clerk, US District Court
COURT 4612

| | |
|---|---|
| 1 | ) |
| 2 | ex rel. ) |
| 3 | ) DO NOT ENTER INTO PACER |
| 4 | THE DAN ABRAMS COMPANY LLC ) |
| 5 | ) |
| 6 | Relators, ) DO NOT PLACE IN PRESS |
| 7 | vs. ) BOX |
| 8 | MEDTRONIC INC., MEDTRONIC ) |
| 9 | PLC, MEDTRONIC SOFAMOR DANEK ) |
| 10 | USA INC., WARSAW ORTHOPEDIC ) |
| 11 | INC., MEDTRONIC SOFAMOR DANEK ) |
| 12 | DEGGENDORF GMBH, AND ) |
| 13 | MEDTRONIC PUERTO RICO ) |
| 14 | OPERATIONS CO., HUMACAO, ) |
| 15 | Defendants. ) |

2

Table of Contents

I.    INTRODUCTION................................................................................6

II.   NATURE OF ACTION........................................................................9

    A.  JURISDICTION AND VENUE ......................................................17

    B.  PARTIES.....................................................................................19

III.  GOVERNING LAWS, RULES, AND REGULATIONS ............................21

    A.  THE FALSE CLAIMS ACT............................................................21

    B.  THE ANTI-KICKBACK STATUTE ................................................23

    C.  DEFENDANTS' VIOLATIONS OF THE ANTI-KICKBACK STATUTE 25

    D.  DEFENDANTS' ILLEGAL REBATE SCHEME ................................34

    E.  FDA REGULATION OF MEDICAL DEVICES..................................37

    i.    DEFINITION OF A MEDICAL DEVICE ........................................47

    ii.   PROHIBITED ACTS..................................................................48

    iii.  ADULTERATED DEVICES..........................................................49

    iv.  MISBRANDED DEVICES............................................................50

    v.   LABELING REQUIREMENTS ......................................................50

    vi.  QUALITY SYSTEM REGULATION ..............................................52

    vii. LEGALLY MARKETED DEVICES ................................................53

    viii.  ILLEGAL DEVICES AND HUMAN EXPERIMENTATION.................56

    ix.  THE PRACTICE OF MEDICINE..................................................57

    x.   GOVERNMENT FUNDED HEALTH CARE PROGRAMS.....................59

    a)  MEDICARE AND MEDICAID GENERALLY ..................................59

    b)  MEDICARE REIMBURSEMENT..................................................60

3

1        i.   MEDICARE EXCLUSION OF EXPERIMENTAL AND
2             INVESTIGATIONAL DEVICES ...................................................60
3        ii.  MEDICARE EXCLUSION FOR SERVICES RELATED TO
4             NONCOVERED DEVICES......................................................65
5        c)   TRICARE...........................................................................66
6        d)   FEDERAL EMPLOYEE HEALTH BENEFITS PROGRAM (FEHBP)......67
7    IV.  DEFENDANTS ENGAGED IN ILLEGAL HUMAN EXPERIMENTATION
8         AND KNOWINGLY CAUSED THE SUBMISSION OF FALSE CLAIMS
9         FOR PAYMENT TO FEDERAL AND STATE PROGRAMS .....................67
10   V.   ADDITIONAL DETAILS ON DEFENDANTS' UNLAWFUL SCHEMES
11        FURTHER ESTABLISHING RELATORS AS ORIGINAL SOURCES ......96
12        A.  THE VERTE-STACK SCHEME ........................................................109
13        i.   THE ACTUAL VERTE-STACK SPINAL SYSTEM DEVICE.................109
14        ii.  RELATORS OBTAINED ACTUAL PACKAGED ILLEGAL
15             EXPERIMENTAL VERTE-STACK DEVICES FROM DEFENDANTS'
16             INVENTORY THAT PROVE HOW THE VERTE-STACK SCHEME
17             WORKED...........................................................................111
18        iii. THE ILLEGAL EXPERIMENTAL VERTE-STACK SPINAL SYSTEM
19             PERIMETER DEVICE .........................................................113
20        iv.  THE ILLEGAL EXPERIMENTAL VERTE-STACK ANATOMIC PEEK
21             DEVICE...........................................................................117
22        v.   THE ILLEGAL EXPERIMENTAL VERTE-STACK SPINAL SYSTEM
23             CORNERSTONE PSR DEVICE ..............................................123
24        vi.  THE ILLEGAL EXPERIMENTAL VERTE-STACK ANATOMIC PEEK
25             DEVICE WAS IMPLANTED INTO RELATOR LEW..........................127

4

vii. THE ILLEGAL EXPERIMENTAL VERTE-STACK CORNERSTONE PSR

PEEK IMPLANTS DEVICE IMPLANTED IN PATIENT #1 ...............148

viii.   THE ILLEGAL EXPERIMENTAL CAPSTONE VERTE-STACK VBS

DEVICE IMPLANTED INTO PATIENT #2 .........................................155

ix.  THE ILLEGAL EXPERIMENTAL CAPSTONE VERTE-STACK VBS

DEVICE IMPLANTED INTO PATIENT #3 .........................................156

x.   OTHER ILLEGAL EXPERIMENTAL COUNTERFEIT VERTE-STACK

DEVICES.......................................................................................158

B.  THE INTERVETEBRAL BODY FUSION DEVICE SCHEME ...............165

C.  THE ADULTERATION AND MISBRANDING SCHEME.....................167

D.  THE COUNTERFEIT INFUSE BONE GRAFT SCHEME ......................174

E.  THE BMP SCHEME ...................................................................187

i.   EVIDENCE OF DEFENDANTS' BMP SCHEME ...................................188

ii.  OTHER EVIDENCE OF DEFENDANTS' BMP SCHEME RESULTING

IN EGREGIOUS ILLEGAL EXPERIMENTATION ON CHILDREN .192

VI.  DETAILED SUMMARY OF FEDERAL REGULATION OF MEDICAL

DEVICES .......................................................................................193

VII. CAUSES OF ACTION ..................................................................194

VIII............................................................................ PRAYER FOR RELIEF

...............................................................................................297

IX.  DEMAND FOR JURY TRIAL...................................................................299

5

I.      INTRODUCTION

1.      Relators The Dan Abrams Company LLC, in the name of and on behalf of the United States of America, the States of Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, bring this action under the False Claims Act (FCA), 31 U.S.C. § 3729 et seq. and various State and local False Claims Acts, to recover losses from false claims that Defendants Medtronic Inc., Medtronic plc, Medtronic Sofamor Danek USA, Inc., Warsaw Orthopedic, Inc., Medtronic Sofamor Danek Deggendorf GMBH, and Medtronic Puerto Rico Operations Co., Humacao, caused to be submitted by health care providers to Medicare, State Medicaid programs, the Department of Veterans Affairs, TRICARE, and other federal, state, county, and municipal insurance and purchasing programs (hereinafter, collectively, Government Health Care Programs).

2.      Defendants made and/or caused to be made submission of false or fraudulent claims to Government Health Care Programs, for implantable medical devices (and for the purpose of this complaint the term "medical device" is meant to include therapeutic biologics), and associated surgical equipment for use with implantable medical devices, and surgical and medical care associated with the implantation and use of those devices.  The claims for payment were and are false and fraudulent because the devices, which were and are introduced or delivered for introduction into interstate commerce by Defendants, were and are not legally marketed devices, but were and are illegal experimental devices, not cleared or

6

1   approved by FDA to be used on patients, and such illegal experimental devices,

2   and the associated surgical equipment for use with these illegal experimental

3   medical devices, as well as the medical and hospital services associated with their

4   use, are precluded by law from serving as the basis of a legitimate claim for

5   insurance or other payment.

6        3.     Commencing sometime before 2000 and continuing into the present,

7   Defendants engaged in a fraudulent scheme that caused the Medicare and Medicaid

8   Programs to pay unlawful claims for payment. As the direct, proximate, and

9   foreseeable result of Defendants' manufacturing, marketing, and sale of

10   implantable Defendants' illegal experimental devices, Defendants knowingly

11   caused health care providers to submit to Government Health Care Programs false

12   claims for reimbursement of Defendants' illegal experimental devices and the

13   associated surgical equipment, as well as the medical and hospital services

14   associated with the use of the illegal experimental devices. In furtherance of this

15   scheme, Defendants engaged, and continue to engage, in a scheme of illegal

16   kickbacks, that included Defendants knowingly and willfully offering, paying,

17   soliciting, or receiving remuneration directly or indirectly, to induce or reward a

18   person for, inter alia, purchasing, ordering, arranging for, or recommending the

19   purchase or ordering of illegal experimental devices for which payment may be

20   made, in whole or in part, under Government Health Care Programs. Defendants

21   have also engaged, and continue to engage, in a scheme of illegal kickbacks related

22   to grants, fellowships, speaking fees, consulting fees, expert panel fees, paid

23   meeting attendance, paid vacations, payments for patient referral programs, and

24   other illegal kickbacks to physicians and publicly funded hospitals, in order to

25   cause the purchase, use of, and the submission of false claims for payment, for

7

their illegal experimental devices. This scheme of illegal kickbacks has therefore resulted in defrauding Government Health Care Programs, state-funded University hospitals and from National Institutes of Health (NIH) funding to hospitals and Universities, diverting these government funds into their own coffers.

4.     Defendants have intentionally marketed illegal experimental devices, promoted either directly or indirectly illegal implantation and use of these experimental devices on patients, trained and paid for physicians to train in illegal implantation procedures, engaged in illegal kickback schemes related to the purchase or ordering of the experimental devices, and thereby have made and/or caused to be made false and fraudulent claims for payment for these illegal experimental devices and the associated surgical equipment, as well as the medical and hospital services associated with the use of the illegal experimental devices.

5.     In addition to manufacturing, marketing, selling, and licensing to sell illegal experimental devices, as more fully alleged herein, Defendants also engaged in a widespread and pervasive scheme of illegal kickbacks to relentlessly boost sales of their illegal experimental devices resulting in massive unjust enrichment. Among other improper inducements, Defendants provided inappropriate rebates for unapproved combination purchases; paid travel and training for physicians on illegal device implant procedures at cadaver training labs around the country, including in Memphis, Las Vegas, and others, and based the decision to pay for travel and training on the physician's potential to create return on investment ("ROI") for the company; and provided free professional marketing and referral development services for physicians who had the potential to create ROI for the company.

6.     On behalf of the United States of America, the States of Arkansas,

8

California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, Relators The Dan Abrams Company LLC, file this qui tam complaint against Defendants Medtronic Inc., Medtronic plc, Medtronic Sofamor Danek USA, Inc., Warsaw Orthopedic, Inc., Medtronic Sofamor Danek Deggendorf GMBH, and Medtronic Puerto Rico Operations Co., Humacao, and allege as follows:

II.     NATURE OF ACTION

7.      This is a qui tam action under 31 U.S.C. Sec. 3729, et seq. of the False Claims Act ("FCA") filed by the Relators in the name of the United States Government and themselves, to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with agencies of the United States, specifically the Medicare, Medicaid and TriCare healthcare programs. This is also a qui tam action under various state and local False Claims Acts, brought by the Relators on behalf of themselves and the various states and cities to recover damages and penalties arising from Defendants' violations of state and local laws.

8.      As more fully alleged herein, this action is based on Defendants causing the submission of false or fraudulent claims to Government Health Care Programs, commencing in or before the year 2000 and continuing to the date hereof.

9.      The Defendants made and/or caused to be made submission of false or fraudulent claims to Government Health Care Programs, for implantable medical

devices (and for the purpose of this complaint the term "medical device" is meant to include therapeutic biologics), and associated surgical equipment for use with implantable medical devices, and surgical and medical care associated with the implantation and use of those devices.  The claims for payment were and are false and fraudulent because the devices, which were and are introduced or delivered for introduction into interstate commerce by Defendants, were and are not legally marketed devices, but were and are illegal experimental devices, not cleared or approved by FDA to be used on patients, and such illegal experimental devices, and the associated surgical equipment for use with these illegal experimental medical devices, as well as the medical and hospital services associated with their use, are precluded by law from serving as the basis of a legitimate claim for insurance or other payment.

10.    As the direct, proximate, and foreseeable result of Defendants' manufacturing, marketing, and sale of implantable Defendants' illegal experimental devices, Defendants  knowingly caused health care providers to submit to Government Health Care Programs false  claims for reimbursement of Defendants' illegal experimental devices and the associated surgical equipment, as well as the medical and hospital services associated with the use of the illegal experimental devices.

11.    Defendants have engaged, and continue to engage, in a scheme of illegal kickbacks, that included Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of illegal experimental devices for which payment may be made, in whole or in part, under Government Health Care

Programs. Defendants have also engaged, and continue to engage, in a scheme of illegal kickbacks related to grants, fellowships, speaking fees, consulting fees, expert panel fees, paid meeting attendance, paid vacations, payments for patient referral programs, and other illegal kickbacks to physicians and publicly funded hospitals, in order to cause the purchase, use of, and the submission of false claims for payment, for their illegal experimental devices. This scheme of illegal kickbacks has therefore resulted in defrauding Government Health Care Programs, state-funded University hospitals and from National Institutes of Health (NIH) funding to hospitals and Universities, diverting these government funds into their own coffers.

12.     Defendants have intentionally marketed illegal experimental devices, promoted either directly or indirectly illegal implantation and use of these experimental devices on patients, trained and paid for physicians to train in illegal implantation procedures, engaged in illegal kickback schemes related to the purchase or ordering of the experimental devices, and thereby have made and/or caused to be made false and fraudulent claims for payment for these illegal experimental devices and the associated surgical equipment, as well as the medical and hospital services associated with the use of the illegal experimental devices.

13.     Defendants engaged in unlawful schemes including but not limited to the following:

    a.  Defendants manufactured, marketed, sold, licensed to be sold, and caused to be implanted into unsuspecting patients without their knowledge or consent, counterfeit illegal experimental "stackable", expandable, and mesh-type vertebral body replacement devices for use in the cervical spine. Some were labeled with the Verte-Stack trade name by itself, or used a trade name

11

that contained the Verte-Stack name, but these devices were not the actual FDA cleared Verte-Stack Spinal System device (K021791), but were counterfeit devices that did not have FDA clearance or approval for any use whatsoever including use in the cervical spine, and such counterfeit illegal experimental devices are by law excluded from coverage under Medicare and Medicaid (and other insurance programs), and such actions by Defendants caused and resulted in illegal human experimentation. The Defendants' scheme also included the marketing of expandable spine devices under trade names such as T2 XVBR, and mesh-type devices under trade names such as Pyramesh in footprint sizes for unapproved intended uses of cervical vertebral body replacement. In addition, Defendants engaged in a scheme or schemes of illegal kickbacks, that included Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of the counterfeit illegal stackable experimental devices, and associated medical and hospital services, for which payment may be made, in whole or in part, under Government Health Care Programs.

b. Defendants manufactured, marketed, sold, licensed to be sold, and caused to be implanted into unsuspecting patients without their knowledge or consent, illegal experimental intervertebral body fusion devices that were not cleared or approved by FDA for any use at the time of marketing, sale, or implantation, and such devices are by law excluded from coverage under Medicare and Medicaid (and other insurance programs), and such actions by Defendants caused and resulted in illegal human experimentation. In addition, Defendants engaged in a scheme or schemes of illegal kickbacks, that included

12

Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of the illegal experimental intervertebral body fusion devices that were not cleared or approved by FDA for any use at the time of marketing, sale, or implantation, and associated medical and hospital services, for which payment may be made, in whole or in part, under Government Health Care Programs.

c.  Defendants manufactured, marketed, sold, licensed to be sold, and caused to be implanted into unsuspecting patients without their knowledge or consent, intervertebral body fusion devices (and associated products) that had an FDA clearance or approval order, but that Defendants intentionally adulterated and misbranded subsequent to FDA clearance or approval, by marketing such intervertebral body fusion devices for combination with rhBMP-2, a therapeutic biologic, and such combination products are classified by law as Class III devices requiring PMA approval, but for which Defendants had no such PMA approval at the time of marketing, sale, and implantation, and therefore such adulterated and misbranded devices were not legally marketed devices, but were illegal experimental devices, and such devices are by law excluded from coverage under Medicare and Medicaid (and other insurance programs), and such actions by Defendants caused and resulted in illegal human experimentation.  In addition, Defendants engaged in a scheme or schemes of illegal kickbacks, that included Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of these illegal experimental

13

intervertebral body fusion devices that were misbranded and adulterated (and associated products), and associated medical and hospital services, for which payment may be made, in whole or in part, under Government Health Care Programs.

d. Defendants manufactured, marketed, sold, and caused to be implanted into unsuspecting patients without their knowledge or consent, illegal experimental rhBMP-2 containing products that are regulated as Class III devices, that Defendants labeled with the Infuse Bone Graft trade name, but these devices were not the actual FDA approved Infuse Bone Graft device (P000054), but were counterfeit versions of the Infuse Bone Graft device, and these counterfeit devices did not have FDA clearance or approval as combination products for any use. Defendants intentionally counterfeited, adulterated, and misbranded by marketing and selling these rhBMP-2 containing Infuse Bone Graft labeled products for combination use with intervertebral body fusion devices, and such combination products are classified by statute as Class III devices requiring FDA approval, but for which Defendants (or other manufacturers) had no such FDA approval, and therefore such counterfeit, adulterated, and misbranded combination products were not legally marketed devices, but were illegal experimental devices, and such devices are by law excluded from coverage under Medicare and Medicaid (and other insurance programs). The intervertebral body fusion devices included illegal experimental intervertebral body fusion devices manufactured by Defendants that were never FDA cleared or approved, intervertebral body fusion devices manufactured by Defendants that were only cleared or approved by FDA for use with bone graft material other than a therapeutic biologic, as

14

well as intervertebral body fusion devices marketed by other manufacturers that were only cleared or approved by FDA for use with bone graft material other than a therapeutic biologic. Such actions by Defendants caused and resulted in illegal human experimentation.  In essence, Defendants' scheme or schemes related to the counterfeit, misbranded, and adulterated Infuse Bone Graft devices, was nothing more than a scheme whereby the counterfeit, misbranded, and adulterated Infuse Bone Graft devices, served as delivery vehicles for Defendants illegal experimental rhBMP-2.  In addition, Defendants engaged in a scheme or schemes of illegal kickbacks, that included Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of the illegal experimental rhBMP-2 containing products that Defendant's intentionally counterfeited, adulterated and misbranded, and associated medical and hospital services, for which payment may be made, in whole or in part, under Government Health Care Programs.

    e.  Defendants manufactured, marketed, sold, and caused to be implanted into unsuspecting patients without their knowledge or consent, rhBMP-2, a product that is, by itself, not a finished medical device cleared or approved by FDA for any use, but that is a component of other FDA approved combination products (See paragraph 97), that Defendants purposely labeled with the Infuse Bone Graft trade name, with the malicious intention that the rhBMP-2 component of these products (including the real Infuse Bone Graft device, as well as the counterfeit misbranded and adulterated Infuse Bone Graft products) be perceived by sales representatives, physicians, and others, as a finished

15

medical device in various spinal and other body area surgeries, without the required FDA approval, and therefore such devices were not legally marketed devices, but were illegal experimental devices. Such devices are by law excluded from coverage under Medicare and Medicaid (and other insurance programs), and such actions by Defendants caused and resulted in illegal human experimentation. In addition, Defendants engaged in a scheme or schemes of illegal kickbacks, that included Defendants knowingly and willfully offering, paying, soliciting, or receiving remuneration directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of the illegal experimental rhBMP-2 that Defendants intentionally marketed and sold without the required FDA approval, and associated medical and hospital services, for which payment may be made, in whole or in part, under Government Health Care Programs.

14.    These acts constitute violations of the federal False Claims Act, 31 U.S.C. § 3729, et. seq., and numerous equivalent state and city statutes as set forth below. The FCA provides, inter alia, that any person who knowingly presents and/or causes to be presented to the United States a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained by the Government. The FCA allows any person discovering a fraud perpetrated against the Government to bring an action for himself and for the Government and to share in any recovery. The complaint in an FCA action is filed under seal for 60 days (without service on the Defendants within such 60-day period) to enable the Government (1) to conduct its own investigation without the Defendants' knowledge and (2) to determine whether to join in the action.

16

15.     Relator Jerome Lew is the Managing Member of The Dan Abrams Company LLC, and was implanted with Defendants' illegal experimental device into his cervical spine on May 2009, at Santa Monica UCLA Medical Center and Orthopedic Hospital by Jeffrey C. Wang, M.D., and this implant cannot be removed.  Relator Member of The Dan Abrams Company LLC has been employed by Defendants and has inside knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' business related to spine and biologics products.

16.     Relators seek to recover damages and civil penalties in the name of the United States and the States for the violations alleged herein.  On information and belief, as set forth below, the damages and civil penalties that may be assessed against the defendants under the facts alleged in this Complaint amount to at least hundreds of millions of dollars.

A.     JURISDICTION AND VENUE

17.     This is an action to recover damages and civil penalties on behalf of the United States of America and certain States of the United States arising from false claims and false statements made by the Defendants in violation of the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.  Relators allege that Defendants made false claims and statements, and caused others to submit false claims and certifications to agencies of the United States Government, specifically the Medicare and Medicaid health programs, which are all components of the U.S. Department of Health and Human Services.  This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §§ 3729 and 3732, which provide that the United States District Courts shall have exclusive jurisdiction of actions brought under the FCA, and FCA multi-defendant

17

jurisdiction pursuant to 31 U.S.C. §3732(a).

18.   Relators also bring this action on behalf of the States of Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, or any applicable subdivision thereof (hereinafter, collectively referred to as the "States") under the Federal False Claims Act, 31 U.S.C. §§ 3729-3732; as well as the False Claims Acts of the above listed States.

19.   Relators are the original sources of all the allegations contained in this Complaint.

20.   There has been no public disclosure of the allegations contained in this complaint.

21.   Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729 et seq., and similar State and city statutes, the Relators have provided the government with a confidential disclosure statement and exhibits to substantiate their allegations.

22.   Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

23.   Pendant and supplemental jurisdiction over the claims pursuant to the State FCA's are conferred by 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

24.   The Defendants are manufacturers of medical devices who caused the federal government to allow or pay claims for various types of medical procedures

18

utilizing medical devices knowing that the devices were illegal experimental devices, not cleared or approved by the FDA, and excluded from Medicare and other insurance coverage.

25.    Defendants do business in the Central District of California and maintain offices in the Central District of California. These Defendants also caused false claims to be made or certified in the State of Central District of California.

26.    Venue and jurisdiction are proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. §1391(c) and 31 U.S.C. §3732(a). At least one defendant can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. §3729 et seq. in the State of California.

B.    PARTIES

27.    Relator Jerome Lew is a citizen of the United States, the Managing Member of The Dan Abrams Company LLC, and a resident of Fullerton, Orange County, California. Mr. Lew is a self-employed creative consultant, researcher, writer-producer of film and television. Defendants manufactured, sold, and caused to be implanted into Mr. Lew's cervical spine Defendants' therapeutic biologic product containing rhBMP-2 used in combination with a counterfeit device (labeled as Verte-Stack PEEK).  Mr. Lew has knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' spine and biologics products.

28.    Relator Member of The Dan Abrams Company LLC is a citizen of the United States.  Member of The Dan Abrams Company LLC has been employed by Defendants and has inside knowledge that is independent of and materially adds to publicly disclosed information regarding Defendants' business related to spine and biologics products.

19

29.    Defendant Medtronic, Inc. has its corporate headquarters in Minneapolis, Minnesota, USA. Medtronic plc has its headquarters in Ireland, and is publicly traded on the NYSE.

30.    According to the 2013 Medtronic annual report (see Exhibit 1), Defendant Medtronic Inc. is a "global leader in medical technology, offering an unprecedented breadth and depth of innovative products, therapies, and services to fulfill our Mission of alleviating pain, restoring health, and extending life. In the past year, more than 9 million people worldwide relied on our therapies, which treat many conditions including … spinal conditions.  With a global reach that extends to more than 140 countries … extensive partnerships, and … more than 46,000 employees."  Annual sales of spine products in 2013 represented 19% of total sales and accounted for total spine sales revenue of 3.131 billions of dollars (declining slightly from previous years).  Total spine sales revenue included $528 million in sales of bone morphogenetic protein (BMP), representing approximately a 30% decline from 2011.

31.    Defendant Medtronic Sofamor Danek USA, Inc. is owned by Medtronic, Inc., and is located in Memphis, Tennessee, USA.

32.    Defendant Warsaw Orthopedic, Inc. is owned by Medtronic, Inc., and is located in Warsaw, Indiana, USA.

33.    Defendant Medtronic Sofamor Danek Deggendorf GMBH is owned by Medtronic, Inc., and is located in Deggendorf, Germany.

34.    Defendant Medtronic Puerto Rico Operations Co., Humacao is owned by Medtronic, Inc., and is located in Humacao, Puerto Rico, USA.

35.    Throughout this Complaint, Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., Warsaw Orthopedic, Inc., Medtronic Sofamor Danek

1  Deggendorf GMBH, and Medtronic Puerto Rico Operations Co., Humacao, are

2  collectively referred to as Defendants.

3      36.    At all times relevant to this Complaint, Defendants manufactured,

4  marketed, sold, licensed to be sold, and caused to be implanted illegal experimental

5  devices into Relator Lew and thousands of other patients, through a network of

6  sales representatives who called on hospitals and other health care providers

7  throughout the United States, and who were present in the operating rooms of

8  virtually every hospital in the United States, every day, and were physically

9  present at virtually every surgical procedure relating to Defendants' spine and

10  biologics products.

11  III.    GOVERNING LAWS, RULES, AND REGULATIONS

12  A.    THE FALSE CLAIMS ACT

13      37.    The False Claims Act, 31 U.S.C. §§ 3729-33, provides for the award

14  of treble damages and civil penalties for, inter alia, knowingly causing the

15  submission of false or fraudulent claims for payment to the United States

16  Government. 31 U.S.C. § 3729(a)(1).

17      38.    The False Claims Act provides, in pertinent part, that any person who

18  "knowingly presents, or causes to be presented, a false or fraudulent claim for

19  payment or approval … is liable to the United States Government for a civil

20  penalty of not less than $5,000 and not more than $10,000, as adjusted by the

21  Federal Civil Penalties Inflation Adjustment Act of 1990 … plus 3 times the

22  amount of damages which the Government sustains because of the act of that

23  person." Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990,

24  as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461

25  (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil

21

penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

39.   The terms "knowing" and "knowingly" mean that "a person, with respect to information— (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." There is no requirement of "proof of specific intent to defraud."

40.   The term "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property … that is presented to an officer, employee, or agent of the United States."

41.   The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery. The complaint must be filed under seal without service on any Defendant, and the complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. (See 31 U.S.C. § 3730(b).)

42.   As codified in the Patient Protection and Affordable Care Act of 2010, a claim for payment to a Federal Health Care Program that includes items or services resulting from a violation of The Anti-Kickback Statute (42 USC § 1320a-7b(b)) constitutes a false or fraudulent claim for purposes of the False Claims Act. (See paragraph (g) of 42 U.S.C. § 1320-a-7b(b)).  Furthermore, the term "Federal Health Care Program" means: (1) "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the

22

1   health insurance program under chapter 89 of title 5); or (2) "any State health care

2   program, as defined in [42 U.S.C. §] 1320a–7(h)."  (See paragraph (f) of 42 U.S.C.

3   § 1320-a-7b(b))

4   B.      THE ANTI-KICKBACK STATUTE

5        43.    The Anti-Kickback Statute (AKS) prohibits any person or entity from

6   knowingly and willfully offering, paying, soliciting, or receiving any remuneration,

7   directly or indirectly, to induce or reward a person for, inter alia, purchasing,

8   ordering, arranging for, or recommending the purchase or ordering of any goods or

9   services for which payment may be made, in whole or in part, under a federal

10  health program, including Medicare (see 42 U.S.C. § 1320a-7b).  Furthermore,

11  violations of the AKS are also subject to civil monetary penalties (see 42 U.S.C. §

12  1320a-7a)

13       44.    The AKS "seeks to ensure that referrals will be based on sound

14  medical judgment and that providers will compete for business based on quality

15  and convenience, instead of paying for ... [referrals]," OIG Advisory Op., No. 98-

16  16, November 3, 1998).  The AKS is intended to prevent arrangements that can

17  lead to the distortion of medical decision-making, overutilization of services and

18  supplies, increased costs to Federal health care programs, and unfair competition

19  (See Exhibit 2).

20       45.    For the purposes of the AKS, remuneration includes the transfer of

21  anything of value, "directly or indirectly, overtly or covertly, in cash or in kind"

22  (see 42 U.S.C. § 1320a-7b(b)(l).  The AKS has been interpreted to cover any

23  arrangement where one purpose of the remuneration was to obtain money for the

24  referral, item, or service, or to induce further referrals, or further purchase of items

25  or services.  See, e.g., United States v. Borrasi, 639 F.3d 774 (7th Cir. 2011);

23

United States v. McClatchey, 217 F.3d 823 (10th Cir. 2000); United States v. Davis, 132 F.3d 1092 (5th Cir. 1998); United States v. Kats, 871 F.2d 105 (9th Cir. 1989); United States v. Greber, 760 F.2d 68 (3d Cir. 1985), cert. denied, 474 U.S. 988 (1985), Cited in OIG Advisory Op., No. 13-07, June 24, 2013.

46.     The Department of Health and Human Services has promulgated safe harbor regulations that define practices that are not subject to the AKS because such practices would be unlikely to result in fraud or abuse (See 42 C.F.R. § 1001.952).  The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor.  However, safe harbor protection is afforded only to those arrangements that precisely meet all of the conditions set forth in the safe harbor.

47.     As codified in the Patient Protection and Affordable Care Act of 2010, a claim for payment to a Federal Health Care Program that includes items or services resulting from a violation of The Anti-Kickback Statute (42 USC § 1320a-7b) constitutes a false or fraudulent claim for purposes of the False Claims Act. (See paragraph (g) of 42 U.S.C. § 1320a-7b).  Furthermore, in accordance with paragraph (f) of 42 U.S.C. § 1320a-7b, the term Federal Health Care Program means: (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5); or (2) any State health care program, as defined in [42 U.S.C. §] 1320a–7(h)].  This amendment to the AKS clarifies "that all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act" (see 155 Cong. Rec. S10854, statement of Senator

24

Leahy).

C.     DEFENDANTS' VIOLATIONS OF THE ANTI-KICKBACK STATUTE

48.     In addition to manufacturing, marketing, selling, and licensing to sell illegal experimental devices, as more fully alleged herein, Defendants also engaged in a widespread and pervasive scheme of illegal kickbacks to relentlessly boost sales of their illegal experimental devices resulting in massive unjust enrichment. Among other improper inducements, Defendants provided inappropriate rebates for unapproved combination purchases; paid travel and training for physicians on illegal device implant procedures at cadaver training labs around the country, including in Memphis, Las Vegas, and others; based the decision to pay for travel and training on the physician's potential to create return on investment ("ROI") for the company; and provided free professional marketing and referral development services for physicians who had the potential to create ROI for the company. Medtronic also demanded that sales reps push hospitals into bulk purchases of Infuse at the ends of quarters.  Sales managers demanded at the ends quarters that high Infuse sales quotas be met by offering extra rebates, discounts, and kickbacks for volume purchases in order to increase sales numbers and market share for the product.

49.     Defendants also illegally paid kickbacks of cash, honoraria, grants, fees, "consulting fees", payments for referral development programs, market development programs, travel, lavish entertainment, and other kickbacks to physicians and publicly funded hospitals in order to divert government funds from Medicaid, Medicare, TriCare, state funds from state-funded university hospitals and from National Institutes of Health (NIH) funds from NIH-funded hospitals into their own coffers. Defendants use illegal kickbacks and quid pro quo arrangements

25

to ensure that physicians would increase their use of Medtronic's devices, ensuring that charges would be made to publicly funded insurance programs and to state funded and NIH funded programs. None of these incentives have anything to do with true scientific or medical research or with the safety of patients.

50.     Defendants use illegal kickbacks and quid pro quo arrangements to induce physicians to cause the purchasing, leasing, ordering and use, or arranging for or recommending purchasing, leasing, or ordering and use, of Defendants' devices for which payment may be made in whole or in part under Government Health Care Programs.

51.     Defendants funnel illegal payments to physicians to encourage them to implant Medtronic devices through direct payments or by inviting them to receive expensive referral development programs, otherwise described by Medtronic sales reps as "co-marketing programs", "market development programs", and Therapy Awareness Programs, or "TAP". Under this guise, Medtronic recruits physicians to dinners or conferences and pays the expenses for them and their local physician referral sources to be entertained at expensive dinners or on paid travel excursions to hear the implanting physicians give presentations in support of Medtronic devices. Under the guise that Medtronic was acting as "co-marketers", Medtronic sales reps sold these events to implanting spine surgeons as free business development, or as a way to expand their network of referring physicians in order to significantly increase their own income. At these meetings, Medtronic would give these physicians presentations related to Medtronic devices to help induce other physicians to refer their patients for Medtronic implants.

52.     Under the guise that Defendants were acting as "co-marketers,"

26

Defendants' sales force promoted these events to spine surgeons who would implant Defendants' devices as free business development, or as a way to expand their network of referring physicians, in order to significantly increase the income of these spine surgeons.  At these events, presentations related to Defendants' devices were given to referring physicians to induce referrals for implantation of Defendants' devices.

53.    These "referral development" and "co-marketing" activities were an illegal inducement, because in many cases there was no equitable commitment of resources from the spine surgeon whose services Medtronic was promoting to his or her referral sources. Some of these "co-marketing" events included joint communications (e.g., a print ad) not directly related to the event in order to entice event attendance by the referral sources, or in order to promote Medtronic products directly to the spine surgeon's referral partners.

54.    Medtronic, acting through its employees, also improperly induced spine surgeons who implant Medtronic devices ("implanting physicians") to continue using Medtronic devices or to convert their business from a competitor's product by paying implanting physicians to speak at events intended to increase the flow of referral business to the implanting physician where some of the attendees were in a position to refer business to the implanting physician. In each instance, Medtronic organized and paid for the entire cost of the event.

55.    By paying spinal surgeons to speak at co-marketing programs, Defendants improperly induced spinal surgeons to continue using Defendants' devices, or to start using Defendants' devices rather than using a competitor's device.

56.    For example, in a January 16, 2015 Medtronic sales email, a sales rep

27

from Connecticut promoted his sales team's "flawless execution" of a TAP referral marketing program for Dr. Benalcazar and it's positive ROI impact on their half-million dollar FY16 sales quota: "You bought in on the valuable impact this program could have on our business, invited the appropriate targets, held them accountable to actually showing up (that's the hardest part), and engaged them in discussions last night to ensure a high rate of procedural adoption. The work is not finished, but with the right followup and business driving activities I know we will achieve our goal of approaching $500,000 in Rialto Sales for FY16" (See Exhibit 3).

57.     For example, in an April 16, 2014 internal sales training document titled "Medtronic Cold Call", Defendants advised their sales force to create referral development programs for physicians by helping the spine surgeons to promote the use of Defendants' devices for use in Laminoplasty (orthopedic surgical procedure for treating spinal stenosis by relieving pressure on the spinal cord). The sales training document urged Medtronic sales force to promote the company's co-marketing materials on Laminoplasty services, "which include presentations designed for referring professionals and patients", to be used "to help your surgeons promote their practices and specialties in their communities" (See Exhibit 4).

58.     For example, for Dr. Ojedapo Ojeyemi at Howard University Hospital in Washington, DC, a Medtronic sales rep noted in 2012 that "referral marketing" was a sales resource, and that they were "Waiting for it to go through hospital compliance and medtronic compliance. Will need financial resources approx 15K. May need the assistance of Comarketing compliance support" (See Exhibit 5, p. 14).

28

59.     For example, for Dr. Hubert Gooch of Memorial Mission Hospital in Asheville, NC, a Medtronic sales rep noted in 2012 that a "Surgeon referral presentation" was a Resource Description to be used to help "top" a FY13 contribution of $91,667 (See Exhibit 5, p. 17).

60.     For example, for Dr. Laurent of Bon Secours DePaul Medical Center in Norfolk, VA, a Medtronic sales rep noted in 2012 that they needed a "Complete Co-marketing event in Nags Head market to drive cases due to departure of Dr. Thai" and to help "maintain" a FY13 contribution of $218,750. In the case of Medtronic marketing, the term "co-marketing" was used to infer a referral development event on behalf of the implanting surgeon (See Exhibit 5, p. 17).

61.     For example, for Dr. Matthew Lee of Tallahassee Memorial Regional Medical Center in Tallahassee, FL, a Medtronic sales rep noted in 2012 that "referral marketing" was a sales resource to help "defend" a FY13 contribution of $183,333, and that they "Had a new surgeon hand-off dinner organized by Casey Strachan" (See Exhibit 5, p. 18).

62.     For example, for Dr. Ramo of Arnold Palmer Hospital in Orlando, FL, a Medtronic sales rep noted in 2012 that "Ramo marketing dinners" for referral marketing was a sales resource to help "maintain" a FY13 contribution of $458,333 (See Exhibit 5, p. 19).

63.     For example, for Dr. Awad of Bridgeport Hospital in Bridgeport, CT, a Medtronic sales rep noted in 2012 the need to "Develop MAST MIDLIF CoMarketing" as a sales resource to help "maintain" a FY13 contribution of $229,167. The term "co-marketing" was used to infer a referral development event on behalf of the implanting surgeon (See Exhibit 5, p. 21).

64.     For example, for Dr. Dean of Mercy Medical Center in Baltimore,

29

MD, a Medtronic sales rep noted in 2012 that referral marketing was a sales resource to help "Develop" a FY13 contribution of $73,333, and that "he wants to do Co-Marketing Events with Medtronic" (See Exhibit 5, p. 23).

65. For example, for Dr. Oshtory of California Pacific Med Center in San Francisco, CA, a Medtronic sales rep noted in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $68,750, and that "He wants help driving referrals" (See Exhibit 5, p. 26).

66. For example, for Dr. Ball of San Ramon Regional Medical Center in San Ramon, CA, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $137,500, and that the company should "Continue referral marketing programs in the Walnut Creek, Pleasonton area" (See Exhibit 5, p. 27).

67. For example, for Dr.'s Duke and Forage of St. Rose Dominican Siena Campus in Henderson, NV, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource, and that with respect to these doctors, "Driving pt's to any surgeon will increase our business through a leveraged business partnership model. this will overcome just about any obstacle". Other entries by the Medtronic sales rep in 2012 stated that a sales resource was "Referral Marketing Dinners any spine referring physician", and on a "Monthly Basis w/ Referral Sources". Another entry by the Medtronic sales rep for Dr. Forage in 2012 stated simply "Referral Drivin [sic] business" (See Exhibit 5, p. 28).

68. For example, for Dr. Moza of Thousand Oaks Surgical Hospital in Thousand Oaks, CA, a Medtronic sales rep wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $916,667, and wrote "develop referral base" (See Exhibit 5, p. 29).

30

69.     For example, for Dr. Onibokun of Elmhurst Memorial Hospital in Elmhurst, IL, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource, and that the doctor was "Starting at new hospital with new group so need to get busy. Have five referral meeting set up over the next two months (See Exhibit 5, p. 32).

70.     For example, for Dr. Russo of Spectrum Downtown hospital in Michigan, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "Top" a FY13 contribution of $37,500, and wrote "Develop marketing plan to drive peds scoli business to surgeon", referring to gaining new pediatric scoliosis clients (See Exhibit 5, p. 32).

71.     For example, for Dr.'s Citow, Alzate, and Erickson at Advocate Condell Medical Center in Libertyville, IL, a Medtronic sales force wrote in 2012 that they were "Having a dinner meeting with Executives from Accelerated Rehab to establish a referral network to The American Center for Spine and Neurosurgery. This could be a huge new source of referrals". Part of the plan was to "Defend" a FY13 contribution of $91,667 (See Exhibit 5, p. 34).

72.     For example, for Dr. Ahmad Latefi of North Shore University Hospital in Lynbrook, NY, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "Top" a FY13 contribution of $641,667, and wrote that the doctor "Wants to continue building his practice through referral talks and presentations" (See Exhibit 5, p. 37).

73.     For example, for Dr. Rohit Verma of North Shore University Hospital in Great Neck, NY, a Medtronic sales rep wrote in 2012 that referral marketing was a sales resource to help "Top" a FY13 contribution of $229,167, and wrote that the doctor "Wants to continue promoting his practice through a series of

31

smaller presentations and dinners with a general spine overview along with case presentation" (See Exhibit 5, p. 37).

74.    For example, for Dr. Daniel Brandenstein of Southside Hospital in Bay Shore, NY, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $275,000, and wrote that the doctor was "Interested in growing his practice through co-marketing events" (See Exhibit 5, p. 37).

75.    For example, for Dr. Alexios Apazidis of Brookhaven Memorial Medical Center in Patchogue, NY, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $183,333, and wrote that the "Surgeon would like assistance in Marketing events to help grow his practice" (See Exhibit 5, p. 37).

76.    For example, a Medtronic sales planning spreadsheet for 2011 stated that there were two co-marketing referral development events planned to help meet a quarterly sales quota of over $809,000 for the Glendale and Pasadena, CA territory: "Event for Dr Fineman combined with Dr Ashford. It is a dinner with a group of PCP's in Pasadena"; and "PCP lunch for Dr Falkinstein with the internal med and family practice doctors of Lakeside Medical" (See Exhibit 6, p. 5).

77.    A 2014 Medtronic sales planning event for 2015 stated that there were two co-marketing referral development activities planned: "Dr. Duffner in Palm Springs may branch out on his own and will need marketing support"; and "Dr. Mahoney OLIF marketing campaign" (See Exhibit 7, p. 1).

78.    Payment for "referral development programs" and the provision of travel, meals, and other incentives to increase referrals to a physician for the use of Medtronic Spinal devices is inappropriate and illegal.  For example, according to

32

the federal Health and Human Services Office of the Inspector General (HHS OIG), paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business. See, e.g., 68 F.R. 2378 "these arrangements potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business."

79.    "Referral Development Programs" were offered as a free service for physicians, clinics and hospitals who agreed to implant Medtronic devices. These Referral Development Programs are professional marketing programs designed by marketing professionals to assist clinics and hospitals to build and maintain referral relationships with other doctors. Essentially, Referral Development Programs are designed to "grow the market" of patients coming to the clinic and involve a series of expensive services. These services include but are not limited to the following: Analyzing a clinic's current referral trends, creating networking and marketing opportunities for the clinic's physicians to meet with their referral physicians, and sending marketing representatives into the field to do one-on-one direct marketing with a clinic's referring physicians.

80.    Medtronic appears to have offered most of its Referral Development Programs for free to their customers who agreed to implant Medtronic's spine devices by using in-house Medtronic sales representatives to do the referral development work (Quid Pro Quo). Medtronic personnel called went into the spine surgery field to offer the same expensive dinner programs, free travel, and other perks that were being offered to implanting physicians to their referral physicians who would promise to refer their spine patients for Medtronic implants. By 2012, free Referral Development Program services had become such an integral part

33

Medtronic's business development that the company created and implemented sales tracking spreadsheets to track the promotion of these programs. These personnel were required to push Medtronic spine implant products with this large referral physician population, and they were also required to grow the referral physician networks for each implanting spine surgeon. Here, it is important to note that these referral programs were designed to offer kickbacks to a large population of new physicians – not just the current implanting "users" of the devices, but also to their referral partners. Clearly, the goal was to expand and grow Medtronic's market share for its spine implant devices.

81.    Several professional marketing companies offer fee for service Referral Development Programs for clinics and hospitals. These professional marketing companies quote general dollar figures ranging from approximately $1,000 per month to do arms-length referral contacting up to $60,000 to $70,000 in startup data acquisition costs averaging plus up to an additional $5,000 per month.

82.    Comparatively, these Referral Development Program figures are conservative compared to the fraudulent Defendants conduct in supporting its loyal implanters by "rounding up" their referral physician partners for expensive dinners and paid travel. Furthermore, even at these conservative rates, a two-year program of referral development could cost a clinic at least $24,000 to $108,000 dollars which results in a tremendously valuable illegal inducement for Medtronic's loyal implanting partners. Unfortunately, a very large percentage of the additional revenue to pay for this egregious form of illegal inducement conduct was going to come from government healthcare payors such as Medicare.

D.    DEFENDANTS' ILLEGAL REBATE SCHEME

83.    There are no safe harbors for illegal experimental products, at any

34

price, including a discounted price.  While there is a safe harbor for discounts on legally marketed products, including rebates, Defendants entered illegal discount/ rebate agreements to induce sales of their illegal experimental products, a violation of the AKS.

84.    Section (h) of the safe harbor regulations (42 CFR 1001.952(h)) sets forth the conditions under which a "discount" for items or services would not violate the AKS.   Buyers (e.g., hospitals) would qualify for the safe harbor as long as the buyers comply with the applicable standards of paragraph (h)(1) of the safe harbor regulations.  A seller would come under the safe harbor as long as the seller complies with the applicable standards of paragraph (h)(2) of the safe harbor regulations.

85.    A "rebate" is a type of discount that could fall under a safe harbor. According to section (h)(4) of 42 CFR 1001.952: "For purposes of this paragraph, a rebate is any discount the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale."

86.    However, according to section (h)(5)(ii) of 42 CFR 1001.952: "The term discount does not include … Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology. …  Other remuneration, in cash or in kind, not explicitly described in paragraph (h)(5) of this section."

87.    On October 20, 2000, the Department of Health and Human Services

35