C. Brooks Cutter (SBN 121407)
bcutter@cutterlaw.com
John R. Parker, Jr. (SBN 25776)
jparker@cutterlaw.com
Celine Cutter (SBN 312622)
ccutter@cutterlaw.com
**CUTTER LAW P.C.**
401 Watt Ave., Sacramento, CA 95864
Phone: (916) 290.9400
Fax: (916) 588.9330

Mychal Wilson (SBN 236189)
mychal@mychalwilsonesq.com
**THE LAW OFFICE OF MYCHAL WILSON**
2425 W. Olympic Blvd., Suite 4000-W
Santa Monica, CA 90404
Phone: (424) 252-4232
Fax: (310) 424-7116

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.: 15-cv-01212 JAK ASX |
| and | |
| THE STATES OF ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA. LOUISIANA, MASSACHUSETTS, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK. NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, | **THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

TEXAS, VIRGINIA, WASHINGTON, AND WISCONSIN

ex rel.

THE DAN ABRAMS COMPANY LLC,

   Relator,

vs.

MEDTRONIC PLC, MEDTRONIC INC., MEDTRONIC SOFAMOR DANEK USA, INC., WARSAW ORTHOPEDIC, INC., MEDTRONIC SOFAMOR DANEK DEGGENDORF GMBH, AND MEDTRONIC PUERTO RICO OPERATIONS CO., HUMACAO,

   Defendants

## I. INTRODUCTION

1. Relator The Dan Abrams Company LLC, is informed and believes, and thereon alleges the following Complaint against Defendants.

2. Defendants Medtronic plc, Medtronic, Inc., Medtronic Sofamor Danek USA, Inc., Warsaw Orthopedic, Inc., Medtronic Sofamor Danek Deggendorf GMBH, and Medtronic Puerto Rico Operations Co., Humacao are medical technology companies that develop, produce, market, sell, and distribute medical devices and implants used in the treatment of the spine (hereinafter "Defendants" or "Medtronic").

3. This case is about fraud that the Defendants perpetrated on public health insurers such as Medicare. Medicare and other public health insurers reimburse

1   hospitals for surgeries in which Defendants' devices are used, including for the cost of

2   the devices themselves. But Medicare will not reimburse for devices that are not legally

3   on the market, so Defendants lied to the FDA about the purpose of the devices to get

4   the devices approved and on the market with the appearance of legitimacy. Then

5   Defendants turned around and lied to doctors and hospitals by failing to disclose that

6   the devices were not approved for their <u>one, actual, viable use</u>. When the hospitals

7   sought reimbursement from Medicare, Medicare approved the reimbursement because

8   the web of predicate lies was concealed by these legitimate-seeming transactions. All

9   Medicare saw was a request for reimbursement for an approved device.

10       4.    A list of the Subject Devices at issue in this case is attached hereto as

11   Exhibit 1.

12       5.    This is not a case of off-label use. Off-label use occurs when a drug or

13   device has a legitimate approved purpose, such as when birth control is prescribed to

14   help with acne. In this case, the devices CANNOT be used for their approved purpose,

15   and were not tested for their one viable use. Whereas birth control, for example, has

16   been extensively clinically tested and been found safe and effective for that use, while

17   also having a side effect of clearing acne, these Subject Devices have not been clinically

18   tested for their one viable use, and they have no other possible uses. This is not like

19   prescribing a prescription drug off-label, it is like submitting an untested drug for FDA

20

approval under the name of a tested prescription drug, then selling it under the name of another prescription drug, and not telling doctors, hospitals, or patients that they are putting untested drugs in the patients' bodies, watching the patients suffer dire consequences, then asking the American taxpayer to foot the bill.

6.      What Defendants did – selling devices with false or misleading labeling – is technically known as "misbranding." This misbranding was not a predicate for off-label use; it was a predicate for selling the devices in the first place. It is illegal to sell unapproved spinal devices even if they have a label saying they are a different kind of approved device. Without putting a false label on their devices, Defendants would not have been able to obtain FDA approval or sell their devices at all, and would have lost significant market share to their competitors.

7.      As alleged herein, Defendants caused thousands of false claims to be made on federal and state health benefits programs. Since at least 2003, Defendants engaged in a national, highly-sophisticated bait-and-switch scheme to traffic and promote sham-labeled spinal implants ("Subject Devices") into U.S. operating rooms by labeling them with the brand names of legitimate FDA-approved products. Among the Subject Devices are modular vertebral body replacement (VBR) devices made of non-bone material called polyetheretherketone (PEEK). The Subject VBR Devices are designed to replace vertebrae and/or discs in the smallest, most dangerous region of the spinal

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 4

1    column, called the cervical spine, located in the neck. However, the Subject Devices

2    were approved and labeled for uses in the less dangerous region of the back, where they

3    would actually not fit. In this way, Defendants' labeling omitted material facts and

4    safety information about the actual device-use risk profile when used in the neck.

5         8.    These Subject Devices were molded and formed from non-bone

6    polyetheretherketone (PEEK) substrates, in identical dimensional specifications and

7    characteristic of Defendants' previously FDA-approved cervical spinal products made

8    of cadaver bone (allograft). But cervical spinal implants made of non-bone materials

9    like PEEK were not FDA-approved and required that they be subjected to time-

10   consuming and costly evidence-based clinical trials through FDA's most rigorous

11   pathway to market called premarket approval (PMA). By the end of 2003, Defendants

12   recognized that competitors DePuy and Synthes (which later merged) had already

13   grabbed a large portion of the global cervical VBR device market.

14        9.    Seeking to become the global leader of cervical spinal products,

15   Defendants rushed the non-bone cervical spinal products and surgical instruments into

16   the market through their Rapid Development division, foregoing the time ordinarily

17   taken to test a medical device to insure it was safe to use in the cervical spine.

18   Defendants set aside public safety, and ignored laws and regulations that strictly

19   prohibited the sale of non-bone cervical spinal implants without pre-market approval.

20

1  Defendants modified their non-cervical PEEK devices into sizes and shapes that can

2  only fit into the cervical spine of the neck, but branded them with device names of their

3  cervical products "Cornerstone" and "Anatomic" made from cadaver bone that the FDA

4  had approved (Exhibit 2).

5      10.      Through their fraud, Defendants profited at the expense of public safety

6  and welfare by:

7      (a) knowingly disregarding Food and Drug Administration ("FDA") regulations

8      requiring that medical devices not be labeled with false, misleading information

9      in any particular or omit material facts and safety information;

10     (b) knowingly disregarding FDA regulations concerning promotion of devices

11     and required disclosure regarding non-FDA approved uses from regulatory

12     authorities, prospective human subjects in sham research studies while

13     concealing such disregard from regulatory authorities;

14     (c) knowingly distributing the Subject Devices using false or misleading

15     labeling, including advertising and instructions-for-use that would harm the

16     patient if actually used in that way;

17      (d) knowingly mispresenting to physicians and patients the absence of

18     evidence-based clinical data regarding the safety, effectiveness and/or

19

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 6

legitimate substantial equivalence of the Subject Device use in the cervical spine;

 (e) knowingly concealing from physicians and patients the actual device-use risks and safety profile of the Subject Device uses in the cervical spine;

(f) improperly sponsoring and disseminating study publications that did not comply with FDA Good Reprint Practices by:

> (i) not disclosing that Subject Device uses in the cervical spine were not FDA-approved and/or were contraindicated on the device labeling;

> (ii) not disclosing financial conflicts; and

> (iii) not reporting truthful and accurate morbidity severity data such as catastrophic device-use related injuries, including numerous patient deaths;

(g) paid illegal financial inducement to physicians to attend seminars, for "consulting," but in fact were arranged to expose physicians to intensive hands-on training demonstrations to promote use of the Subject Devices for non-FDA approved uses and indications; and

(h) paid illegal financial inducements to promote and influence surgeon practice patterns involving the Subject Devices for non-FDA approved uses and indications

11.     Some of the Subject Devices cannot physically be used for their FDA-approved uses because of how they are sized and shaped. Other Subject Devices are only sold and used in unapproved uses in the neck; use of these Devices in the neck is contraindicated because of risk of serious harm associated with the Devices. The labeling for these devices contraindicates use in the neck because Defendants never performed validated studies to qualify use of these devices in the cervical spine (neck), a fact which they concealed from their customers. Doctors therefore had no clinical evidence that use of these devices in the neck would actually be safe and effective. As a consequence, their use in the cervical spine amounted to nothing more than Russian Roulette. The device labeling falsely represented they were either for use in the back below the neck, <u>or not for use in the spine at all, when in fact this is the only way they could ever be used</u>. Defendants omitted material safety information including the risk of known device-related injuries such as quadriplegia and death.

12.     Despite the lack of valid clinical evidence showing that the Subject Devices would work safely, Defendants trained and instructed sales representatives to sell the Devices for uses that were not approved by the FDA, and instead to sell them exclusively for the <u>contraindicated use</u> on the device label! Doctors relied on Defendants' representations that use of these devices was permissible. In fact, Defendants' technique guides explicitly demonstrate how to implant the devices for

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 8

1   these unsafe, untested, unapproved uses. Defendants' hubris was so great that some

2   devices, though clearly designed and distributed by Defendants' sales force solely for

3   use in the spine were labeled as <u>not to be used in the spine</u>.

4        13.   Defendants' mislabeling of the Subject Devices duped physicians,

5   hospitals, patients – everyone. One look at the Subject Devices and device names (i.e.

6   "Cornerstone" and "Anatomic" both equated to cervical devices in Medtronic's

7   branding convention) conveyed to their sophisticated surgeon customers exactly what

8   part of the spine they were to be used in (cervical). However, the labeling information

9   was not consistent with the manner in which the devices were actually designed, sold

10  for, and used. This mislabeling caused patients to be denied informed consent, and

11  doctors to implant these devices for uses that were never tested in a valid scientific

12  manner, therefore resulting in many device-related injuries. Medtronic billed the

13  hospitals for these devices, and the hospitals obtained reimbursements from public

14  health benefits programs such as Medicaid and Medicare.

15       14.   Defendants exploited a common hospital practice by which devices are

16  ordered directly from Medtronic to accommodate specific spinal procedures. Many of

17  these devices were not FDA-approved and, in the case of cervical corpectomy

18  procedures, the devices were labeled <u>contraindicated for the very procedure in which</u>

19  <u>they would be used</u>. Medtronic's representatives took these orders by e-mail, phone or

20

_____

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 9

fax, scheduled the date and time of the surgeries into their sales calendars, and sent a company sales representative that walked the Subject Devices directly into the operating rooms. When sales representative arrived at the operating room, the patients had already been prepped for surgery, had their spines surgically exposed, and were prepared for implantation of the Subject Devices. Medtronic provided the sales representative with a separate suitcase full of Medtronic spine devices, one suitcase for each separate device diameter size. Some Medtronic suitcases were called "cervical suitcases" because the diameters of the devices they contained were only for use in the cervical spine. The Medtronic sales representative then unboxed the Subject Devices, discarded the packaging and labeling, and handed the Subject Devices and/or specialty surgical instruments to the scrub tech, who in turn handed them directly to the implanting spine surgeon, who then implanted the devices into the patient's spine. It is important to note that the same Medtronic sales representative that walked the devices into surgery is the person who made a sales commission on the sale of the subject devices to the hospital and is the same sales representative who took the doctors out for expensive meals and entertainment. The hospital, in turn was reimbursed by Medicaid, Medicare, a private insurer, or through some private pay arrangement for the device and the surgery. At no point in this process did anyone from Medtronic warn the doctor or the hospital or the patient that their spine devices had never been approved, or cleared,

or tested, or in some cases were contraindicated for the very uses for which they were being implanted.

15.     The Subject Devices are expensive, costing up to $15,000 each. In addition, the surgeries to implant the devices, the hospital stay for patients to recover, and the drugs used during and after the surgery can mean that the total cost for treatment with one of the Subject Devices can be well over $150,000. Medtronic's contraindicated cervical spine devices are far more expensive and profitable than the alternative, FDA-approved cadaver bone implants that the Defendants themselves had deemed to be the "Gold Standard" (Exhibit 3). These cadaver bone spacers and strut grafts routinely cost less than $1,000 (Exhibit 4).

16.     The medical device industry is regulated by the FDA. Pursuant to the Food, Drug and Cosmetics Act, 21 U.S.C. § 301 et seq., the FDA strictly regulates the content of consumer- and physician-based advertising, direct-to-physician product promotion, and device labeling information used by medical device companies in promoting and selling FDA-approved devices.

17.     In this way, Defendants knowingly sold Subject Devices that were misbranded and adulterated. *See* 21 U.S.C. §), 351(e)-(f), 352 (a). Selling misbranded and adulterated devices is explicitly prohibited. *Id.* at § 331.

18.     So successful were Defendants' schemes, the sale of the Subject Devices

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 11

quickly eclipsed sales of their less-profitable cadaver bone product offerings, though the Subject Devices were never FDA-approved for any use in the cervical spine or in some cases for any use in the spine itself. In order to ensure that Medtronic would capture a large amount of market share away from the legitimate cadaver bone devices, Defendants illegally provided monetary and other incentives for physicians who were willing to use the Subject Devices. Defendants funneled money to physicians in the form of free referral services, consulting agreements, travel, large royalty payments, and dining. These payments induced physicians to use the Subject Devices, forming a quid pro quo relationship of payments and entertainment for device sales and implants, and therefore constituted illegal kickbacks. Federal laws and regulations governing Medicaid and Medicare and similar state statutes prohibit medical device companies from providing kickbacks to physicians and medical care providers. 42 U.S.C. § 1320a-7b(b)(2)(B). To conceal the nature of the kickback payments from insurance carriers and patients, Defendants entered into contractual agreements with doctors and hospitals to provide financial inducements through significant rebates on the Subject Device sales. The compensation paid was based on the number of Subject Devices that were sold to and used by the customer physicians and hospitals.

19. **Effects of the scam**. Had CMS and other health benefit payors known the true facts regarding (a) the sale of mislabeled devices for their contraindicated use, (b)

the dubious, sham studies surrounding their unapproved uses in the cervical spine and (c) the payment of kickbacks to induce the sale, study and promotion of those devices, they would not have paid the claims.

20.     When Defendants present physicians with false or misleading information about the approved uses of the Subject Devices and encourage physicians to use the Subject Devices for dangerous, unapproved, and contraindicated uses, Defendants cause physicians and health care facilities to submit bills for payment that are based on fraud and are thus ineligible for reimbursement under government health care programs. Defendants also cause physicians and health care facilities to place unwitting patients in peril by using devices for untested and unsafe contraindicated uses.

## II. PARTIES, JURISDICTION, AND VENUE

21.     Relator The Dan Abrams Company LLC is a citizen of the United States. The Dan Abrams Company LLC's member, Bryan Shapiro, has worked in medical device sales since 1998, and specialized in spinal device sales since 2001. Mr. Shapiro worked for Defendants as a spinal specialist from 2003-2016, selling spinal implant devices, including the Subject Devices, to providers in the Southern California region. Mr. Shapiro was one of the most successful spinal sales representatives in the company and trained more than 20 sales associates. While working for Defendants, Mr. Shapiro developed firsthand knowledge of the acts set forth in this Complaint concerning the

1   activities of Defendants. Relator's knowledge and information is independent of, and

2   materially adds to publicly disclosed information regarding Defendants' spinal device

3   business. Relator is the original source of all the allegations contained in this Complaint.

4   There has been no public disclosure of the allegations contained in this complaint prior

5   to filing this case.

6       22.     Defendant Medtronic plc has its headquarters in Dublin, Ireland.

7   Defendant Medtronic, Inc. is a Minnesota corporation, and is a subsidiary of

8   Medtronic plc. Defendant Medtronic Sofamor Danek USA, Inc. is owned by

9   Medtronic, Inc., and is located in Memphis, Tennessee. Defendant Warsaw

10  Orthopedic, Inc. is owned by Medtronic, Inc., and is located in Warsaw, Indiana.

11  Defendant Medtronic Sofamor Danek Deggendorf GMBH is owned by Medtronic,

12  Inc., and is located in Deggendorf, Germany. Defendant Medtronic Puerto Rico

13  Operations Co., Humacao is owned by Medtronic, Inc., and is located in Humacao,

14  Puerto Rico.

15      23.     Throughout this Complaint, Medtronic plc, Medtronic, Inc., Medtronic

16  Sofamor Danek USA, Inc., Warsaw Orthopedic, Inc., Medtronic Sofamor Danek

17  Deggendorf GMBH, and Medtronic Puerto Rico Operations Co., Humacao, are

18  collectively referred to as "Defendants" or "Medtronic."

19      24.     Defendants are the world's largest manufacturer of spinal implants.

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 14

Defendants' estimated U.S. sales of spinal implants were greater than $2 billion in 2013. The Defendants caused the federal and state governments to allow or pay claims for surgeries to implant Defendants' Subject Devices. Defendants purposely sold the Subject Devices for unapproved, contraindicated uses. Defendants knew that doing so was unsafe, fraudulent and illegal, and therefore excluded from Medicare and other government insurance coverage.

25.     Defendants do business in the Central District of California and maintain offices in the Central District of California. Defendants also caused false claims to be made or certified in the Central District of California.

26.     At all times relevant to this Complaint, Defendants manufactured, marketed, sold, licensed to be sold, and caused Subject Devices to be implanted into thousands of patients, through a network of sales representatives who called on hospitals and other health care providers throughout the United States, and who were present in the operating rooms of virtually every hospital in the United States, every day, and were physically present at virtually every surgical procedure relating to Defendants' spine and biologics products.

27.     Relator also brings this action on behalf of the States of Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan,

Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and Wisconsin, or any applicable subdivision thereof (hereinafter, collectively referred to as the "States") under the Federal False Claims Act, 31 U.S.C. §§ 3729-3732; as well as the False Claims Acts of the above listed States.

28.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §§ 3729 and 3732, which provide that the United States District Courts shall have exclusive jurisdiction of actions brought under the False Claims Act, and FCA multi-defendant jurisdiction pursuant to 31 U.S.C. §3732(a). Pendent and supplemental jurisdiction over the claims pursuant to the State FCA's are conferred by 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b). Venue and jurisdiction are proper in the United States District Court, for the Central District of California pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732 (a).

29.     Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729 et seq., and similar state and city statutes, the Relator has provided the government with a confidential disclosure statement and exhibits to substantiate the allegations.

### III. FACTS

30.     Cervical spondylotic myelopathy (CSM) is the most common spinal disorder among the aging North American population. To capture this highly-lucrative

---

cervical spine market, Defendants hatched a systematic, highly sophisticated and complex fraudulent marketing and research scheme. As described below, the scheme is devised of several component arms:

(a) Defendants trafficked cervical spinal devices through a bait-and-switch device naming strategy involving spinal implants that were mislabeled for bogus uses in the less dangerous region of the back;

(b) Defendants engaged key-opinion-leaders (KOLs) through financial inducements to promote and publish studies on the unapproved uses in the cervical spine;

(c) Defendants made payments to physicians in the form of illegal kickbacks to induce and influence Subject Device uses that were not approved by the FDA;

(d) Defendants made payments to hospitals in the form of illegal rebates to induce and influence Subject Device uses that were not approved by the FDA; and

(e) Defendants made payments in the form of royalties for devices claimed to be for use in the back -- but, were in fact, designed solely for unapproved uses in the cervical spine of the neck -- as a form of inducements to influence other surgeons to use the Subject Devices for non-FDA approved uses.

31.     Defendants' fraudulent scheme proved wildly successful. In the 1990s,

1    Medtronic's legally marketed cadaver bone "Cornerstone"-branded cervical spacers

2    had firmly been established as the "Gold Standard" for cervical implants, according to

3    the company (Exhibit 3).  But sales of the Defendants' Subject Devices quickly

4    supplanted those cadaver bone sales, attaining the coveted status of top-selling non-

5    bone cervical devices purchased in the U.S., though the device labeling expressly

6    contraindicated such uses.

7       32.     Although Defendants did not directly sell to federal and state insurance

8    programs or prescribe the Subject Device uses in the cervical spine, Defendants

9    embarked on a course of unlawful conduct that they knew would lead to the

10    submission of thousands of claims involving uses of the Subject Device that were not

11    eligible for federal or state health program reimbursement. Defendants knew their

12    actions would inevitably cause healthcare providers to submit false claims to the

13    federal and state governments. Accordingly, Relator Dan Abrams LLC seeks to hold

14    Defendants liable for knowingly causing these false claims to be presented to the

15    United States for payment in violation of 31 U.S.C. § 3729.

16       33.     As set forth more fully below, Defendants pursued unlawful marketing

17    goals and fraudulent research for the Subject Devices by promoting them for uses that

18    the FDA documented as not safe, effective or substantially equivalent to any legally

19    marketed devices, and therefore not eligible for reimbursement by public insurance.

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 18

A.   <u>Background Information on the Spine, Spinal Surgery, and Spinal Devices</u>

*1. Spinal Fusion Surgery*

34.   The spine is composed of individual bones called vertebrae. A vertebra has two parts that surround and protect the spinal cord: the vertebral arch, and the vertebral body. The vertebral body is the box-shaped, main, weight-bearing part of a vertebra on the front (anterior) part of the spinal cord. Vertebral bodies are separated from each other by intervertebral discs, which are not bones. The discs act as cushions or shock absorbers and allow motion between the vertebrae. As these discs in the spine grow older, they begin to dry out and calcify, which causes them to compress and thus causes the space between the vertebrae to close up. This puts added stress on the cartilage that keeps the joints in the spine working properly and causes the cycle of degeneration to continue. Disc degeneration can also lead to a herniated disc, which can put additional pressure on the spine by pressing against the spinal cord or nerve roots.

35.   To treat disc degeneration, there are two types of commonly performed spinal fusion procedures. One is called "<u>interbody fusion</u>" and consists of removing a degenerated disc and replacing it with an implant, sometimes called a spacer. In this procedure, the surgeon places a relatively small device in the disc space between the vertebral bodies, where the disc would normally be, hence the name "interbody" and

_____

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 19

1   "spacer."

2   36.   The second procedure is called a "vertebral body replacement," "VBR" or

3   "corpectomy." It is a more complex procedure than an interbody fusion, because it

4   consists of removing the entire vertebral body (the box-shaped bones) as well as the

5   discs above and below it and replacing them all with the same "dime-sized" diameter

6   (or footprint) device, but that is longer in span (or taller) to match the taller height of

7   the surgically removed vertebra. The implanted corpectomy device must perform the

8   function of structural bone (the vertebral body), so its main feature is a structural

9   component called a "strut." The strut must bear the weight of the body and hold it up

10  against the force of gravity, just as the bone would do. Vertebral body replacement and

11  interbody fusion are not the same, nor are the devices for these procedures

12  interchangeable.

13  37.   The cost of a corpectomy procedure can range from $25,000 to more than

14  $150,000. Patients typically spend 4 – 5 days in the hospital and need weeks of narcotics

15  and physical therapy thereafter. The device itself can cost $5,000-$15,000. Spinal

16  corpectomy surgery causes much more blood loss and has higher morbidity compared

17

18

19

20

1   to interbody fusion.[1]

2   38.     For interbody procedures, the implants are commonly referred to as

3   "spinal cages" or "spacers." Spinal cages used in corpectomy are called corpectomy

4   cages or VBR devices. Corpectomy cages can be modular (or stackable), like

5   Defendants' Verte-Stack devices, with a central strut to replace the vertebral body,

6   and end caps to replace the interbody discs.

7   39.     There are three regions of the spine where these spinal devices are

8   implanted in fusion procedures: cervical (neck), thoracic (upper back), and lumbar

9   (lower back). The thoracic and lumbar regions are sometimes referred to as one entity,

10  the "thoracolumbar" spine. Spinal cages are designed to fit the anatomic features

11  unique to each specific region of the spine. Each region is uniquely curved, and the

12  devices must match the direction and degree of curvature to maintain proper

13  alignment.

14  40.     Spinal cages designed to fit into the smaller cervical spine cannot

15  possibly be used in the larger regions of the spine. Likewise, spinal cages designed for

16  use in the thoracic or lumbar spine cannot be used in the cervical spine because they

17

18  _____

19  [1] Han Y-C, Liu Z-Q, Wang S-J, Li L-J, Tan J (2014) Is Anterior Cervical Discectomy and Fusion Superior to
    Corpectomy and Fusion for Treatment of Multilevel Cervical Spondylotic Myelopathy? A Systemic Review and Meta-
20  Analysis. PLoS ONE 9(1): e87191.

are too big. Using spinal cages that do not fit properly can result in biomechanical instability,-spinal misalignment, as well as potential catastrophic injuries (like quadriplegia and death) and patient maltreatment. This is particularly true in the event of device-related failures in the cervical spine. The cervical spine is the smallest and most dangerous region of the spinal column, housing vital neurovascular and airway structures in a very confined space unique to the neck. Accordingly, spinal cages must be in design constructs and dimensions designed to match a specific region of the spine, otherwise there is a greater risk of injury from cage migration, expulsion or dislocation (See Exhibit 5, graphical representation of spinal cage footprints and vertebra sizes). A surgeon must implant these different shape and size devices using different shapes and sizes of tools, just as a mechanic uses different wrenches for different nuts and bolts. It is not a one-size-fits-all situation.

41.     The majority of spinal implants and other spinal devices are used for spinal fusion surgery, with approximately 50% of all spine surgeries being lumbar fusion and approximately 37% being cervical fusion, with very few thoracic fusions.[2]

*2. Surgery and Devices in the Cervical Spine*

_____

[2] *See* Orthopedic Network News, 2013 Spinal Surgery Update, Vol. 24, No. 4, October 2013 (Exhibit 3).

42.     The neck region is called the cervical spine. It consists of seven small vertebrae – known as "C1-C7" – most of which are box-shaped. The cervical spine is critical to all movement of the human body because the cervical vertebrae protect the brain stem, nerves, and spinal cord. They also support the skull and allow for a wide range of head movement. The cervical spine is the most mobile part of the spine; it twists and turns with the movement of the head, whereas the thoracic and lumbar spine have a much more limited range of motion. An injury to the cervical spine can result in partial or total paralysis, or even death.



43.     The cervical spine has a slight lordotic curve – it curves slightly inward. Defendants' Subject Devices designed for use in the cervical spine have a trapezoidal or D-shaped footprint to fit the available box-shaped surface area of the cervical spine,

and to address the close proximity of the spinal cord, neurologic, vascular and airway structures. Cervical spinal cages are typically wedge-shaped, with slight degrees of lordosis to conform to the lordotic curvature found in the neck. Pictured here are some of the Subject Devices. They are clearly designed for use in the neck because they have a trapezoidal footprint, a slight lordotic curve, and are very small. These Subject Devices are, in fact, identical in cage geometries (i.e. size and shape) to the "Cornerstone" branded cadaver bone products that Defendants first sought FDA approval to sell for use in the cervical spine and established as the "Gold Standard" for cervical procedures (Exhibit 3).

44.     Defendants subject devices and cadaver bone Cornerstone products can only be implanted by way of an anterior (frontal) approach in the neck. Therefore, they have just one insertion hole, where the surgeon's tool connects to the device for implantation. On the Devices pictured above, the insertion hole is on the anterior side. The tools used for the anterior approach for cervical surgeries are small, delicate, and have short shafts since the distance from the skin to the cervical spine is very short. Most cervical surgeries are performed under a microscope, with a small incision, so the field of vision must not be obscured by a bulky tool.

45.     Because the cervical spine is the most mobile and dangerous region of the spine, the FDA regulates devices used in this region as Class III highest risk

1  devices, which means they are subject to the most stringent regulatory requirements.

2  All Class III devices must be approved by the FDA using evidence-based clinical data

3  demonstrating safety and effectiveness for their intended uses before they are put on

4  the market. This is called pre-market approval. Under the Food, Drug & Cosmetic

5  Act, it is illegal to sell a Class III device that fails to meet pre-market approval

6  requirements without evidence-based clinical data, and disclosure of information

7  mitigating known risks of using the device for its truthful and accurate intended use.

8      46.    Cervical corpectomy devices made of synthetic material, such as the

9  Subject Devices, are Class III devices that require pre-market approval, in large part

10  due to safety concerns (See Exhibit 6). Corpectomy devices in the cervical spine carry

11  an additional source of risk over interbody fusion devices. Corpectomy devices are

12  taller in height than interbody fusion devices that replace just a disc, and thus if they

13  collapse or dislodge there is a far greater likelihood that the surrounding structures

14  like the cervical spinal cord, nerve roots, esophagus, airway and vertebral artery could

15  be damaged causing catastrophic injuries. A recent article reported that 23.4 percent of

16  vertebral artery injuries occurred during cervical corpectomy, while 9 percent were

17  attributed to cervical interbody fusion procedures.[3]

18                      ———————————————

19

20  [3] (Lunardini, David J., et al. "Vertebral artery injuries in cervical spine surgery." The Spine Journal 14.8 (2014): 1520-

    _____

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 25

47.     The cervical corpectomy procedure itself is reported as being no more effective than cervical interbody fusion, which is less complex, has less blood loss, shorter operating room times, shorter length of hospital stay, and is less costly. Medicare DRG payments from 2007-2015 for "Other Cervical Fusion of the Anterior Column" (the most common hospital billing code for cervical corpectomy procedures) totaled $3.563 billion dollars, of which Medtronic's approximate 25 percent market share in cervical spine devices would equate to over $890 million in payments from Medicare (Exhibit 7). Medicare paid over $360 million to physicians from 2006-2016 for combinations of billing codes for cervical corpectomy plus a biomechanical cage[4] for procedures on 143,493 patients. Medtronic's approximate 25 percent market share in cervical spine devices would equate to over $90 million in payments to surgeons from Medicare. (Exhibit 8).

### 3. Surgery and Devices in the Thoracic Spine

48.     Below the cervical spine is the thoracic spine. The thoracic spine supports the chest and rib cage. Thoracic vertebrae are larger than cervical vertebrae and are hemi-cylindrical in shape with rib attachments that protect all the vital organs

_____

1525).

[4] Healthcare Common Procedure Coding System code numbers 63081 and 22851.

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 26

in the chest. The thoracic spine connects with each rib to form the rib cage. The thoracic spine has a kyphotic shape – it curves outward – and consists of twelve vertebral bodies, known as T1-T12.

49.     Devices for use in the thoracic spine are shaped cylindrically to match the vertebrae and are wedge-shaped to match the kyphotic curve. Surgeons implant devices in the thoracic spine via a lateral or posterolateral approach, not an anterior approach like that used in the cervical spine. This approach is necessary in order to avoid injuring the organs housed in the chest cavity like the heart, lungs, and major blood vessels and arteries that feed those organs. Devices for use in the thoracic spine have several different insertion holes, to allow the surgeon to use different surgical approaches to implant the device.

50.     Surgical approaches to access the thoracic spine may be performed using video assistance, so the tools used in these surgeries are specifically designed to access the entire thoracic spine and chest cavity from lateral and posterolateral approaches. Alternative approaches to the thoracic spine also have significant limitations and require special tools and orientations that cannot be used in the cervical spine.

### 4. Surgery and Devices in the Lumbar Spine

51.     The third region is the lower back, called the lumbar spine. It consists of

1  the five largest vertebrae in the spine and the sacrum, called L1-L5. They are hemi-

2  cylindrical in shape and carry most of the body's weight. The lumbar spine has a

3  significant lordotic curve, and the vertebrae are much bigger in the lumbar spine than

4  in the cervical spine. Like devices in the thoracic spine, lumbar devices may have

5  multiple insertion holes to allow for a variety of surgical approaches. Tools used to

6  access the lumbar spine are heavier, chunkier, generally have longer handled shafts,

7  and are completely unsuitable for use in the cervical spine (See Exhibit 9). Devices for

8  use in the lumbar spine do not support the range of motion that a cervical device must

9  support, because the lumbar spine moves much less than the cervical spine.

10        B.      Defendants Engaged in an Extensive Mislabeling Scheme to Get Subject
                  Devices on the Market

11

12        52.      In 1997 Medtronic launched "cortical blocks" and "Select/Cortical

13  Wedge" fabricated from human cadaver bone (allograft). These allograft products

14  were machined into specific sizes and shapes designed to match and specifically fit

15  into the cervical spine. Made of human tissue materials, these products did not fall

16  under FDA regulatory controls for medical devices made from non-human tissue

17  sources. Branded with the trade name "Cornerstone," the allograft product offerings

18  include blocks, wedges and struts in specific sizes, shapes and heights to replace

19  damaged or diseased discs or vertebrae only in the cervical spine (e.g. Cornerstone

20  Select/Cortical Wedge) (Exhibit 3).

53.     In 2002, FDA cleared the first non-bone Verte-stack spinal device for
the intended use of vertebral body replacement (VBR) in the thoracolumbar spine (the
region of the back directly below the cervical spine of the neck) (Exhibit 10). The
Verte-stack construct was modular in design, consisting of a center strut that
interlocked with two adjoining endcaps. The FDA cleared the modular device only for
VBR in the <u>back</u>. The device "footprint" and dimensions were designed in sizes and
shapes to specifically match and fit the anatomy of the spine below the neck called the
thoracolumbar spine (back), a design rationale consistent with the FDA-cleared use
and indication (Exhibit 11).

54.     Beginning in 2003, Medtronic submitted a number of additional 510(k)
applications to the FDA consisting of modifications to the original Verte-stack device.
These modifications reduced the footprint size, making important changes to the shape
of the strut and end cap components to match the dimensional characteristics of
Defendant's highly successful <u>cervical</u> allograft "Cornerstone"-branded product line.
Though the FDA requires that any modifications that impact the safety, effectiveness,
intended use or indication must be disclosed in any 510(k) application, Defendants
claimed that the modifications did not impact the intended use or indication of the
original Verte-stack device. This was a blatant and deliberate lie – Defendants knew
the new devices could only be used in the cervical spine, rather than the

thoracolumbar spine like the original predicate devices. (See Exhibits 12, 13, 14, 15, 16 - pre-market 510(k) clearance orders K030736, K041197, K052931, K070173 and a copy of the labeling information submitted by Medtronic cleared by the FDA). Though designed and molded into shapes and sizes that matched or were nearly identical to those dimensions of the Cornerstone cortical bone product used and sold only for use in the cervical spine, Medtronic misrepresented and continues to maintain that the Verte-stack modifications were intended for use below the neck, in the back.

55.     The table below shows comparison of dimensions (width, depth, height) for the Cornerstone-branded cadaver bone products being nearly identical to those of the Subject Devices.

| | FOOTPRINT SHAPE | FOOTPRINT (DEPTH x WIDTH) | HEIGHT | |
|---|---|---|---|---|
| **LABELED CERVICAL FOR USE IN THE NECK** | | | | |
| **CORNERSTONE-SR ALLOGRAFT CERVICAL SPACER 1999** | **D-SHAPED**  | 11x11 11x14 14x14 | 5-9 | |
| **CORNERSTONE SELECT CORTICAL WEDGE** | **CORTICAL RING**  | 10-16 DIAMETER | 5-14 35, 50, 70 STRUT LENGTHS | |
| **LABELED NON-CERVICAL FOR USE IN THE BACK (OR NOT FOR USE IN SPINE\*)** | | | | |
| **VERTE-STACK XS [K030736] 2003** | **IDENTICAL TO CORNERSTONE SR**  | **IDENTICAL TO CORNERSTONE-SR** | **ENDCAPS 5-15** | **STRUTS 5, 25 ASSEMBLED W/ ENDCAPS 15-55** |
| **VERTE-STACK [K041197] 2004** | | | | **ASSEMBLED WITH ENDCAPS 54-74 (WITHDRAWN, BUT SOLD INTO MARKET** |
| **VERTE-STACK [K052931] 2005** | | | | **STRUTS 5, 25 ASSEMBLED W/ ENDCAPS 15-55** |
| **VERTE-STACK [K070173] 2007** | | **IDENTICAL TO CORNERSTONE-SR WITH ADDITION OF 14x16, 16x18** | | **STRUTS 5, 25 ASSEMBLED W/ ENDCAPS 15-54** |
| **HYDROSORB CORNERSTONE HSR \*** | | **IDENTICAL TO CORNERSTONE-SR** | 5-9 | |

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 31

>    1.    *Defendants did not want to spend the time or money to obtain*
>          *proper approval, because they did not want to lose the lucrative*
>          *cervical spine market. So instead, they mislabeled their Devices.*

56.     As mentioned, CSM is the most common spinal disorder among the

aging North American population. Among the available surgical practice options are

two procedures that involve the Subject Devices: (1) anterior cervical discectomy and

fusion (ACDF); and (2) anterior cervical corpectomy and fusion (ACCF). These are

two very different cervical procedures requiring use of two very different types of

device constructs. ACDF involves the use of interbody fusion (IBF) devices that

replace the damaged or diseased disc space between the bones in the neck. These

devices are fashioned in specific footprints, shapes, and heights to accommodate the

space occupying the area in between each vertebra in the cervical spine. On the other

hand, ACCF, though using the same surgical approach through the front of the neck,

is a more complex, dangerous but highly-profitable procedure involving vertebral

body replacement (VBR): replacing damaged bone in the neck along with the discs

directly adjacent to each vertebra replaced. ACCF carries a much higher risk of

morbidity with each vertebral body that is replaced.

57.     Not only did surgeons and hospitals make higher fees from ACCF

procedures, Defendants' Subject Devices used exclusively for non-FDA-approved

ACCF procedures cost many times more than other available products such as

Defendant's own allograft "Cornerstone" products or the patient's own harvested bone

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 32

1  graft that were accepted as the "Gold Standard" of practice for both ACDF and ACCF

2  procedures.

3  58.    Also driving the unapproved device use:

4  (a) surgeon reimbursements for implanting non-bone PEEK cages is higher than

5  using allograft products;

6  (b) sales representatives' commission rates are higher on the sale of non-bone

7  PEEK spinal implants than on the allograft cadaver bone products. Defendants

8  scheme all along was to supplant the "Gold Standard" and legally marketed

9  allograft "Cornerstone"-branded product offerings with more profitable, but

10  illegally marketed, non-bone spinal implants (*the Subject Devices*).

11  59.    It is evident from the FDA review of other products designed for the

12  intended use of cervical vertebral body replacement that there were serious concerns

13  about the safety and effectiveness of such novel devices. For example, the FDA has

14  only issued one exemption to PMA requirements for a device to be sold for the

15  intended use of cervical VBR. In 2000, FDA issued an exemption to PMA

16  requirements under a humanitarian device exemption ("HDE") which limits sales of

17  the device to treat conditions that effect no more than 4,000 people in the U.S.

18  annually. Defendants had set their sights far exceeding that number, and therefore did

19  not seek an HDE. Instead, Medtronic submitted the Subject Devices through the

20

1    FDA's less stringent 510(k) pathway which only required that the Defendant claim

2    that its proposed Subject Devices were merely "substantially equivalent" to other

3    legally marketed non-cervical systems intended for use in the less dangerous region of

4    the back (thoracolumbar spine).

5         60.     In 2004, Medtronic submitted 510(k) application K041197. The FDA

6    rejected the inclusion of Medtronic's 44mm lordotic (cervical) strut components,

7    concluding that the proposed product could not be determined to be "substantially

8    equivalent" to any legally marketed product. The 44mm lordotic strut is specifically

9    designed to interlock with component endcaps to form a device designed to replace

10   multiple vertebral body levels in the cervical spine. Multiple level cervical

11   corpectomy carries the highest risk of injury to patients. The greater the span of the

12   corpectomy in the neck, the higher the rate of morbidity and likelihood of device-

13   related failure, such as dislocation. (Exhibit 17). Dr. Richard Treharne, SVP of

14   regulatory affairs responded by conceding that Medtronic would remove the

15   concerning product from 510(k) considerations (Exhibit 18). Yet, the product is listed

16   to this day as being available "in commercial distribution" where it has been reported

17   to have resulted in device-related malfunctions and injuries (See Exhibits 19, 20 –

18   FDA's Unique Device Identification ("UDI") listing and Adverse Event Report for the

19   Medtronic 44mm strut). Though the device component products were never approved

20

1   or cleared by the FDA for any use whatsoever, Defendants' marketing materials show

2   the availability of the product for sale (Exhibit 21 – Medtronic catalog showing 44mm

3   strut for sale). Defendants' Key Opinion Leaders ("KOLs") also published studies on

4   the product use in the cervical spine, though never having obtained permission of the

5   FDA to sell them for any use (Exhibits 22, 23, 24). Studies involving this unapproved,

6   uncleared, unregulated device were all part of Medtronic's national scheme to

7   promote use of the Subject Verte-stack devices in the cervical spine without disclosing

8   that such use is not FDA-approved or cleared for any use and is an illegally marketed

9   device. Its use in the clinical and research settings amounts to unauthorized human

10  experimentation in the absence of FDA approval, clearance, or exemptions in effect.

11  This conduct is exemplary of Defendants' reckless and deliberate disregard to comply

12  with laws and regulations governing the sale and use of unregulated medical devices

13  in human subjects.

14      61.   In another example, in 2009 the FDA issued a warning letter concerning

15  the distribution and promotion of a cervical VBR device sold and promoted under the

16  tradename "Valeo C-VBR" by device manufacturer Amedica. The Agency found that

17  the violative device was being sold in the absence of safety& effectiveness data

18  required of an approved PMA and/or that the company did not seek an approved

19  exemption to such requirements under an IDE, therefore rendering the device

20

adulterated and misbranded (Exhibit 25). Medtronic engaged in the very identical unlawful misconduct as Amedica.

62.     In another example, in 2010 FDA rejected the down-classification of cervical vertebral body replacement devices made of bone, concluding that there were safety concerns that the device could result in additional surgeries and damage to neurovascular tissues unique to the cervical spine of the neck (Exhibit 26 – FDA rejection letter of RTI bone product down-classification).

63.     In 2011, the FDA cleared the Medtronic "Anatomic PEEK Cervical system" under clearance order K112444. Medtronic obtained this clearance by falsely claiming that it could not be used for VBR. Medtronic stated, "… dimensional changes are designed to eliminate the ability of this device to be used with the Subject Device Verte-stack Anatomic PEEK center struts…".  Center struts are the structural component of devices used in VBR. This was another lie; the combination of the two products would, in fact, not eliminate the unapproved use of the Verte-stack products in the cervical spine. In fact, the unapproved combination of the Verte-stack strut components with the Anatomic PEEK device resulted recently in a patient being implanted with the products for the very device use combinations that Medtronic claimed would be "eliminated" (Exhibit 27 – example surgical implant record).

64.     A central component of Medtronic's mislabeling scheme was to bait-and-

switch device terms like "Verte-stack Cornerstone" or "Verte-stack" with simply

"Cornerstone" or to switch "Verte-stack Anatomic PEEK" or "Verte-stack" with

simply "Anatomic PEEK". The clear intent of the switching of device terms was to

mislead doctors and hospitals about the actual regulatory status of their dubious non-

cervical spinal implants and promote the non-FDA approved use of the Subject

Devices in the cervical spine. In the 2008 Hospital Materials Management ("HMM")

newsletter covering purchasing of materials and devices for hospitals, the pricing of

the "Spacer Cornerstone PSR PEEK end pieces" is listed on page 8 (Exhibit 28). But

the Cornerstone PSR device was not cleared for any intended use by the FDA until

June 2010 under K100214. Yet HMM reports pricing information from 2005 through

2007. Everyone was duped.

65.     Defendants' bait-and-switch strategy was all part of a mislabeling device

scheme that went beyond attempting to mislead and cause confusion but turned into

outright lies and deceptive representations. Exhibit 29 (email from Medtronic District

Sales Manager Paul McClintock) shows that a Medtronic district sales manager

promoted the Medtronic "Anatomic PEEK" device for use in the cervical spine in

2009 though it had not been cleared or approved until 2011. McClintock's email states

"the anatomic PEEK is for the thoracic and lumbar cases, but because of its small size

many surgeons choose to use it in the cervical spine …"   In fact, McClintock knew

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 37

that the Anatomic PEEK was designed for cervical use but was not FDA-cleared or approved for any use in the body in 2009. McClintock lies in this email exhibit to the former UCLA spine chief Dr. Jeffrey Wang as the Anatomic PEEK did not obtain FDA-clearance to be sold for any use in the cervical spine until 2011.

66.    In another example, a 2009 study published by the American Association of Neurological Surgeons  reports that 15 patients underwent cervical corpectomy with "Cornerstone PSR" (Exhibit 30). However, the Medtronic "Cornerstone PSR" had not obtained FDA-clearance for <u>any</u> use in the body let alone the cervical spine until June 2010 (Exhibit 31). The intended use cleared by the FDA in 2010 was for interbody fusion, not vertebral body replacement. Medtronic had thus been marketing and selling the Subject Verte-stack device with labeling claiming it was the Cornerstone PSR.

67.    Defendants even used the bait-and-switch strategy in sham studies presented to investors, and in seeking patients to enroll in those studies. For example, in one solicitation Medtronic stated, "About the PEEK Interbody Spacer," adding, "The PEEK interbody spacer is cleared by the FDA as a vertebral body replacement from levels T1-L5…".  As explained, interbody spacers and vertebral body replacement devices are not interchangeable. One device replaces the disk, the other replaces an actual structural vertebra and disk. Nor are the devices used in the cervical

spine interchangeable with those used in the back (T1-L5). These statements were meant to deliberately mislead and confuse prospective patient recruits into thinking that the spinal cages were legitimate (Exhibit 32).

68.     In 2009, the company went further by informing prospective investors that the cervical IDE study advertised in this way involve the Cornerstone PSR (Exhibit 33). But the Cornerstone PSR was not approved or cleared by the FDA until June 2010 under final clearance order (Exhibit 31). The actual cervical spine study involved the use of the Verte-stack, which is labeled contraindicated for cervical use. Yet neither prospective patients nor investors were informed that the much-touted cervical study involved use of devices contraindicated for uses in the neck. Further evidencing Defendants' deliberate misconduct, internal documents obtained by relator show that the part numbers (6286xxxx) used for the study were FDA-cleared in 2005 under K052931 with cage geometries identical to the Cornerstone cadaver bone products (Exhibit 34).

69.     Though they were required to obtain an approved application for investigational device exemption (IDE) to study the Verte-stack for a new cervical indication that is contraindicated, Defendants completely disregarded the need to obtain one. Defendants only obtained an IDE for the altered dosage of the graft material used inside of the Subject Device. This kind of gross misconduct and deliberate omission of material facts and safety information from patients and investors about the cervical contraindication is the severest form of deception and violation of the public trust. In this case, 224 patients were implanted with the Subject

Verte-stack product (represented to investors as being the "Cornerstone PSR"), and 4

patients died, with 28 patients in unresolved litigation [See

https://clinicaltrials.gov/ct2/show/results/NCT00485173?term=cervical+PEEK+infuse&rank=1&sec

t=X30156#evnt].

70.    Another example of the bait-and-switch strategy that led directly to

patient harm and fraudulent billing is seen in records obtained from a 2009 Medicaid

patient, paralyzed and requiring three revision surgeries following the implantation of

Defendants' Subject Devices at University of California Irvine Medical Center.

Records show that Defendants had switched the labeling of the Subject Devices with

that of the "Cornerstone PSR" and "Cornerstone PSR Strut" yet the part numbers

(6276611 and 6276006) belong to devices cleared by the FDA as the "Verte-stack."

(Exhibit 35).

71.    It becomes clear that Medtronics' bait-and-switch strategy all along was

part of a scheme to mislead surgeons that the Subject Devices were for cervical use by

using the established "Cornerstone" branding. On the one hand, brand names like

"Cornerstone" and "Anatomic" were synonymous with Medtronic devices designed

for use exclusively in the cervical spine, yet the FDA had not given any approval for

those devices until 2010 and 2011, respectively. Instead, Medtronic used the bait-and-

switch strategy by disguising those non-cervical Verte-stack part numbers,

interchanging the Verte-stack tradename with any number of device name

combinations like "Verte-stack Cornerstone PSR" or simply "Cornerstone PSR" and "Cornerstone PSR Strut" product offerings that were labeled as non-cervical systems. If not for the bait-and-switch device name strategy and mislabeling, the Subject Devices could not possibly have found their way into U.S. operating rooms. The Defendants' bait-and-switch scheme was unprecedented.

72.     In March 2008, one of the listed inventors on the 1996 patent application for the design that Medtronic used for the "Cornerstone" and two of the inventors on the 2007 patent application for the design that resulted in the "Anatomic PEEK" non-bone devices, Kenneth Shipp and Dr. Kevin Foley, gave a presentation before the AANS/CNS Joint Conference on the average geometric shape and dimensions of the cervical endplates in patients with symptomatic disc disease. Here, the inventors of these devices showed their knowledge that the average patient had cervical endplates that would only accommodate devices that were sold in the exact sizes that Medtronic was selling as the "Cornerstone PSR", "Anatomic PEEK", "Anatomic PEEK strut", and Defendants' other cervical Subject Devices (Exhibit 36).

73.     Defendant Medtronic misbranded and sold the Subject Devices for unsafe, unapproved uses in the cervical spine, though the labeling directly contraindicated any use of the device in the neck. Defendants sold the subject devices for uses for which there was no valid evidence-based clinical data demonstrating

safety and effectiveness. Instead, Defendants mislabeled the subject devices for bogus indications below the neck in the back. The subject devices cannot be used for the labeled indications because of how they are constructed, the surgical approaches, techniques, and instruments required to implant them. However, Defendants claimed that these devices were for use in the less dangerous area of the lower back but represented that by virtue of the smaller cage geometries they "could" be used in the cervical spine in the neck. In fact, the physical cage geometries (i.e. the size and shape of the device constructs), could only fit into the smaller region of the cervical spine – they could not fit below the neck.

74.     Novel, first-of-a-kind devices that can present potential harm can reach the market by one of only three FDA pathways:

(a) obtaining an approved application for premarket approval ("PMA"), the FDA's most rigorous path, requiring validated, evidence-based clinical data demonstrating a devices safety and effectiveness;

(b) de novo.

[https://www.fda.gov/downloads/Training/CDRHLearn/UCM421766.pdf] ; and

(c) an exemption (i.e. Investigational Device Exemption ("IDE"), or Humanitarian Device Exemption ("HDE").

75.     Defendants knew the Subject Cervical VBR Devices were novel,

requiring PMA or an exemption. Such first-of-its-kind devices are required to submit clinical data demonstrating safety and effectiveness prior to gaining permission from the FDA to sell them. By claiming the Subject Devices were not for the cervical spine or not for use in the spine at all, Defendants concealed the known dangers and actual device use and risk profile.

76.     The cervical spine in the neck is the most mobile and vulnerable part of the entire spinal column. The bones and discs that make up the cervical spine are the smallest in size and unique in shape, constructed specifically to allow the greatest range-of-motion ("ROM"), that is, the ability for the head to rotate in multiple angles simultaneously. No other part of the spine has these biomechanical characteristics. In fact, specific bench-testing is required of VBR devices (Exhibit 37).

77.     Vertebral body replacement devices are not interchangeable with interbody fusion devices, which only replace a disc space, as Defendants have represented. They are no more interchangeable than trying to use a bowling ball to play golf. Additionally, the cervical spine in the neck houses neurovascular and adjacent tracheoesophageal structures and tissues that control vital functioning of the brain and critical organs below the neck, including the ability to breath and use of the hands, limbs, bladder and bowel movements.

78.     Damage to any structures in the neck can prove catastrophic. For this

very reason, the FDA mandated that devices designed to replace the bones (vertebral body replacement) in the neck be required to undergo the FDA's most rigorous premarket approval process (Exhibit 26 – FDA rejection letter of RTI bone product down-classification). On the other hand, spine implant devices designed for use in the less dangerous area below the neck could find their way to market by using FDA's premarket notification 510(k) pathway based on "substantial equivalence" -- that is, that the device is represented to be like other legally marketed devices that have already been demonstrated through validated clinical data to be safe and effective. FDA has stated that there are no legally marketed devices for the intended use of vertebral body replacement (a/k/a corpectomy) in the cervical spine. Though the FDA has approved and cleared devices marketed by the Defendant for interbody fusion in the cervical spine or the back, the FDA has not approved, cleared, or exempted Defendants from requirements to sell and market the Subject Devices for uses in the cervical spine.

79.     Only one device was legally marketed for cervical VBR under an exemption to FDA's PMA requirements (Exhibit 39). However, the application for humanitarian device exemption ("HDE") for this TPS-C device was withdrawn shortly after clinical studies showed an unacceptably high rate of revisions surgeries (Exhibit 40).

80.     Furthermore, the FDA has rejected attempts by the device industry to
seek market permission to sell vertebral body replacement devices for cervical
indications due to concerns for the very dangers associated with the potential for
catastrophic injuries in the neck (Exhibit 26 - RTI bone device rejection letter). The
FDA confirms in warning letters that devices marketed for cervical vertebral body
replacement are misbranded and adulterated in the absence of PMA or an exemption
(Exhibit 25 – Amedica 2009 FDA warning letter).

81.     Despite these material facts, Defendants engaged in a scheme or schemes
to traffic cervical vertebral body replacement (VBR) devices under the guise that they
were non-cervical systems with labeling and advertising falsely representing them to
be for uses below the neck in the back, when, in fact they were only sold and could
only be used to fit in the more dangerous and lucrative procedures involving the
cervical spine of the neck.

82.     Defendants' scheme all along was to game the so-called practice of
medicine doctrine (21 U.S.C. § 396), which permits the use of any legally marketed
devices for unlabeled or "off-label" indications in the course of the legitimate doctor-
patient relationship. But there can be no legitimate doctor-patient relationship when
the information the doctor relies upon and passes to the patient is false and misleading
labeling.

83.     Permissible off-label use serves as a valuable tool in the practice of medicine. When a medical product has been FDA-approved or cleared for one specific use, physicians may find clinically valid applications for uses that are not indicated on the product labeling. But when the product is impossible to use for the labeled and advertised purpose, protections afforded under legitimate off-label uses are not available since the original labeled use is a sham. Federal law prohibits the sale and advertising of medical products that are labeled with false and misleading information that may be injurious to health because of results from such products prescribed in the advertisement (21 U.S.C. § 352).

84.     Some of the Subject Devices cannot physically be used for their FDA-cleared and labeled purpose. Other Subject Devices were designed for the very use that is contraindicated on the device labeling. The labeling for these devices contraindicates use in the neck because Defendants concealed that validated studies to qualify use of these devices in the cervical spine had never been performed. Doctors therefore had no validated evidence-based clinical data that use of these devices in the neck would actually be safe and effective. As a consequence, their use in the cervical spine amounted to nothing more than Russian Roulette.

85.     Despite the absence of validated clinical evidence showing that the subject devices would work safely in specific regions of the spine, Defendants' trained

and instructed sales representatives to sell the Devices for uses that were not approved

by the FDA, but exclusively for the uses in the spine contraindicated on the device

label. Doctors relied on Defendants' representations that use of these devices was

permissible under so-called off-label uses, though such representations were also

false, misleading and misplaced just as the device labeling itself. In fact, Defendants'

technique guides explicitly demonstrate how to implant the devices for these unsafe,

untested, unapproved and contraindicated uses (Exhibit 41).

86.     Defendants relied on a known practice pattern that healthcare

practitioners and providers rarely read nor fully appreciate information contained on

medical products labeling. This is especially true in the implanted device setting

where surgeons trusted and relied upon Medtronic representatives to deliver an

appropriate, on-label, FDA-approved device into the surgical field for implantation.

Defendants' sales representatives themselves usually walked the Subject Devices into

surgery, discarding the packaging and label materials prior to handing the spine device

to the surgical scrub tech for use.

87.     Defendants' mislabeling of the subject devices duped physicians,

hospitals, and patients – everyone was duped. One look at the subject devices

conveyed exactly what part of the spine they were to be used in (cervical). The

Subject Devices were all formed and molded into specific constructs and geometries

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 48

designed to explicitly match the anatomy and morphometry unique to the bones and discs only found in the cervical spine of the neck (Exhibit 36). But the labeling information was not consistent with the manner in which the devices were designed and only sold for. The device labeling claimed the subject devices were for use in the thoracolumbar spine (region of the spine below the neck) or were not intended for use in the spine at all.

88.     By making these false representation, Defendants then did not have to disclose any of the known risks and complications associated with actual device-use for the very indications the products were designed for. There was no disclosure of the dangers or risk of catastrophic device-related injuries when implanting these devices in areas proximate to neurovascular and tracheoesophageal structures unique to the neck or the spine itself. In this manner, patients were denied informed consent, and doctors implanting the Subject Devices were duped into believing that any non-labeled use was okay under the so-called practice of medicine doctrine provisions for off-label use. It was not and is not. Medtronic billed the hospitals for these devices, and the hospitals paid Medtronic with reimbursements from public health benefits programs.

2. *Effects of the Scheme*

89.     If Defendants had not misbranded the Subject Devices, the Subject

1  Device would never have been sold or implanted. Had CMS and other health benefits

2  carriers known the true facts regarding (a) the sale of mislabeled devices for their

3  contraindicated use and (b) the payment of kickbacks to induce the sale and device-

4  use for non-FDA approved indications, they would not have paid the claims.

5      90.    Under the Medicare Act, healthcare coverage is only available when the

6  covered product or service is reasonable and necessary for the diagnosis or treatment

7  of illness or injury or to improve the functioning of a malformed body member (42

8  U.S.C. § 1395(y)(1)(A)). In order of preference, a determination of coverage is based

9  on "[i] Published authoritative evidence derived from definitive randomized clinical

10  trials or definitive studies, and [ii] General acceptance by the medical community,

11  otherwise, 'standard of care,' as supported by sound medical evidence."  Defendants

12  did not report catastrophic injuries, including patients deaths,  involving the subject

13  devices in published studies, none of which were reported to the FDA, nor did the

14  investigating surgeons disclose that use of the Subject Devices were contraindicated

15  for the very use that was being studied, thereby making the study results unreliable

16  and biased from undisclosed conflicts of interests (Exhibits 42 and 43 -  internal

17  Medtronic documents include an investigational device exemption ["IDE"] cervical

18  study with part numbers to Verte-stack Cornerstone which is contraindicated for

19  cervical use; and Marketing documents soliciting patients to enroll in the study).

20

91.     Any standard of care or pattern of medical practice cannot possibly be

legitimate if established from clinical studies that are not rooted in reliable, unbiased,

validated evidence-based clinical data. Moreover, there is no standard of care that

would accept a curative procedure that expressly contraindicates the device-use for

that procedure. Moreover, undisclosed contraindicated devices used in human subjects

in any study would be a violation of human research protections provisions outlined in

both the Belmont Report (45 C.F.R. 46) and in 21 C.F.R part 50.

92.     FDA device clearance or approval is another factor that is considered in

Medicare coverage. In general, devices that do not have FDA clearance are not

eligible for Medicare reimbursement. CMS, however, does not categorically prohibit

reimbursement for off-label device use (*See id*), however, in off-label use is not

available when the FDA-cleared labeling provides information that is false,

misleading in any particular and/or provides inadequate instructions-for-use and/or

omits material facts and safety information concerning the actual device-use risk

profile.

93.     When Defendants present physicians with false or misleading

information about the approved uses of the Subject Devices and encourage physicians

to use the Subject Devices for dangerous, unapproved, and contraindicated uses,

Defendants cause physicians and health care facilities to submit bills for payment that

are based on fraud and are thus ineligible for reimbursement under government health care programs. There is no Defendants also cause physicians and health care facilities to place unwitting patients at the peril of using devices for untested and unsafe contraindicated uses.

C.   <u>Defendants' Unapproved Spinal Subject Devices</u>

94.   Devices designed for use in one region of the spine (cervical, thoracic or lumbar) cannot be used in other regions of the spine because each region requires a different size, curvature and shape device, as well as different tools and insertion options, depending on the region and the surgical approach. Using an analogy, one's front teeth and back teeth are not interchangeable; a back-molar implant cannot replace a front tooth. In other words, spinal devices do not follow a "one-size-fits-all" paradigm. In the same way, a spinal surgeon can tell which region of the spine a device belongs in just by looking at it. This is similar to looking at a handful of coins and knowing the difference between a dime, nickel or a quarter. They aren't interchangeable in a vending machine, and in the same way, different spinal cages of different shapes, sizes and other characteristics are not interchangeable in someone's spine.

95.   Defendants effectively concede that the Subject Devices are designed and made only for use in the cervical spine as they are in identical dimension as their own cervical cadaver bone product offerings, yet the labeling of the non-bone Subject

1  Devices contraindicates use in the cervical spine. Using another analogy, it would be

2  as if a 40-foot sailboat came with instructions that claimed, "not to be used in open

3  waters … and only for use in a baby pool."  Defendants sold the Subject Class III

4  Devices with labeling that contains false and misleading information and omitted

5  required safety and risk information concerning device use in unapproved and

6  contraindicated areas of the spine. No doctor would knowingly use a device in a

7  contraindicated manner in the cervical spine, so Defendants hid the contraindication

8  from the spinal surgeons.

9      96.    To conceal the fact that the Devices were contraindicated for use in the

10  cervical spine, Defendants implemented a distribution scheme in which doctors never

11  saw the labeling and Defendants did a bait-and switch on the device names. For

12  example, Defendants' non-bone cervical cages were labeled "Cornerstone PSR" and

13  Anatomic PEEK" yet the part numbers were attributed to the Subject Verte-stack

14  devices that contraindicated use in the cervical spine. By using the Cornerstone PSR

15  label, Defendants concealed: (1) the cervical product had no FDA approval or

16  clearance for sale in the U.S., and (2) the cervical labeled-contraindication [See Zang

17  implant record]. Defendants' sales representatives were tasked with taking the devices

18  out of their boxes, throwing away the labeling, and handing the devices to the nurse to

19  open onto the sterile field for surgeons in the operating room.

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 53

97.     The Defendants' sales representatives are tasked with delivering the devices into operating rooms. The surgeons do not keep a stockpile of the devices on hand, they rely on the sales representatives to give them the specific size and shape device they will need for that day's surgery. Because the operating room and everything in it must be sterile, the devices are removed from their individual packaging boxes, and the boxes and labeling they contain are thrown away before the devices are passed to the surgeons. The boxes contain instructions for use that state the FDA-approved uses of the device, as well as contraindications. In the case of the Subject Devices, the instructions-for-use erroneously direct surgeons to implant the devices into areas of the spine where they could not fit (the back). Because the surgeon is sterile, and the boxes and instructions for use are not, the surgeon will never see them.

98.     Prior to using the devices, spinal surgeons and their staff saw sample devices provided by Defendants, or watched a training video created by Defendants, or attended trainings at a cadaver lab hosted by Defendants. Defendants never mentioned that the devices were not approved for the exact or contraindicated uses they were teaching surgeons and staff how to do.

99.     For example, Defendants' internal documents describe the different training materials they make available. "There are plenty of materials available on the

SPINE ZONE and MySpineTools.com that you can use for this training. Some of the most popularly referenced resources are… Surgical techniques; Animations; Surgeon case presentations; Competitive overviews; Success Stories; 'I've found the animations to be particularly effective when working with the scrub techs,' says Phoenix Sales Representative Kevin Guyette. 'They give a really clear demonstration of how the Inserter works, which in turn helps the tech expedite implantation with their surgeon.'" (Exhibit 44)

100.    For example, a Medtronic "training lab" for doctors showed the day's agenda included training doctors for unapproved lumbar interbody fusion procedures with the Subject Boomerang and Capstone Devices (Exhibit 45).

101.    Spinal surgeons did not question whether the devices were approved, because the device packaging had the appearances of being FDA-approved and the devices looked appropriate for the uses for which Defendants were selling them. Furthermore, though a surgeon might look at a sample, or go to a training, a surgeon would most likely never see the labeling that states what the device is approved for, because of the way that Defendants give the devices to doctors.

102.    Members of the Defendants' sales force are present in surgery at the actual time of implantation of Defendants' Subject Devices. In fact, Defendants' internal documents instruct their sales force to "act as our eyes and ears in the field

1 and operating room" (see Exhibit 46). The spinal sales force had to be present in the

2 operating rooms to ensure that the surgeons and their staff never uncovered the truth

3 that the devices were contraindicated for the very use for which they were sold.

D.   <u>Defendants Illegally Promoted and Sold Devices for Unapproved, Unsafe, Contraindicated Uses in The Cervical Spine.</u>

103.   Though the Subject Verte-stack Devices contraindicated cervical use on the FDA-cleared package inserts, Defendants labeled them with FDA UDI stickers using only the "Cornerstone PSR" name, the very brand name recognized by surgeons and hospitals as having been established as the "Gold Standard" for cervical surgery devices. The deceptive labeling schemes were so pervasive and successful that the Devices became the top-selling cervical spinal cages purchased by U.S. hospitals. But the part numbers to the top-selling cervical devices belonged to the Verte-Stack family of Subject Devices, and their labeling absolutely <u>contraindicates</u> use in the cervical spine (Exhibit 47 - graphical comparison of *Orthopedic News Network's 2015 Top-Ten Cervical Non-bone devices* compared to FDA part numbers). A contraindicated device use means when not to use the device because it is likely to cause harm over any potential benefit.

104.   Defendants never conducted the rigorous, evidence-based clinical testing necessary to establish that the Subject devices were actually safe to use in the cervical spine. For example, Medtronic's 510(k) submission to the FDA on June 7, 2004 for the

1    Verte-Stack 44mm center strut cervical corpectomy device made the false claim that it

2    was for use from the "T1-L5 spinal levels" (Exhibit 18). Due to the fact that Medtronic

3    was seeking approval for a thoracolumbar device, any testing they conducted would be

4    inadequate for the axial range of motion of the neck. The neck has specific

5    biomechanical characteristics and has rotational motion unlike any other part of the

6    spinal column. In order to properly test the device, Medtronic would have had to have

7    conducted "worst case scenario," "worst case design scenario," and "worst case device-

8    use scenario" tests for a device that was meant for use in the cervical spine.

9         105.    But Medtronic did not conduct this type of thorough testing. Nor did the

10   company conduct proper rotational or axial testing to determine the devices'

11   appropriateness for use in the neck. Medtronic only conducted "static compression

12   tests" to show the strength of the strut to withstand compression. The FDA refused to

13   approve Medtronic's 510(k) application on the basis that the strut's design "would

14   reduce the strength of the center strut and hence with static compression test alone, I

15   cannot determine the substantial equivalence of the device. Due to this reason, I

16   recommend that the submission be put on hold for additional information" (Exhibit 48).

17        106.    In fact, not only did Medtronic fail to properly test the device for the

18   cervical spine - the ONLY space in the spine that the device would fit - but the company

19   marketed and made the device available for "commercial distribution" without required

20

FDA permission to sell the device at all (Exhibit 19 - FDA Unique Device Identification ("UDI") listings for the 44mm strut parts numbers).

107.     In addition, these very products that were never approved or cleared by the FDA resulted in device malfunctions and injury reported in FDA's MAUDE database (Exhibit 20 - FDA adverse reaction report for 44mm strut).

108.     Prior to September 2015, the FDA had never cleared or approved **any** device for corpectomy use in the cervical spine. The FDA has also never cleared or approved a cervical corpectomy device manufactured by Defendants or any device from any manufacturer designed to replace multiple vertebra in the neck (See July 15, 2015 FDA communication from Melissa Sage, Exhibit 49). Furthermore, the FDA has refused to lower the classification for devices intended to replace bones in the cervical spine. For example, a 2009 FDA deficiency letter denied a petition to down-classify cervical corpectomy devices made of bone heterograft. In the letter, the FDA states that such devices must go through the pre-market approval process, and clinical data must support the devices' utility compared to the risk of failure, which can cause paralysis and death. Defendants did not apply for pre-market approval for any of the Subject Devices that were designed to replace bones in the cervical spine.

109.     The cervical Subject Devices are in unique design constructs that are intended for **cervical** use, and that are unsuitable for their labeled **thoracolumbar**

indications. This includes spinal cages shown in Defendants' patents, trademarks, trademark specimens, marketing brochures and 510(k) submissions with footprints of 11x11, 11x14, 14x14, 14x16, and 16x18(mm). The footprints are D-shaped with end cap and strut components configured in only slightly lordotic profiles designed to fit specifically into the cervical spine and to match the slight curvature of the neck, with one implant insertion hole (See Exhibit 50, graphic representation of Defendant's bone and non-bone cervical devices). The one implant insertion hole is located on a dedicated frontal (anterior) side of the device such that it can only be implanted via the anterior approach. As described above, the anterior approach is the only approach to the cervical spine. Though the lumbar spine can also be accessed via the anterior approach, the cervical Subject Devices are too small and brittle to withstand the load of the lumbar spine. Therefore, these Devices can only be used in the cervical spine. But the Subject Devices were not cleared or approved by the FDA for use in the cervical spine and are contraindicated for use in the cervical spine. And none of the Subject Devices' predicate ancestors have been cleared or approved for use in the cervical spine. The labeling for many of the Devices clearly states, "Not intended for use in the spine" or "contraindicated for use in the cervical spine."

**CONTRAINDICATIONS**
The VERTE-STACK® Spinal System device is not intended for cervical nor posterior surgical implantation.

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 59

*[Contraindication labeling, Exhibit 51]*

110.    The Subject Devices for the cervical spine are either standalone devices (Pyramesh), expandable (T2 XVBR, T2 Altitude) or modular (stackable consisting of component end caps and a center strut). In a stacked assembly, the Verte-stack device components are designed to replace one or more vertebral bodies and adjacent discs in the cervical spine. The end cap components were designed and sold to replace the interbody disc space in between the vertebrae in the cervical spine. (The end caps were not approved for this use until a later year – from 2008-2011, depending on the device). The component D-shaped footprint and sizes are specifically constructed to fit into the cervical spine, while the slightly wedged or convex side profiles are designed to restore or maintain the natural lordotic curvature of the neck found in the cervical spine. The cage geometries of the subject devices are identical to that of Defendants' cadaver bone cervical products branded "Cornerstone" (Exhibit 52 – 2005 RTI/Medtronic marketing agreement filed with the SEC).

111.    In spite of the fact that all cervical corpectomy devices are designated as Class III because of safety concerns, Defendants sold cervical corpectomy devices without the required pre-market approval for safety and effectiveness.

112.    For example, an April 22, 2008 email from sales manager Paul McClintock at Medtronic to UCLA Medical Center Value Analysis committee

member John Yeretsian stated that "the Anatomic PEEK is for thoracic or lumbar cases, however because of its small size, many surgeons choose to use it in the cervical spine for ACDF procedures". <u>Here, a district sales manager at Medtronic was telling the Value Analysis committee member of a major public institution to use a device for a use that is</u> **labeled contraindicated for the cervical spine**. It is also **a false statement** because it claims that the device was designed for use in the thoracolumbar spine, but the device could not possibly be used in the thoracolumbar spine (Exhibit 29). The "Anatomic PEEK" cervical device was not cleared until March 2011, here this 2008 email shows Medtronic District Sales Manager Paul McClintock representing the device to be for the thoracolumbar spine.

113.    Additionally, McClintock also stated the following, "Verte-Stack is a family brand name for several of our products …. They are PEEK spacers, such as Cornerstone, and Capstone, which have been used at UCLA for years. They are used for grafting in the disc space… I have attached the brochure for Capstone TLIF/PLIF… I know the cervical spacer is $1200, and the TLIF spacer [Capstone] is $3,375". McClintock's statements are direct evidence of the Defendants' fraudulent promotion of two devices for uses they were not FDA-cleared, nor approved for, any intended uses for at the time, and that Medtronic even went so far as to create brochures for these unapproved uses. His statements are also a clear indication that

Medtronic had been promoting these unapproved uses "for years" to major institutions

such as UCLA (see Exhibit 29).

114.    For example, the Verte-Stack Cornerstone PSR PEEK is an illegal

experimental device that combines the Verte-Stack name with part of the name of a

device called the Cornerstone PSR Spinal System. This device is sold only for use in

the cervical spine, but its labeling explicitly contraindicates such use. In fact,

Defendants' brochure for the device does not depict a single non-cervical use (Exhibit

53).

115.    Defendant also sold and marketed a device called Verte-Stack Perimeter

XS. In a Medtronic technique guide (Exhibit 56 – Verte-Stack Perimeter XS technique

guide) with a copyright date of 2007 there are several blatant images and diagrams

depicting this untested device and contraindicated procedure. Verte-Stack Perimeter

XS was approved as a vertebral body replacement device (VBR) from T1-L5, with a

contraindication for use in the cervical spine. On page 5, diagram 1 shows the image

of a spine model.



Figure 1

116.     This image is of the cervical spine C1-C7 and thoracic spine T1-portion of T3. This diagram demonstrates how Defendants promoted contraindicated, unsafe uses of their Devices. There is no reason the cervical spine should be shown in a technique guide for a product that does not have FDA clearance for cervical use, and that is contraindicated for cervical use.

117.     On the next page, page 6 figure 2, there is an image of a Verte-Stack Perimeter XS implant trial being inserted into the disc space of C6-7 in an interbody fusion procedure.

1
2
3
4
5
6
7
8
9
10



Figure 2

11   118.  Verte-Stack Perimeter XS implants are not approved for interbody fusion;

12   they are intended for vertebral body replacement, which is a significant difference.

13   Like all the other Subject Devices, Verte-Stack Perimeter XS is also not approved for

14   cervical applications. This image demonstrates blatant promotion of an implant that

15   was not cleared in the cervical spine and not cleared for interbody use.

16   119.  On page 8, figure 5 shows an implant being inserted in a spine model image.

17
18
19
20

Figure 5

120.      In this image, the Verte-Stack Perimeter XS device is being implanted into the disc space of C7-T1, in an interbody fusion procedure. Again, the indications for Verte-Stack Perimeter XS use are for vertebral body replacement at T1-L5, not interbody fusion, and this image shows the device being implanted into the cervical spine. Again, this device is contraindicated for use in the cervical spine.

121.      In this technique guide there is not one instance in which Defendant depicts the removal of the whole vertebral body. The guide only describes the vertebral space which is the disc space between the endplates, or vertebral discs. Perimeter XS was never approved for this application and consistently throughout this technique guide the defendant is demonstrating and promoting a dangerous,

1  contraindicated use of Perimeter XS. In fact, the guide states on page 14 that the

2  device is "not intended for cervical nor posterior surgical implantation" under the

3  heading "Contraindications".

4      122.    Defendants also sold and continue to sell a device called "Anatomic

5  PEEK."  The name "Anatomic" refers to the anatomic shape, size, and diameters of

6  the cervical spine. On page 2 of Medtronic's promotional brochure for the Anatomic

7  PEEK (Exhibit 57), it states, "anatomic shape restores and maintains the body's

8  natural alignment." This restoration of the body's natural alignment only applies in the

9  cervical spine as well as the unique shape of the vertebral bodies in the cervical spine

10  region. However, the Verte-Stack Anatomic PEEK device was never cleared for use in

11  the cervical spine. To this day, the Anatomic PEEK corpectomy struts and correlating

12  end caps, although clearly intended for cervical use, are not FDA approved for

13  cervical use and are mislabeled, misbranded, adulterated devices sold by the

14  defendants in a dangerous, contraindicated manner.

15      123.    On page 2 of the Anatomic PEEK brochure, there are three pictures of a

16  3-part corpectomy device that can only be used in the cervical spine due to its

17  footprint, size, anatomic shape, specific lordotic curvature, and single anterior

18  threaded insertion hole. Medtronic describes the device as having an "Anterior

19  threaded hole for ease of insertion" - only devices meant for the cervical spine and for

20

the lumbar spine are implanted via the anterior approach. Thoracic spine devices would have to be implanted from the side or from a posterior approach due to the vital organs and rib cage protecting these vital organs from T1-T12. Also, the size of this threaded inserter is small and is another aspect which is consistent with cervical spine instruments and inserters. Anterior lumbar inserters are much bigger and much sturdier due to the distance and force needed to implant devices in the lumbar spine from an anterior approach. Defendants deliberately did not write the FDA-approved indications for the device in the guide (Exhibit 57).

124.    Defendants sold many of these unapproved, Class III cervical devices, and they were implanted mostly in patients of Medicare age, due to the progression of disc and joint degeneration as people get older.

125.    For example, on January 31, 2017, a 74-year old Medicare patient was implanted in his cervical spine with a Medtronic Anatomic PEEK strut (part number 6242064) and two Medtronic cervical spacers (part number 5030964) in a corpectomy configuration (Exhibit 58). The FDA has never approved a Medtronic Anatomic PEEK strut for any use. Defendants used an "Anatomic" brand-naming reference from their approved cadaver bone products but used it for this unapproved PEEK plastic device. The cervical spacers (part number 5030964) were coated with titanium and were only approved for use as interbody spacers. When combined, the two spacers

1 plus the strut did not have any locking mechanism to keep them together, and

2 subsequently the components separated in the patient's neck, causing him significant

3 pain and endangering his life. The predicate device was approved by the FDA under

4 510(k) #K112244, which stated in part that Medtronic's "dimensional changes are

5 designed to eliminate the ability of this device to be used with the Verte-Stack

6 Anatomic PEEK Spinal System center struts, reducing the risk of off label use", and

7 yet Defendants sold this part combination for implantation into this Medicare patient's

8 neck regardless (Exhibit 59). Using this combination of devices in the neck would be

9 like driving a car without any lug nuts to hold the tires onto the axles. The patient had

10 both Medicare and UnitedHealthcare AARP supplemental Medicare insurance to pay

11 for this highly inappropriate device combination and surgical procedure. The patient

12 now requires a revision surgery to remove these inappropriately combined Medtronic

13 devices and to find a legitimate way to support his neck (Exhibit 60).

14

15

16

17

18

19

20

126.     For example, at Desert Regional Medical Center in Palm Springs, Defendants sell such a high volume of cervical corpectomy cages, that Defendants' sales representative (Mike Von Scherr) stores bins full of them at the hospital, to avoid the delay of pre-ordering (Exhibit 61). According to the 2010 United States Census, 26.5 percent of the residents of Palm Springs are age 65 or older.



127.     For example, on January 8, 2010, a Medtronic Verte-Stack Spinal System Anatomic PEEK device was implanted in a Medicare patient's cervical spine via anterior approach – a use contraindicated on the device labeling. The procedure was billed to Medicare at a cost of $18,080. (Exhibit 62) The device has not functioned properly, and the patient has continuing pain and numbness in her neck, arms, and hands as a result. The two cervical plate screws holding her Medtronic device in place have broken, the Medtronic device has not fused, and the fragmented or fractured

screws are floating loose in her neck. Cervical plate use with these devices are not an FDA approved procedure. She now has damage to the C5 spine level because of her Medtronic cage pushing up against that level. She also needs a revision surgery at C6-C7 to replace the Medtronic cage. Due to the lack of fusion, and significant pain, she now has minimal range of motion in her neck. She has to sleep in a very specific position each night in order to avoid increased pain and numbness in her shoulders, arms and hands.

128.    For example, on August 4, 2011, Medtronic Verte-Stack Anatomic PEEK devices with part numbers 6240641 and 6240841 were implanted at the C4-C6 levels in the cervical spine of a patient at University of Illinois Medical Center at Chicago by Dr. Russell Nockels. This was a use contraindicated on the device labeling for the part numbers involved. Within two weeks, follow-up scans showed that the devices had slipped out of position and were causing severe neck pain and right-sided radiculopathy. Since that time, the devices have continued to move and impinge on her spinal cord, leaving her in tremendous pain and putting her at risk of paralysis or death (Exhibit 63). Dr. Nockels has received a large amount of income from Medtronic, including $963,372 that was reported by CMS from 2013-2016. Medtronic was the only company he took money from during those years according to CMS, and apparently his brand loyalty is being increasingly rewarded by the company, with his

1   2016 payments ($755,265) being more than ten times higher than his Medtronic

2   payments in the prior three years (Exhibit 64).

3       129.    For example, on June 6, 2011, a Medtronic Verte-Stack Anatomic PEEK

4   device with part number 6240741 was implanted at the C4-C5 level in the cervical

5   spine of a Medicare patient at Coliseum Medical Center in Macon, Georgia. This was

6   a use contraindicated on the device labeling for the part number involved. Since that

7   time, the patient complains about significant pain in her shoulders, arms, hands and

8   pain and numbness in her fingers. She also complains about significant throat

9   soreness. She has already had one revision surgery in order to try to correct the lack of

10  fusion of her Medtronic device (Exhibit 65).

11      130.    For example, on January 10, 2011 a Medtronic Pyramesh device was

12  implanted as a cervical corpectomy device for a surgery at Cedars Sinai Medical

13  Center. The device was described as "pre-cut", meaning that Medtronic had fashioned

14  it for a shape and size specifically for the cervical spine (Exhibit 66).

15      131.    For example, on January 14, 2011 a Medtronic Pyramesh device was

16  implanted as a cervical corpectomy device for a C6 cervical level surgery at Cedars

17  Sinai Medical Center (See Exhibit 67).

18      132.    For example, on March 21, 2011 a Medtronic Verte-stack Cornerstone

19  PSR device was implanted for cervical corpectomy device for a C4-C7 cervical level

20

1   surgery at Cedars Sinai Medical Center (See Exhibit 68) – a use contraindicated on the

2   device labeling.

3        133.    For example, on March 29, 2011 a Medtronic Verte-stack Cornerstone

4   PSR device was implanted for another contraindicated cervical corpectomy device-use

5   for a C5 cervical level surgery with Dr. Robert Pashman in Los Angeles (See Exhibits

6   69, 70). Relator was required to attend and assist on this surgery as part of his regular

7   job duties at Medtronic, because he had primary responsibility for assisting on

8   Medtronic spine implant surgeries at Cedars-Sinai Medical Center, where this surgery

9   occurred. On the morning of the surgery, Relator arrived early to the hospital and

10  retrieved Medtronic Cornerstone Lordotic surgical instruments, Medtronic

11  Cornerstone PSR surgical instruments, and Atlantis Vision surgical instruments and

12  implants off the shelf of the 8th floor operating room. Relator placed these items on a

13  "case cart" and retrieved the Medtronic black cervical suitcase with the Cornerstone

14  implants from where it was kept in the hospital basement. Relator brought them to the

15  operating room, in this case either Room 7 or any open room because it was a trauma

16  surgery. Dr. Pashman worked on his regular operations on Mondays and Wednesdays

17  and sometimes Fridays, but this was a trauma case, so it was being held while Dr.

18  Pashman had trauma call on a Tuesday. Relator had received an email the afternoon

19  prior from Dr. Pashman's assistant, telling him to be at the operating room and that

20

1  Pashman "wants plating, stackable, cervical stuff" (*Id.*). Relator removed the specific

2  sized Medtronic implant from the black suitcase as instructed by Dr. Pashman. The

3  implant came in a box that said "Cornerstone PSR" on it, and had a package insert on

4  the inside that said "Verte-Stack", and that it was contraindicated for use in the

5  cervical spine. After the surgery was underway, Relator handed the device to Dr.

6  Pashman's nurse, named Lady Jane Mackey, who opened the box, took out the

7  implant package, and opened it onto the sterile field. Dr. Pashman's scrub tech took

8  the implant and prepared it for Dr. Pashman for implantation. The non-sterile

9  "Cornerstone PSR" box and "Verte-Stack" label were thrown in the trash, excluding

10  the implant stickers which were stuck onto the patient's surgery sheet and onto the

11  Medtronic device invoice.

12      134.    For example, on March 21, 2011 the three components of a Medtronic

13  Verte-stack Cornerstone PSR device were implanted for a contraindicated cervical

14  corpectomy at Cedars Sinai Medical Center (See Exhibit 71).

15      135.    For example, in an April 27, 2011 email, a Medtronic sales representative

16  stated that he was trying to get an order of (Verte-stack) Cornerstone PSR implants for

17  cervical corpectomy for a doctor to be "pushed through this week."   There was no

18  disclosure that such use is contraindicated and that he informed the doctor of the

19  contraindicated use (See Exhibit 72).

20

136.     For example, on May 24, 2011 Medtronic representative scheduled a (Verte-stack) Cornerstone PSR contraindicated cervical corpectomy at the C-5 level at a hospital in Klamath Falls, Oregon (See Exhibit 73).

137.     Additionally, there are several invoices and sales representative billing records from St. Joseph's hospital in Tucson, AZ, Cottage Hospital in Santa Barbara, CA, Olympia Medical Center in Los Angeles, CA, and Cedars-Sinai Medical Center in West Hollywood, CA from 2011-2015 showing cases of the Defendants' cervical corpectomy cages being sold and implanted for the contraindicated cervical device-use.

138.     For example, on October 4, 2014, Medtronic created an invoice for Santa Barbara County (CA) Cottage Hospital for a set of devices for a surgery on a 25-year-old male who was implanted with the Medtronic Verte-stack Cornerstone PSR corpectomy device (1 strut and 2 end caps) which could only fit in the cervical spine based on its size, footprint, curvature, and single anterior threaded access port. The Verte-stack Cornerstone PSR was only FDA approved for thoracolumbar VBR and is contraindicated for any use in the cervical spine. The charges for the devices implanted in this surgery were $4,200.69 (Exhibit 74).

139.     For example, on July 3, 2015, Medtronic created an invoice for Santa Barbara County (CA) Cottage Hospital for a set of devices for a surgery on a

Medicare-aged 76-year-old male who was implanted with the Medtronic Verte-stack Cornerstone PSR corpectomy device (1 strut and 2 end caps) for the contraindicated use in the cervical. The charges for the devices implanted in this surgery were $6,825 (Exhibit 75). Relator is aware of the procedure that the Medtronic sales representative carried out in assisting with this surgery. The Medtronic sales representative was required to attend and assist on this surgery as part of his regular job duties at Medtronic, as he had primary responsibility for Medtronic spine implants at Santa Barbara County Cottage Hospital, where the surgery occurred. On the morning of the surgery, the sales representative arrived early to the hospital and retrieved the Medtronic Cornerstone Lordotic surgical instruments and Medtronic Cornerstone PSR surgical instruments, and Atlantis Vision surgical instruments and implants off the shelf from a medical device inventory room in the hospital. The sales representative placed these items on a "case cart" and retrieved the Medtronic black cervical suitcase with the Cornerstone implants from where it was kept in the hospital. The sales representative brought them and the case cart to the operating room. The Medtronic sales representative had received a scheduling phone call or email from the staff at the hospital some days prior to the surgery, telling him to be at the operating room and that the doctor wanted to implant a Medtronic PEEK cervical device. The Medtronic sales representative removed the specific sized Medtronic implant from the black

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 75

1  suitcase as instructed by the surgeon. The implant came in a box that said

2  "Cornerstone PSR" on it, and had a package insert on the inside that said "Verte-

3  Stack," and which stated on it that the device was contraindicated for use in the

4  cervical spine. During the surgery, the sales representative handed the implant box to

5  the surgeon's nurse or scrub tech, who took the implant and prepared it for the

6  surgeon for implantation. The non-sterile "Cornerstone PSR" box and "Verte-Stack"

7  label were thrown in the trash, excluding the implant stickers which were stuck onto

8  the patient's surgery sheet and onto the Medtronic device invoice.

9       140.    For example, on February 14, 2012, Medtronic created an invoice for

10  Olympia Medical Center in Los Angeles, CA for a "Cornerstone HSR" Hydrosorb

11  cervical "spacer" and an Atlantis Elite cervical plate, despite the fact that Hydrosorb

12  has never been cleared for load-bearing use in the spine, and its package insert says

13  "not intended for use in the spine". The charges for the devices implanted in this

14  surgery were $5,802.00 (Exhibit 76). The surgeon on the case, Dr. Todd Lanman, had

15  a consulting agreement with Medtronic for $27,400 in payments as a KOL and wrote

16  a white paper promoting the use of Medtronic's Hydrosorb "Cornerstone HSR"

17  product in cervical spine surgeries, where it was specifically not to be used per its

18  label (Exhibit 77). Dr. Lanman has continued to receive large payments from

19  Medtronic, with CMS reporting he earned $52,845 from Medtronic from 2013-2015

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 76

(Exhibit 78).

141.    For example, on July 12, 2012, Medtronic created an invoice for Cedars-Sinai Medical Center in Los Angeles, CA for a Verte-stack Cornerstone PSR cervical device, despite the fact that the device-labeling contraindicates use in the cervical spine. The charges for the devices implanted in this surgery were $1,950.00 (Exhibit 79).

142.    For example, on July 26, 2012, Medtronic created an invoice for Cedars-Sinai Medical Center in Los Angeles, CA for a Verte-stack Cornerstone PSR cervical device, despite the fact that the device-use is contraindicated in the cervical spine. The charges for the devices implanted in this surgery were $1,950.00 (Exhibit 80).

143.    For example, on April 2, 2012, Medtronic created an invoice for St. John's Health Center in Santa Monica, CA a "Cornerstone HSR" Hydrosorb cervical device and an Atlantis Elite cervical plate, despite the fact that Hydrosorb has never been cleared or approved by FDA for load-bearing use in the spine, and its package insert says "not intended for use in the spine" (Exhibit 81).

144.    For example, on March 1, 2013, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an Atlantis Vision Elite cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,058.18 (Exhibit 82).

145.    For example, on April 30, 2013, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK corpectomy cage, despite being specifically contraindicated for use in the cervical. The charges for the devices implanted in this surgery were $6,008.18 (Exhibit 83).

146.    For example, on July 10, 2013, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK corpectomy cage and cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,008.18 (Exhibit 84).

147.    For example, on July 3, 2012, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an anterior cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,008.18 (Exhibit 85).

148.    For example, on June 20, 2012, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an Atlantis Vision Elite cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $12,576.36 (Exhibit 86).

149.    For example, on June 2, 2012, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an anterior cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,108.18 (Exhibit 87).

150.    For example, on November 14, 2013, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an anterior cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,158.18 (Exhibit 88).

151.    For example, on June 2, 2012, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an Atlantis Vision Elite cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The charges for the devices implanted in this surgery were $6,113.18 (Exhibit 89).

152.    For example, on February 2, 2012, Medtronic created an invoice for St. Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy cage and an Atlantis Vision Elite cervical plate, despite the fact that Medtronic corpectomy cages are specifically contraindicated for use in the cervical spine. The

1    charges for the devices implanted in this surgery were $6,008.18 (Exhibit 90).

2        153.    For example, on March 5, 2012, Medtronic created an invoice for St.

3    Joseph's hospital in Tucson, AZ for a Verte-stack Anatomic PEEK cervical corpectomy

4    cage and an Atlantis Vision Elite cervical plate, despite the fact that Medtronic

5    corpectomy cages are specifically contraindicated for use in the cervical spine. The

6    charges for the devices implanted in this surgery were $6,008.18 (Exhibit 91).

7        154.    For example, St. Joseph's hospital in Tucson, AZ implanted an Anatomic

8    PEEK cervical corpectomy cage in a cervical procedure on a female patient born on

9    4/8/1951, despite the fact that Medtronic corpectomy cages are specifically

10   contraindicated for use in the cervical spine (Exhibit 92).

11       155.    Medtronic even gave spine surgeons instructions on how to bill Medicare

12   for inappropriate cervical corpectomy procedures using their contraindicated devices.

13   For example, a 2017 Medtronic spine reimbursement manual (attached) states on page

14   4 that physicians can combine the CPT billing code for cervical corpectomy (63081

15   or 63082), plus add a CPT code for a non-bone biomechanical device (22854). If these

16   billing codes are combined, the physician is coding for a non-bone cervical corpectomy

17   cage - an unapproved PEEK or metal cervical corpectomy cage that is contraindicated

18   for use in the cervical spine (Exhibit 93).

19

20

156.    Defendants caused false claims on government health care programs in connection with the following Subject Devices, sold for non-FDA approved uses in the cervical spine: Pyramesh [K011406, 12/27/2001], T2 XVBR [K071033, 08/14/2007], Verte-stack XS (Cornerstone PSR) [K030736, SE 04/02/03], Verte-stack XS (Cornerstone PSR) [K041197, SE 08/09/04], Verte-stack XS (Cornerstone PSR Lateral Ports) [K052931, SE 11/16/05], Verte-stack Perimeter XS [K062073, SE 08/14/06], and Verte-stack Anatomic PEEK, [K070173, SE 03/14/07] (*See also* Exhibit 94).

E.    Defendants Illegally Promoted and Sold Devices for Unapproved, Unsafe Uses in The Lumbar Spine

157.  Lumbar interbody fusion (interbody fusion) is the most common spinal fusion surgery. According to a 2015 report from Orthopedic News Network, sales of synthetic materials for the lumbar spine represented 52% of sales, while cervical spine had 39% share of a total $1.6 billion in sales of interbody fusion devices for 2015 (Exhibit 95).

158.  Defendants sold the end caps of corpectomy cages for use in interbody fusion without FDA approval. Defendants developed, branded, and labeled lumbar interbody fusion devices with the marks, "Capstone," "Boomerang," "Crescent", "Clydesdale," "Telamon," and "Perimeter." They submitted these devices as end cap components to the modular Verte-Stack VBR systems, which were approved for thoracolumbar corpectomy. (The "VBR" in the name refers to vertebral body replacement, a/k/a corpectomy). Defendants never intended to market nor sell the devices for use in

corpectomy procedures. Defendants knew all along that the end cap components would only be sold for non-FDA approved lumbar interbody fusion procedures called TLIF, PLIF, DLIF, OR ALIF and not corpectomy procedures in the thoracolumbar spine.

159.  Defendants sold these devices to providers as "spacers" – a term that refers to the function of a disc to fill the space between vertebral bodies – though they were never cleared as such (Exhibit 96).

160.  In fact, Defendants did not even manufacture the center strut necessary for the device to be used as approved. As described above, the main piece of a corpectomy device is the load-bearing strut to replace a vertebral body, which has end caps attached to replace the discs that separate vertebral bodies. Defendants routinely manufactured and sold only the end caps, representing them as interbody spacers, a use for which they did not have FDA approval.

161. Medtronic never manufactured nor sold any of the center struts for these devices as required by the FDA. Therefore, it would be impossible to use these devices in an on-label manner because the key component was never made, never existed, and was never sold into commerce. These devices were clearly sold as interbody spacers, marketed as interbody spacers, had technique guides and literature that clearly stated, showed in detail, and described them as "spacers", yet were never cleared as such (Exhibit 97 - see Capstone Technique).

162.    For example, a 2006 Medtronic Capstone Interbody Surgical Technique guide showed the device and its instruments only being used for use as an interbody spacer, not for its approved use as a VBR device on pages 6, 7, 8, 9, 10. 11, 12, 15, 16, 17, 18, 19, 20, 21 (Exhibit 97).

163.    For example, Medtronic made a "Capstone Interbody" brochure in 2006, when the Capstone device was not approved for use as an interbody spacer – only as a lumbar VBR device. On pages 1, 2, and 3 of the brochure, Medtronic showed pictures of the device and its trial instruments only being used for use as an interbody spacer, being inserted solely into the disc space, not for its approved use as a VBR device. On page 3 of the brochure, Medtronic showed a picture of the Capstone devices that were clearly made from PEEK material (due to the visible lateral holes), which was only approved for lumbar VBR use. Also, on page 3, Medtronic stated that "Convex shape trials better match patient anatomy and allow for more accurate sizing" - this is only the case if the device is used as an improper (in 2006) interbody spacer (Exhibit 98).

164.    The defendant also held numerous training labs and surgeon educational courses using the words "mast TLIF" or "TLIF" which depicts the training of an interbody procedure called a *transforaminal lumbar interbody fusion*. Although the defendant did not manufacture an FDA approved device that was cleared for use as an interbody spacer, they held hundreds of courses throughout the years that trained

surgeons on this procedure showing them how to use such implants like VerteStack Capstone, VerteStack Crescent, VerteStack Boomerang, VerteStack Telamon, etc. At these courses, the surgeons learned the techniques and eventually incorporated them into their practice without any knowledge that these "spacers" were only FDA approved as VBR devices which were impossible to use in that fashion since only the end cap "spacer" was manufactured.

165.    For example, in Defendant's 2006 "Surgical Technique Guide" for the Capstone Instrument Set, Medtronic only shows the Capstone-branded surgical tools and implantation of the Verte-Stack (Capstone) end cap component for the non-FDA approved lumbar interbody fusion. This interbody fusion was for treatment of single-level degenerative disc disease, when the modular device was FDA cleared in 2004 only for use as a corpectomy device (See Exhibit 97).

166.    For example, a 2007 document called "Cedars Goal Pricing" for Cedars-Sinai Medical Center in Los Angeles showed that only end cap part numbers were for sale for the Capstone, Crescent and Perimeter devices, meaning those devices were being sold only for unapproved interbody fusion (See Exhibit 99).

167.    For example, an April 28, 2006 revenue "Snapshot" by Medtronic noted that the company had met 110.50% of its sales target of "interbody" device sales for the year in Los Angeles, despite the fact that in 2006 Medtronic did not have any products

that were FDA approved for interbody use (Exhibit 100).

168.    At Cedars-Sinai Medical Center in West Hollywood, CA these devices were used regularly for interbody spinal fusion surgery without anyone knowing they were not approved as such. There was no communication to the customer that these were not approved as interbody spacers since that is the only way they can be used, no one questioned it. That is the scheme the defendant has used for many years. Similarly, a 2005 Medtronic brochure for the Capstone device only shows the instruction and promotion of the Capstone end cap for non-FDA approved use as an interbody spacer (See Exhibit 101).

169.    Defendants caused false claims on government health care programs in connection with the following lumbar Subject Devices sold for non-FDA approved uses in the lumbar spinal disc space: (1) Capstone VBS [K043561], (2) Verte-stack Boomerang [K040536], (3) Verte-stack Crescent [K052261], (4) Verte-stack Telamon [K040422, K0], (5) Verte-stack Clydesdale [K062133], and Verte-stack Perimeter [K041452, K043566]. (See Exhibit 94)

F.    Defendants Illegally Promoted and Sold Devices Made of Unapproved, Unsafe Hydrosorb Material

170.    Defendants also sold devices made of "Hydrosorb" or "HSR" for use in the spine. Hydrosorb/HSR is designed to dissolve or "resorb" into the body after implantation. Hydrosorb product labeling states "not intended for use in the spine,"

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 85

but Defendants made and sold many spinal devices made of Hydrosorb, including: Cornerstone HSR, Hydrosorb Telamon, Hydrosorb Boomerang, and Hydrosorb Mesh. These products were sold **exclusively** by the Medtronic Spinal Sales force, and no other sales force, even though the instruction for use included in the product boxes explicitly says, "not intended for use in the spine" (Exhibit 102).

171.    For example, Dr. Michael Kropf at St. John's Medical Center in Santa Monica used a Hydrosorb Subject Device in a patient's lumbar spine. The patient experienced a significant complication with the use of Hydrosorb and required a serious revision surgery. This complication was never reported to the FDA's adverse event reporting database. The Medtronic sales representative at the time was Paul McClintock.

172.    In addition, Medtronic used key opinion leader ("KOL") spine surgeons to meet with the manufacturers of the Hydrosorb product, Macropore, to help develop the product. Medtronic also compensated KOL surgeons to increase awareness of the products through off-label promotion, and white paper presentations, with the ultimate goal of increasing sales of these "not intended for use in the spine" implants that can in fact only be used in the spine. For example, Dr. Todd Lanman had a consulting agreement with Medtronic for $27,400 in payments as a KOL and wrote a white paper promoting the use of Medtronic's Hydrosorb "Cornerstone HSR" product in cervical

spine surgeries, where it was specifically not to be used per its label (Exhibit 77). Dr. Lanman has continued to receive large payments from Medtronic, with CMS reporting he earned $52,845 from Medtronic from 2013-2015 (Exhibit 78).

G.    Defendants Promoted Unapproved Uses in Spite of Danger to Patients

173.    Defendants have known for years, but concealed, downplayed, underreported and misreported, that their mislabeled, misbranded, adulterated cervical Subject Devices could cause death, quadriplegia, and other catastrophic, life-altering injuries due to device-related failures in the neck.

174.    The misbranded Subject Devices are referenced in numerous submissions to the FDA's Medical Device Reporting system as resulting in life-altering and catastrophic injuries, including neurological injury, esophageal perforation, airway compression, paralysis, quadriplegia, device malfunction, repeat surgeries, and death.

175.    The cervical use of the Verte-Stack Subject Devices has resulted in numerous injuries that the FDA never contemplated since the Defendants did not disclose the objective intent was actually for cervical indications.

176.    The FDA's "MAUDE" Adverse Event Reporting database reports at least 50 adverse events where Defendants' vertebral body replacement devices resulted in device-related malfunctions and/or serious, life-altering injuries following contraindicated device use in the cervical spine (Exhibit 103).

177.     For example, on January 2, 2015 a Cornerstone brand corpectomy device broke into three pieces during insertion. (Exhibit 104)

178.     For example, in 2015 a patient underwent a cervical interbody fusion with Defendants' Subject Device. Shortly after the device was implanted, it shifted and broke in the patient's neck, causing difficulty breathing, swallowing, speaking, walking, and using his arms and hands. (Exhibit 105)

179.     For example, on June 24, 2014 a Cornerstone corpectomy device broke into three pieces during surgical insertion. (Exhibit 106)

180.     For example, on July 17, 2014 a Cornerstone corpectomy device "buckled under the pressure" after implantation. (Exhibit 107)

181.     For example, on October 21, 2014, one day post-implantation, an Anatomic PEEK cervical corpectomy device was broken inside the patient. (Exhibit 108)

182.     For example, on November 3, 2014 a Cornerstone cervical corpectomy device broke into three pieces while being "tapped" into place in the patient's spine. (Exhibit 109)

183.     For example, on March 12, 2013, an Anatomic PEEK corpectomy device had to be removed and replaced because it had shifted to the side. (Exhibit 110)

184.     For example, on April 5, 2013, a Cornerstone cervical corpectomy device

broke during implantation. (Exhibit 111)

185.     For example, on June 12, 2013 an Anatomic PEEK cervical corpectomy device collapsed inside the patient, thirty-six days after implantation. (Exhibit 112)

186.     For example, on August 13, 2013 an Anatomic PEEK cervical corpectomy device broke inside the patient a "a few months post-op." (Exhibit 113)

187.     For example, on December 1, 2011 a Medtronic Cornerstone PSR cervical corpectomy device was reported to have caused choking, weakness, wasting and weakness of hands, and cancer post-surgery, making the patient unable to work. Patient states that there was no disclosure prior to surgery that the Cornerstone PSR was not approved for cervical corpectomy (Exhibit 114).

188.     For example, on May 27, 2011 a Cornerstone cervical corpectomy device was found to have a loose endcap and had to be removed and replaced (Exhibit 115).

189.     For example, in 2011 a Verte-Stack PEEK interbody fusion device subsided into the adjacent vertebral body, and the patient had to undergo revision surgery (Exhibit 116).

190.     In addition to these reported events, many adverse events involving the Subject Devices have not been reported, and a study shows widespread underreporting of adverse events connected to spine surgery outcomes. (Edwards et al, "Accurate

Identification of adverse outcomes after cervical spine surgery," J. of Bone and Joint Surgery 86,2. 251-256 (2004) Exhibit 117)

191.     Neither Defendants nor the user-facilities reported certain adverse events involving the Verte-Stack Subject Devices.

192.     For example, in December 2006, a Kentucky Medicare/Medicaid patient suffered injuries following use of a Verte-Stack Subject Device. The patient underwent a single-level (L5-S1) translateral lumbar interbody fusion (TLIF) performed at Central Baptist Hospital in Lexington, Kentucky on December 8, 2005. On the date of surgery, there was no FDA clearance or approval for the Capstone Verte-Stack VBS device. The first of twelve clearance orders under the Trade Name Capstone Spinal System was issued by FDA on April 24, 2008, more than 2 and half years after Patient #2's surgery (Exhibit 118). The patient's billing records indicate charges of $35,988 in Medtronic spinal implants along with Medicare parts A and B being billed for a total amount of $51,914.70 (Exhibit 119). The surgeon in this case, Dr. Scott Hodges, has received a large amount of income from Medtronic, including $647,563 that was reported by CMS from 2013-2016. CMS reports indicate that Dr. Hodges was quite loyal to Medtronic, with over 90% of his device company income coming from Medtronic during those years (Exhibit 120).

193.     In February 2008, a California Medicaid patient suffered catastrophic

injuries following synthetic cervical corpectomy with Defendant's Verte-Stack Subject Device components labeled "Verte-stack Cornerstone PSR," "Cornerstone PSR," and "Cornerstone PSR Strut". This patient required three additional revision surgeries, **all billed to Medicaid at over $750,000.00** (Exhibit 121).

194.    In May 2013, a Medicaid recipient in Louisiana, was implanted with the Verte-Stack Anatomic for a C5 cervical corpectomy that failed (Exhibit 122).

      H.    <u>Selling Class III Devices for Unapproved, Contraindicated Uses Is Not Legal "Off-Label Use" – It Is Illegal Misbranding and Adulteration.</u>

195.    Defendants will try to argue that using unapproved Class III devices is "off-label use." As discussed above, this "practice of medicine" exception has been part of the scheme all along – doctors are allowed to exercise their medical judgment to use a drug or device in a way that is not described in the device labeling, and Defendants hope to use this as a shield. The cervical spine is extremely delicate and sensitive, and a device that malfunctions in the cervical spine can cause death, quadriplegia, and other catastrophic, life-altering injuries. In order to avoid products liability for failure to warn of these risks, Defendants actually sought labeling that contraindicated use of the devices in the cervical spine, even though, as described above, some of the devices can <u>only be used in the cervical spine</u>. Thus, the surgeons would be liable for using the devices in an "off-label" manner contraindicated on the device labeling.

196.     Off-label use, however, only applies when a device has a legitimate labeled use approved or cleared by the FDA, and it is only for physicians to do. In fact, the use of most of these devices in an on-label manner would be considered malpractice by expert spine surgeons.

197.     By concealing and contraindicating the intended cervical use of the devices, and then uniformly marketing the products for that very same use to hospitals and physicians, Defendants caused the Subject Devices to be misbranded and adulterated, and thus ineligible for any federal reimbursement.

198.     Defendants brazenly promoted use of the stackable Subject Devices (including Hydrosorb) in "case studies" presented at industry conferences and published in trade journals by hired key-opinion leaders that had affiliations with leading publicly- and privately- funded teaching facilities. No disclosures were made that use of the devices were not FDA-approved, contraindicated or that the case studies/clinical trials were performed under an approved IDE application.

199.     For example, in October 2005, Dr. Mummaneni presented a case study of 15 patients that underwent "fully synthetic cervical corpectomy" involving "PEEK stackable cages" (See Exhibit 123, 2005 Mummaneni cervical corpectomy slide deck).

200.     Because many of the Subject Devices are made of plastic (polymers), they are invisible under imaging. Only the radiopaque markers are visible which are

1    used to confirm implant placement and orientation. Using computer generated

2    imaging (CGI) tools, the radiographs were rendered, and the devices were

3    reconstructed. The device radiographs published in Dr. Mummaneni's case study

4    match the Subject Device components cleared under K030736 (2003), K041197

5    (2004) and K052931 (2005) (Exhibit 124, graphical representation of Mummaneni

6    2005 slides compared to actual subject devices).

7    201.    Dr. Mummaneni and other Medtronic-sponsored opinion leaders co-

8    authored a number of publications referencing the Subject Devices as "PEEK

9    Stackable Cages" or the "Cornerstone PSR" for cervical corpectomy and interbody

10   fusion interbody fusion procedures, never disclosing that such uses were not approved

11   or cleared by the FDA, or that the labeling contraindicated implantation of the devices

12   in the cervical spine (See Exhibits 125, 126, 127).

| Study | Type of study | Indications (# of patients) | Cervical Levels performed | Reported and/or Identified Device | Reported Complications |
|---|---|---|---|---|---|
| Mummaneni et al. (2005) | Case series | Cervical Spondylotic Myelopathy (CSM) (15) | 1-3 (not identified) | Stackable PEEK Cages (Verte-stack XS K030736, K041197, K052931) | 1 Death, Post-op pneumonia |
| Mummaneni et al. (2007) | Prospective review | CSM (UK) | 3-4 (not identified) | | none |
| Theodore et al. (2009) | Case series | Trauma (9), myelopathy (6) | 1 (11) 2 (4) | Cornerstone PSR (Verte-stack XS) | 1 patient hardware failure requiring revision |
| Mummaneni et al. (2011) | Retrospective review | OPPL (9) CSM (22) | C4(8) C5(22) C6(1) | Stackable PEEK Cages (Verte-stack XS K030736, K041197, K052931) | 2 patients C5 palsy |
| Mummaneni et al. (2014) | Retrospective Comparative Review | CSM | 2 level ACCF (29) vs. 3 level ACDF | | 10.3% complication rate for ACCF, greater blood loss associated with ACCF |
| Kushal et al. (2015) | Case Study | Blastomycosis | C6 | (PEEK) Stackable Cage (Verte-stack Anatomic PEEK K070173) | |
| Cervical | IDE | CSM (224) | Single-level | Verte-stack XS | 4 deaths, 28 patients in |

_____

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 93

| IDE/PEEK+ Infuse Study/ NCT 00485173 | | | ACDF | (Cornerstone PSR end caps) [K052931] | unresolved spinal litigation |
|---|---|---|---|---|---|

Mummaneni PV et al. (2005) The Synthetic Anterior Cervical Corpectomy and Fusion: Experience with PEEK Stackable Cages and rhBMP-2. Congress of Neurological Surgeons 25th Annual Meeting, Boston MA Oct 8-13, 2005.

Mummaneni PV, Haid, RW, & Rodts Jr, GE. (2007). Combined ventral and dorsal surgery for myelopathy and myeloradiculopathy. Neurosurgery,60(1), S1-S2.

Theodore N. (2009) Anterior Cervical Corpectomy and Arthrodesis Using Polyetheretherketone (PEEK): Initial Experience in 15 Patients. AANS/CNS Annual Meeting. March 11-14, 2009. Phoenix, AZ.

Gandhoke G., Wu JC, Rowland NC, Meyer SA, Gupta C & Mummaneni PV (2011). Anterior corpectomy versus posterior laminoplasty: is the risk of postoperative C-5 palsy different? Neurosurgical focus, 31(4), E12. http://thejns.org/doi/pdf/10.3171/2011.8.FOCUS11156

Mummaneni PV. et al. (2014). Two Level Corpectomy Versus Three Level Interbody fusion of the Cervical Spine: Analysis of Spinal Alignment, Adjacent Level Disease, Neck Pain, and Neurological Function. 30th Annual AAN/CNS Meeting. Orlando, FL. March 5, 2014.

Kushal PR, Szczodry M, Neckrush S & Sieimnow K. (2015) Anterior cervical corpectomy and fusion for blastomycosis causing destruction of C6 vertebra: a case report. Journal of Medical Case Reports. 9:271.

202.     One of the lead authors of the 2014 study referenced above was Dr. Rishi Wadhwa from UCSF Spine Center in San Francisco. In an August 31, 2015 email, Dr. Wadhwa agreed with the statement that the Cornerstone PSR had been used in this cervical corpectomy study (See Exhibits 128, 129).

203.  Defendants knowingly sold into commerce Subject Device components that were withdrawn from FDA's 510(k) consideration, and thus were non-regulated and illegally marketed devices. The FDA's approval folder for the Verte-Stack XS device (K041197) contains communications between Defendant and the FDA concerning proposed modifications that included tapered (wedged) end cap components and a 44mm tapered center strut. The 44mm tapered struts drew concerns of substantial equivalence by FDA reviewer Brunda Kattekola (See Exhibits 130, 131, 132). Medtronic responded by claiming they would withdraw the concerning centerpiece strut components in order to expedite the review (and clearance) of the

1   device. Yet FDA's unique device identifier ("UDI") and "MAUDE" Adverse Event

2   Reporting databases and internal Medtronic documents demonstrate that the

3   withdrawn 44mm strut components have been and continue to be entirely sold into

4   commerce for its contraindicated cervical use. Two adverse event reports demonstrate

5   that the unapproved Subject Device components resulted in revision surgeries, device

6   malfunction and a patient injury (See Exhibit 133, 134). The unregulated Subject

7   Device 44mm components are also seen in web postings and published study

8   radiographs demonstrating use of the unapproved products for multilevel cervical

9   corpectomy (Exhibit 128, 135). In 2006, Medtronic published a Height Reference

10  guide for the Verte-Stack Cornerstone PSR PEEK devices. In this spreadsheet,

11  Medtronic listed 57 different versions of cervical corpectomy cages using the 44 mm

12  strut, with different footprint sizes and total sizes based on the strut's use with

13  different sized end cap components (Exhibit 136).

14       I.   <u>Defendants Knew It Was Illegal to Promote Spinal Devices for</u>

15           <u>Unapproved and Contraindicated Uses.</u>

16       204.   Prior to selling the cervical Subject Devices, Defendants Knew they were

17  designated as Class III, requiring pre-market approval. Defendants were on notice that

18  their cervical Subject Devices were designated as Class III, and therefore required pre-

19  market approval for all intended uses. Defendants were also on notice that it was

20

1    illegal to sell all the Subject Devices made with PEEK for uses without pre-market

2    approval. A device sold for a use other than its intended use is deemed to be

3    "misbranded." (21 U.S.C. §352) A Class III device sold without a pre-market approval

4    is deemed to be "adulterated." (21 U.S.C. §351(f)) The FDA has issued many warning

5    letters over the years that put the spine device industry on notice of this issue.

6         205.  For example, Jonathan Peck, was on the FDA's review team for multiple

7    Medtronic spinal devices. He co-authored a chapter in the 2012 "PEEK Biomaterials

8    Handbook" in which he wrote, "[T]he FDA does not issue blanket approvals for a

9    device either, but only a device paired with a specific set of indications for use."

10   Furthermore, he wrote, "receiving FDA approval only allows the manufacturer to

11   market their new device for that particular set of indications, **not for any other**

12   **purposes**." (PEEK Biomaterials Handbook. DOI: 10.1016/B978-1-4377-4463-

13   7.10017-X) (emphasis added).

14        206.  For example, FDA Warning Letter issued on November 6, 1997 (see

15   Exhibit 137) described when a spinal device was adulterated and misbranded: "an

16   advertisement promoting a … product for a use not cleared by FDA … has resulted in

17   the misbranding and adulteration of [the product]." The device in question was

18   misbranded because, like the Subject Devices, "no notice or other information

19   respecting the modification of the intended use was provided to FDA … and the

20

device was not found substantially equivalent to a predicate device for the uses implied in the ad."  The device was adulterated because, "it is a class III device … and does not have an approved premarket approval application … or an approved application for an investigational device exemption."

207.  For example, an FDA Warning Letter issued on January 27, 2009 (see Exhibit 138) stated that a vertebral body replacement/corpectomy device was adulterated because it did not have pre-market approval or qualify for an exemption. The device was misbranded because, "The (Valeo VBR) device is indicated for use in the thoracolumbar spine (T1 to L5)" but the sales materials, training materials, and videos "describe[d] the surgical implantation of the Valeo-C VBR in the cervical spine" (emphasis added).

208.  For example, FDA Warning Letter issued on December 7, 2007 (see Exhibit 139) stated that a cervical cage was deemed adulterated because the manufacturer did not have premarket approval for the device or qualify for an exemption. The device was misbranded because the manufacturer did not inform the FDA of its intent to introduce the device into commercial distribution.

209.  For example, FDA Warning Letter issued on June 12, 2014 (see Exhibit 140) stated that changing the shape of certain interbody fusion devices constituted a "major design change" that triggered a new premarket requirement called a 510(k):

1   "These [old] 510(k)s were cleared for straight and curved designs of various

2   sizes…Your addition of the bulleted design is a major design change from your

3   original premarket clearance submission that can significantly affect the safety and

4   effectiveness of the device, and thus requires a new 510(k)."

5        J.   <u>Defendants Paid Royalties and Kickbacks to Surgeons in Connection with the Subject Devices.</u>

6

7        210.  The omission of material facts concerning the Verte-stack design

8   modifications was part of scheme or schemes and pattern of misrepresentation by at

9   least one of the inventors of the original Verte-stack device. Kevin T. Foley is listed as

10  an inventor of U.S. patents consistent with devices that had been modified to match

11  the dimensional and design rationale of Defendants' allograft "Cornerstone" products.

12  Though the dimensional characteristics conveyed in patent information and marketing

13  materials for the Cornerstone refer only to product use in the cervical spine, payments

14  to Kevin T. Foley gathered from the CMS Sunshine Act database show that he has

15  been paid only $15.00 in royalties attributed to cervical devices, while having received

16  payments in excess of $100 Million dollars for devices labeled for use in the lumbar

17  spine (Exhibit 141). On information and belief Defendants have paid illegal proceeds

18  from the sale of non-bone, illegally marketed cervical spinal devices to Kevin Foley

19  disguised as "royalties" and "consulting fees" attributed to intellectual property

20

1   interests in lumbar devices.

2          211.  So successful were Defendants' schemes, the sale of the mislabeled

3   devices quickly increased alongside the illegal revenue to Medtronic. In order to

4   ensure that Medtronic would capture a large amount of market share from the

5   legitimate devices, such as the market share for cadaver bone struts for cervical

6   corpectomies, Defendants illegally provided monetary and other incentives for

7   physicians who were willing to use the Subject Devices. Defendants funneled money

8   to physicians in the form of free referral services, consulting agreements, travel, and

9   dining. This induced physicians to use the Subject Devices, forming a quid pro quo

10  relationship of payments and entertainment for device sales and implants, and

11  therefore constituted illegal kickbacks. Federal laws and regulations governing

12  Medicaid and Medicare and similar state statutes prohibit medical device companies

13  from providing kickbacks to physicians and medical care providers. 42 U.S.C. §

14  1320a-7b(b)(2)(B). To conceal the nature of the kickback payments from insurance

15  carriers and patients, Defendants entered into contractual agreements with doctors and

16  hospitals to provide financial inducements through significant rebates on the subject

17  device sales. The compensation paid was based on the number of subject devices that

18  were sold to and used by the customer physicians and hospitals.

19         212.  Defendants used different types of kickbacks to drive sales of the Subject

20

Devices. Among other improper inducements, Defendants provided inappropriate

rebates for unapproved combination purchases; paid travel and training for physicians

on illegal device implant procedures at cadaver training labs around the country,

including in Memphis, Las Vegas, and others; based the decision to pay for travel and

training on the physician's potential to create return on investment for the company;

and provided free professional marketing and referral development services for

physicians who had the potential to create return on investment for the company.

Defendants hosted these trainings, events, and dinners for physicians with the

expectation that the physicians would, in turn, choose Defendants' products to use in

surgery. These are quid pro quo arrangements, and they are illegal when they are

connected to government health care programs.

213. Defendants also illegally paid kickbacks of cash, honoraria, grants, fees,

"consulting fees", payments for referral development programs, market development

programs, travel, entertainment, and other kickbacks to physicians and publicly

funded hospitals in order to divert government funds from Medicaid, Medicare,

TriCare, state funds from state-funded university hospitals and from National

Institutes of Health (NIH) funds from NIH-funded hospitals into their own coffers.

Defendants use illegal kickbacks and quid pro quo arrangements to ensure that

physicians would increase their use of Medtronic's devices, ensuring that charges

1  would be made to publicly funded insurance programs and to state funded and NIH

2  funded programs. None of these incentives have anything to do with true scientific or

3  medical research or with the safety of patients.

4      1.   *Improper Rebates*

5      214.  For example, based on Defendants' internal documents, Defendants'

6  sales agreements with Hospitals contain inducements in the form of rebates or

7  kickbacks for purchasing mislabeled Subject Device components, where the

8  components were designed for non-FDA approved uses in the cervical and lumbar

9  spine, including: "VerteStack Cornerstone PSR", "Cervical Revision Set",

10  "Pyramesh", "Hourglass Vert Body Spacer", "Telamon Titanium", "Vertespan",

11  "Telamon P – PEEK", "PEEK Verte-Stack", "Crescent VB Spacer", "Capstone PEEK

12  Vert Body Spacer", "XVBR PEEK", "Boomerang II", "Perimeter XS PEEK Spacers",

13  "Clydesdale VBS", and "Capstone L VBS". (See e.g., internal Medtronic documents

14  including: Medtronic Sofamor Danek USA, Inc. Pricing and Rebate Agreement

15  entered into between Defendants and St. Johns Health Center, Santa Monica, CA,

16  signed and dated May 30, 2007 (see Exhibit 142), and the Pricing and Rebate

17  Agreement references 2005 and 2006 price lists; and Pricing Agreement Between

18  Medtronic Sofamor Danek USA, Inc. and Cedar Sinai Medical Center, dated August

19  3, 2008, see Exhibit 143).

20

2. *Quid Pro Quo "Marketing" and "Referral Development"*
*Programs*

215. Defendants encourage physicians to implant Medtronic devices through

direct payments or by inviting them to receive expensive referral development

programs, otherwise described by Medtronic sales reps as "co-marketing programs",

"market development programs", and Therapy Awareness Programs, or "TAP".

Medtronic recruits physicians to dinners or conferences and pays the expenses for

them and their local physician referral sources to be entertained at expensive dinners

or on paid travel excursions to hear the implanting physicians give presentations in

support of Medtronic devices. Under the guise that Medtronic was acting as "co-

marketers", Defendants' sales force sold these events to implanting spine surgeons as

free business development, or as a way to expand their network of referring physicians

in order to significantly increase their own income. At these meetings, Medtronic

would give these physicians presentations related to Medtronic devices to help induce

other physicians to refer their patients for Medtronic implants.

216. Defendants also paid physicians to speak at these events. In each

instance, Defendants organized and paid for the entire cost of the event. By paying

spinal surgeons to speak at these co-marketing programs, Defendants improperly

induced spinal surgeons to continue using Defendants' devices, or to start using

1  Defendants' devices rather than using a competitor's device.

2      217.  Defendants' internal documents show that Defendants ran these programs

3  with the expectation that the physicians would buy Defendants' devices. In most

4  cases, there was no equitable commitment of resources from the spine surgeon whose

5  services Medtronic was promoting to his or her referral sources – Defendants paid for

6  the events up front with the understanding that business generated for the surgeons

7  would be business for Medtronic.

8      218.  Payment for these referral development programs and the provision of

9  travel, meals, and other incentives to increase referrals to a physician for the use of

10  Medtronic Spinal devices is inappropriate and illegal. For example, according to the

11  federal Health and Human Services Office of the Inspector General (HHS OIG), paid

12  meals would be inappropriate if they are tied directly or indirectly to the generation of

13  federal health care program business for the manufacturer, or for the purposeful

14  inducement of business. *See, e.g.*, 68 F.R. 2378 ("these arrangements potentially

15  implicate the anti-kickback statute if any one purpose of the arrangement is to

16  generate business.")

17      219.  Defendants offered the referral development programs as a free service

18  for physicians, clinics and hospitals who agreed to implant Medtronic devices. These

19  programs are designed by marketing professionals to assist clinics and hospitals to

20

build and maintain referral relationships with other doctors. Essentially, the purpose of referral development is to "grow the market" of patients coming to the clinic, and generating this growth involves a series of expensive services. These services include but are not limited to the following: Analyzing a clinic's current referral trends, creating networking and marketing opportunities for the clinic's physicians to meet with their referral physicians, and sending marketing representatives into the field to do one-on-one direct marketing with a clinic's referring physicians.

220.  Medtronic offered referral development for free to customers who agreed to implant Medtronic's spine devices. Defendants provided these services using in-house Medtronic sales representatives to do the referral development work on a quid pro quo basis. Medtronic personnel went into the field to offer the same expensive dinner programs, free travel, and other perks that were being offered to spine surgeons to their referral physicians who would promise to refer their spine patients for Medtronic implants. By 2012, free referral development services had become such an integral part Medtronic's business strategy that the company created and implemented sales tracking spreadsheets to track the promotion of these programs. Sales personnel were required to push Medtronic spine implant products with this large referral physician population, and they were also required to grow the referral physician networks for each implanting spine surgeon. Here, it is important to note that these

referral programs were designed to offer kickbacks to a large population of new physicians – not just the current implanting "users" of the devices, but also to their referral partners. Clearly, the goal was to expand and grow Medtronic's market share for its spine implant devices.

221.  Several professional marketing companies offer fee-for-service referral development programs for clinics and hospitals. These professional marketing companies quote general dollar figures ranging from approximately $1,000 per month to do arms-length referral contacting, up to $60,000 to $70,000 in startup data acquisition costs averaging plus up to an additional $5,000 per month. These were all services which Defendants provided to spine surgeons free of charge, in order to drive sales of Medtronic devices. These figures do not take into account the amount that Defendants spent on expensive dinners and paid travel for the spine surgeons and the referring physicians. But even these conservative estimates show that a two-year program of referral development could cost a clinic at least $24,000 to $108,000 dollars, which results in a tremendously valuable illegal inducement for surgeons to use Defendants' devices.

222.  For example, in a January 16, 2015 Medtronic sales email, a sales rep from Connecticut promoted his sales team's "flawless execution" of a TAP referral marketing program for Dr. Benalcazar and its positive return on investment on their

half-million-dollar FY16 sales quota:

> "You bought in on the valuable impact this program could have on our business, invited the appropriate targets, held them accountable to actually showing up (that's the hardest part), and engaged them in discussions last night to ensure a high rate of procedural adoption. The work is not finished, but with the right followup and business driving activities I know we will achieve our goal of approaching $500,000 in Rialto Sales for FY16" (See Exhibit 144).

Dr. Benalcazar was reported by CMS to have received $197,846 in payments from Medtronic from 2013-2016, with over 90% of his total medical device company payments coming from Medtronic, showing the company's significant investment in growing his business (Exhibit 145). According to CMS, Dr. Benalcazar is an active Medicare provider, performing 253 spine surgery services for Medicare patients in 2015 alone (Exhibit 146).

223.  For example, in an April 16, 2014 internal sales training document titled "Medtronic Cold Call", Defendants advised their sales force to create referral development programs for physicians by helping the spine surgeons to promote the use of Defendants' devices for use in Laminoplasty (orthopedic surgical procedure for treating spinal stenosis by relieving pressure on the spinal cord). The sales training document urged Medtronic sales force to promote the company's co-marketing materials on Laminoplasty services, "which include presentations designed for referring professionals and patients", to be used "to help your surgeons promote their practices and specialties in their communities" (See Exhibit 147).

224.  For example, for Dr. Ojedapo Ojeyemi at Howard University Hospital in Washington, DC, a Medtronic sales rep noted in 2012 that "referral marketing" was a sales resource, and that they were "Waiting for it to go through hospital compliance and Medtronic compliance. Will need financial resources approx 15K. May need the assistance of Comarketing compliance support" (See Exhibit 148, p. 14).

225.  For example, for Dr. Hubert Gooch of Memorial Mission Hospital in Asheville, NC, a Medtronic sales rep noted in 2012 that a "Surgeon referral presentation" was a Resource Description to be used to help "top" a FY13 contribution of $91,667 (See Exhibit 148, p. 17).

226.  For example, for Dr. Laurent of Bon Secours DePaul Medical Center in Norfolk, VA, a Medtronic sales rep noted in 2012 that they needed a "Complete Co-marketing event in Nags Head market to drive cases due to departure of Dr. Thai" and to help "maintain" a FY13 contribution of $ 218,750. In the case of Medtronic marketing, the term "co-marketing" was used to infer a referral development event on behalf of the implanting surgeon (See Exhibit 148, p. 17).

227.  For example, for Dr. Matthew Lee of Tallahassee Memorial Regional Medical Center in Tallahassee, FL, a Medtronic sales rep noted in 2012 that "referral marketing" was a sales resource to help "defend" a FY13 contribution of $ 183,333, and that they "Had a new surgeon hand-off dinner organized by Casey Strachan" (See

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 107

Exhibit 148, p. 18).

228. For example, for Dr. Ramo of Arnold Palmer Hospital in Orlando, FL, a Medtronic sales rep noted in 2012 that "Ramo marketing dinners" for referral marketing was a sales resource to help "maintain" a FY13 contribution of $458,333 (See Exhibit 148, p. 19).

229. For example, for Dr. Awad of Bridgeport Hospital in Bridgeport, CT, a Medtronic sales rep noted in 2012 the need to "Develop MAST MIDLIF CoMarketing" as a sales resource to help "maintain" a FY13 contribution of $229,167. The term "co-marketing" was used to infer a referral development event on behalf of the implanting surgeon (See Exhibit 148, p. 21).

230. For example, for Dr. Clayton Dean of Mercy Medical Center in Baltimore, MD, a Medtronic sales rep noted in 2012 that referral marketing was a sales resource to help "Develop" a FY13 contribution of $ 73,333, and that "he wants to do Co-Marketing Events with Medtronic" (See Exhibit 148, p. 23). According to CMS, Dr. Dean was a very active spine surgeon by 2014, performing 1,026 spine surgery services for Medicare patients in 2014 alone (Exhibit 149).

231. For example, for Dr. Oshtory of California Pacific Med Center in San Francisco, CA, a Medtronic sales rep noted in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $ 68,750, and that "He wants help

driving referrals" (See Exhibit 148, p. 26).

232.  For example, for Dr. Ball of San Ramon Regional Medical Center in San Ramon, CA, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $ 137,500, and that the company should "Continue referral marketing programs in the Walnut Creek, Pleasonton area" (See Exhibit 148, p. 27).

233.  For example, for Drs. Derek Duke and James Forage of St. Rose Dominican Siena Campus in Henderson, NV, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource, and that with respect to these doctors, "Driving pt's to any surgeon will increase our business through a leveraged business partnership model. this will overcome just about any obstacle". Other entries by the Medtronic sales rep in 2012 stated that a sales resource was "Referral Marketing Dinners any spine referring physician", and on a "Monthly Basis w/ Referral Sources". Another entry by the Medtronic sales rep for Dr. Forage in 2012 stated simply "Referral Drivin [sic] business" (See Exhibit 148, p. 28). Medtronic's efforts to build Dr. Duke's and Dr. Forage's business appeared to make good business sense, as according to CMS, they were very active spine surgeons by 2014, with Dr. Duke performing 699 spine surgery services for Medicare patients in 2014 alone, and Dr. Forage performing 354 Medicare spine surgery services for Medicare in 2014 (Exhibit

150).

234.  For example, for Dr. Moza of Thousand Oaks Surgical Hospital in Thousand Oaks, CA, a Medtronic sales rep wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $ 916,667 and wrote "develop referral base" (See Exhibit 148, p. 29).

235.  For example, for Dr. Onibokun of Elmhurst Memorial Hospital in Elmhurst, IL, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource, and that the doctor was "Starting at new hospital with new group so need to get busy. Have five referral meeting set up over the next two months (See Exhibit 148, p. 32).

236.  For example, for Dr. Scott Russo of Spectrum Downtown hospital in Michigan, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "Top" a FY13 contribution of $ 37,500, and wrote "Develop marketing plan to drive peds scoli business to surgeon", referring to gaining new pediatric scoliosis clients (See Exhibit 148, p. 32). Dr. Russo was reported by CMS to have received $47,877 in payments from Medtronic from 2013-2016, with over 90% of his total medical device company payments coming from Medtronic, showing the company's significant investment in growing his business (Exhibit 151). According to CMS, Dr. Russo is an active Medicare provider, performing 156 spine surgery

1   services for Medicare patients in 2015 alone (Exhibit 152).

2        237.  For example, for Dr.'s Citow, Alzate, and Erickson at Advocate Condell

3   Medical Center in Libertyville, IL, a Medtronic sales force wrote in 2012 that they

4   were "Having a dinner meeting with Executives from Accelerated Rehab to establish a

5   referral network to The American Center for Spine and Neurosurgery. This could be a

6   huge new source of referrals". Part of the plan was to "Defend" a FY13 contribution

7   of $91,667 (See Exhibit 148, p. 34).

8        238.  For example, for Dr. Ahmad Latefi of North Shore University Hospital in

9   Lynbrook, NY, a Medtronic sales force wrote in 2012 that referral marketing was a

10  sales resource to help "Top" a FY13 contribution of $ 641,667, and wrote that the

11  doctor "Wants to continue building his practice through referral talks and

12  presentations" (See Exhibit 148, p. 37).

13       239.  For example, for Dr. Rohit Verma of North Shore University Hospital in

14  Great Neck, NY, a Medtronic sales rep wrote in 2012 that referral marketing was a

15  sales resource to help "Top" a FY13 contribution of $ 229,167, and wrote that the

16  doctor "Wants to continue promoting his practice through a series of smaller

17  presentations and dinners with a general spine overview along with case presentation"

18  (See Exhibit 148, p. 37). Medtronic went on to give Dr. Verma $10,083 in

19  inducements such as speaking fees, consulting fees, travel and food in 2014 (Exhibit

20

153).

240.  For example, for Dr. Daniel Brandenstein of Southside Hospital in Bay Shore, NY, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $ 275,000, and wrote that the doctor was "Interested in growing his practice through co-marketing events" (See Exhibit 148, p. 37). Medtronic went on to give Dr. Brandenstein $8,205 in inducements such as consulting fees, travel and food in 2014 (Exhibit 154).

241.  For example, for Dr. Alexios Apazidis of Brookhaven Memorial Medical Center in Patchogue, NY, a Medtronic sales force wrote in 2012 that referral marketing was a sales resource to help "maintain" a FY13 contribution of $183,333, and wrote that the "Surgeon would like assistance in Marketing events to help grow his practice" (See Exhibit 148, p. 37). Medtronic went on to give Dr. Apazidis $18,491 in inducements such as speaking fees, consulting fees, travel and food in 2014 (Exhibit 155).

242.  For example, a Medtronic sales planning spreadsheet for 2011 stated that there were two co-marketing referral development events planned to help meet a quarterly sales quota of over $809,000 for the Glendale and Pasadena, CA territory: "Event for Dr Fineman combined with Dr Ashford. It is a dinner with a group of PCP's in Pasadena"; and "PCP lunch for Dr Falkinstein with the internal med and

1   family practice doctors of Lakeside Medical" (See Exhibit 156, p. 5).

2       243.  A 2014 Medtronic sales planning event for 2015 stated that there were

3   two co-marketing referral development activities planned: "Dr. Duffner in Palm

4   Springs may branch out on his own and will need marketing support"; and "Dr.

5   Mahoney OLIF marketing campaign" (See Exhibit 157, p. 1).

6       K.      Medtronic's Fraud Resulted in Violation of the False Claims Act

7       244.  Medtronic made material misrepresentations at every step of the way to

8   the final step of the government paying funds for the Subject Devices.

9       245.  Medtronic obtained FDA approval of the Subject Devices by falsely

10  claiming to the FDA that the Subject Devices were for use in the thoracolumbar spine.

11  The Subject Devices, however, were designed and manufactured for, and could only

12  be used in the cervical spine. Accordingly, Medtronic's provision of the misbranded

13  Subject Devices was itself a factually false certification. This is only one of numerous

14  material predicate lies that Defendants told on the way to government reimbursement.

15      246.  As described above, after obtaining the sham label, Defendants used a

16  bait-and-switch strategy to convince doctors to use the Subject Devices. The bait-and-

17  switch also concealed the true risks of the spinal surgeries from patients, preventing

18  them from giving informed consent.

19      247.  Moreover, by submitting claims for payment and causing hospitals to

20

seek reimbursement for the Subject Devices, Medtronic represented that it was providing devices approved by the FDA that were not adulterated or misbranded. This was totally false, and therefore actionable under an implied certification theory.

248.  Although the Subject Devices were "FDA-approved" in name, Medtronic then switched the name for marketing purposes, and omitted critical information regarding compliance with FDA standards. Medtronic's fraud was directed at the FDA, the Center for Medicare and Medicaid Services and other payers, and the Department of Health and Human Services, which oversees both the FDA and CMS.

249.  Regardless, Medtronic's provision of unapproved and non-compliant devices was itself a false certification done knowingly and with intent to deceive.

250.  CMS would not have approved payment for the Subject Devices had Medtronic disclosed the true use of the Subject Devices for a contraindicated purpose. Without CMS approval, the devices could not be reimbursed by Medicaid and Medicare, and the United States would not have paid for the devices. Accordingly, Medtronic's false representations here were material.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### False Claims Act: Presentation of False Claims 31 U.S.C. § 3729(a)(l)(A)

251.  Relator re-alleges and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 114

252.  Defendants' Subject Devices would never have been sold in the United States if not for serious misrepresentations that Defendants made to FDA and to their customers (doctors, hospitals, and patients). By presenting physicians and hospitals with false information about their devices that were not cleared or approved by the FDA, Defendants caused physicians and facilities to submit numerous bills for Defendants' illegal experimental devices and associated surgical procedures and associated hospital and outpatient facility charges, that were ineligible for reimbursement by Government Health Care Programs. Defendants knowingly caused physicians and healthcare facilities, expressly or impliedly, to make false certifications about Defendants' illegal experimental devices. Defendants therefore caused the submission of false claims for payment by Government Health Care Programs. Defendants' numerous misrepresentations materially misled every party that encountered the Subject Devices. Defendants misled FDA about the intended use of the Devices. Defendants lied by omission to doctors and hospitals by allowing them to believe the Devices were approved for use in the neck and spine. Finally Defendants Had the United States known the preceding facts, the United States would not have provided reimbursement for such illegal experimental devices, or the associated surgical procedures, hospital and outpatient facility charges. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(l)(A).

253.  The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False Record or Statement to Cause Claim to be Paid) (31 U.S.C. § 3729(a)(l)(B))

254.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

255.  As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements - i.e., the false certifications and representations made or caused to be made by defendant - material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(l)(B).

## THIRD CAUSE OF ACTION
### (Violations of Anti-Kickback Statute) (42 U.S.C. § 1320a-7a)

256.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

257.  By engaging in the conduct described in the foregoing Paragraphs, Defendants have violated 42 U.S.C. § 1320a-7a and 42 C.F.R. § 1001.952(f).

258.  Defendants have knowingly caused to be submitted claims to the United States Government and to Government Health Care Programs as a result of the

payment of kickbacks. The payment of kickbacks to induce purchases constitutes remuneration to increase the level of business in violation of the anti-kickback statute.

259.  Pursuant to paragraph (g) of 42 U.S.C. § 1320a-7b, a claim for payment to a Federal Health Care Program that includes items or services resulting from a violation of The Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

260.  As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for medical procedures, associated hospital and outpatient facility charges which, had the Government known were utilized as a result of the kickbacks, the Government would not otherwise have paid for and/or reimbursed.

**PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT**

261.  Relator respectfully requests this Court to enter judgment against Defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b) That civil penalties at the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this action.

## FOURTH CAUSE OF ACTION
### (Arkansas Medicaid Fraud False Claims Act) (A.C.A. § 20-77-901 et seq.)

262.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

263.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Arkansas. Upon information and belief, Defendants' actions described herein occurred in the State of Arkansas as well.

264.  This is a qui tam action brought by Relator and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

265.  The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who- Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program; At any time knowingly makes or

causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

266.  In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

267.  Defendants violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) (2) & (7)(A) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

268.  Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2001 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described herein.

269.  The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

270.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants' fraudulent and illegal practices.

271.  Had the State of Arkansas known that Defendants was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

272.  As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

273.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint and brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of themselves and the State of Arkansas.

274.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

275.  Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State of Arkansas and Relator are entitled to the following damages as against Defendants:

276.  To the STATE OF ARKANSAS: Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Arkansas; prejudgment interest; and all costs incurred in bringing this action.

277.  To RELATOR: The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law; reimbursement for reasonable expenses which Relator incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## FIFTH CAUSE OF ACTION
### (California False Claims Act) (Cal. Gov't Code § 12650 et seq.)

278.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

279.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of California. Upon information and belief, Defendants' actions described herein occurred in the State of California as well.

280.  This is a qui tam action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal.

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 121

1   Gov't. Code § 12650 et seq.

2   281. Cal. Gov't Code § 12651(a) provides liability for any person who:

3   Knowingly presents, or causes to be presented, to an officer or employee of the state

4   of any political division thereof, a false claim for payment or approval; knowingly

5   makes, uses, or causes to be made or used a false record of statement to get a false

6   claim paid or approved by the state or by any political subdivision; conspires to

7   defraud the state or any political subdivision by getting a false claim allowed or paid

8   by the state of by any political subdivision; is a beneficiary of an inadvertent

9   submission of a false claim to the state or a political subdivision, subsequently

10  discovers the falsity of the claim, and fails to disclose the false claim to the state or the

11  political subdivision within a reasonable time after discovery of the false claim.

12  282. In addition, the payment or receipt of bribes or kickbacks is prohibited

13  under Cal. Bus. & Prof. Code §§ 650 and 650.1 and is also specifically prohibited in

14  treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

15  283. Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal.

16  Welf. & Inst. Code § 14107.2 from at least 2001 to the present by engaging in the

17  fraudulent and illegal practices described herein.

18  284. Defendants furthermore violated Cal. Gov't Code § 12651(a) and

19  knowingly caused hundreds of thousands of false claims to be made, used and

20

presented to the State of California from at least 2001 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as described herein.

285.  The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

286.  Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

287.  Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

288.  As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

289.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

290.  This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

291.  Pursuant to the California False Claims Act, the State of California and Relator is entitled to the following damages as against Defendants:

292.  To the STATE OF CALIFORNIA: Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California; prejudgment interest; and all costs incurred in bringing this action.

293.  To RELATOR: The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law; reimbursement for reasonable expenses which Relator incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this Court deems

equitable and just.

## SIXTH CAUSE OF ACTION
### (Colorado Medicaid False Claims Act) (Col. Rev. Stat. §§ 25.5-4-303.5 et seq.)

294.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

295.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Colorado. Upon information and belief, Defendants' actions described herein occurred in the State of Colorado as well.

296.  This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. et seq.

297.  Colorado Revised Statutes § 25.5-4-305 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property; authorizes the making or delivery of a document certifying receipt of property used, or to be

1  used, by the state in connection with the "Colorado Medical Assistance Act" and,

2  intending to defraud the state, makes or delivers the receipt without completely

3  knowing that the information on the receipt is true; knowingly buys, or receives as a

4  pledge of an obligation or debt, public property from an officer or employee of the

5  state in connection with the "Colorado Medical Assistance Act" who lawfully may not

6  sell or pledge the property; knowingly makes, uses, or causes to be made or used, a

7  false record or statement material to an obligation to pay or transmit money or

8  property to the state in connection with the "Colorado Medical Assistance Act", or

9  knowingly conceals or knowingly and improperly avoids or decreases an obligation to

10  pay or transmit money or property to the state in connection with the "Colorado

11  Medical Assistance Act"; conspires to commit a violation of paragraphs (a) to (f) of

12  this subsection.

13      298.  Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least

14  2001 to the present by engaging in the fraudulent and illegal practices described

15  herein.

16      299.  Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305

17  and knowingly caused thousands of false claims to be made, used and presented to the

18  State of Colorado from at least 2001 to the present by its violation of federal and state

19  laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

20

300.  The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

301.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Defendants' fraudulent and illegal practices.

302.  Had the State of Colorado known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

303.  As a result of Defendants' violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

304.  Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Colorado Revised Statutes § 25.5-4-306(2) on behalf of itself and the State of Colorado.

305.  This Court is requested to accept supplemental jurisdiction of this related

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 127

state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of Colorado in the operation of its

Medicaid program.

306. Pursuant to the Colorado Medicaid False Claims Act, the State of

Colorado and Relator is entitled to the following damages as against Defendants:

307. To the STATE OF COLORADO: Three times the amount of actual

damages which the State of Colorado has sustained as a result of Defendants'

fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more

than $11,000 for each false claim which Defendants caused to be presented to the

State of Colorado; prejudgment interest; and all costs incurred in bringing this action.

308. To RELATOR: The maximum amount allowed pursuant to Colorado

Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

reimbursement for reasonable expenses which Relator incurred in connection with this

action; an award of reasonable attorneys' fees and costs; and such further relief as this

court deems equitable and just.

## SEVENTH CAUSE OF ACTION
### (Connecticut False Claims Act for Medical Assistance Programs) (Connecticut General Statutes § 17b-301b. et seq.)

309. Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

310.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Connecticut. Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

311.  This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. et seq.

312.  Connecticut General Statutes § 17b-301b. provides liability for any person who: knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services; knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services; conspires to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

313.  Defendants violated Connecticut General Statutes § 17b-301b from at least 2001 to the present by engaging in the fraudulent and illegal practices described

herein.

314. Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

315. The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

316. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' fraudulent and illegal practices.

317. Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

318. As a result of Defendants' violations of Connecticut General Statutes §

17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

319. Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Connecticut General Statutes § 17b-301d on behalf of itself and the State of Connecticut.

320. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

321. Pursuant to the Connecticut False Claims Act for Medical Assistance Programs, the State of Connecticut and Relator is entitled to the following damages as against Defendants:

322. To the STATE OF CONNECTICUT: Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut; prejudgment interest; and all costs incurred in bringing this action.

323. To RELATOR: The maximum amount allowed pursuant to Connecticut

General Statutes § 17b-301 and /or any other applicable provision of law;

reimbursement for reasonable expenses which Relator incurred in connection with this

action; an award of reasonable attorneys' fees and costs; and such further relief as this

court deems equitable and just.

## EIGHTH CAUSE OF ACTION
### (Delaware Medicaid False Claims Act) (6 Del. C. § 1201 et seq.)

324.  Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

325.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in

the State of Delaware. Upon information and belief, Defendants' actions described

herein occurred in Delaware as well.

326.  This is a qui tam action brought by Relator and the State of Delaware to

recover treble damages and civil penalties under the Delaware Medicaid False Claims

Act, 6 Del. C. § 1201 et seq.

327.  6 Del. C. § 1201 et seq. provides liability for any person who: knowingly

presents, or causes to be presented, directly or indirectly, to an officer or employee of

the Government a false or fraudulent claim for payment or approval; knowingly

makes, uses or causes to be made or used, directly or indirectly, a false record or

statement to get a false or fraudulent claim paid or approved; conspires to defraud the

Government by getting a false or fraudulent claim allowed or paid; knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government.

328.  Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

329.  Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2001 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

330.  The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

331.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Delaware in

connection with Defendants' fraudulent and illegal practices.

332.  Had the State of Delaware known that Defendants were violating the

federal and state laws cited herein, it wound not have paid the claims submitted by

health care providers and third-party payers in connection with Defendants' fraudulent

and illegal practices.

333.  As a result of Defendants' violations of 6 Del. C. § 1201(a), the State of

Delaware has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

334.  Defendants did not, within 30 days after it first obtained information as to

such violations, furnish such information to officials of the State responsible for

investigating false claims violations, did not otherwise fully cooperate with any

investigation of the violations, and have not otherwise furnished information to the

State regarding the claims for reimbursement at issue.

335.  Relator is a private person with direct and independent knowledge of the

allegations of this Complaint, who have brought this action pursuant to 6 Del. C. §

1203(b) on behalf of themselves and the State of Delaware.

336.  This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

337. Pursuant to the Delaware Medicaid False Claims Act, the State of Delaware and Relator is entitled to the following damages as against Defendants:

338. To the STATE OF DELAWARE: Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware; prejudgment interest; and all costs incurred in bringing this action.

339. To RELATOR: The maximum amount allowed pursuant to 6 Del C. § 1205, and /or any other applicable provision of law; reimbursement for reasonable expenses which Relator incurred in connection with this action; and an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

**NINTH CAUSE OF ACTION**
**(District of Columbia Procurement Reform Amendment Act) (D.C. § 2-308.13 et seq.)**

340. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

341.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the District of Columbia. Upon information and belief, Defendants' actions described herein occurred in the District of Columbia as well.

342.  This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

343.  D.C. Code § 2-30814(a) provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval; knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District; conspires to defraud the District by getting a false claim allowed or paid by the District; is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

344.  In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following: Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or recommending the purchase, lease, or

order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

345.  Defendants violated D. C. Code § 4-802(c) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

346.  Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2001 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

347.  The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

348.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' fraudulent and illegal practices.

349.  Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by

health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

350.  As a result of Defendants' violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

351.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

352.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

353.  Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relator is entitled to the following damages as against Defendants:

354.  To the DISTRICT OF COLUMBIA: Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the

District of Columbia; prejudgment interest; and all costs incurred in bringing this action.

355.  To RELATOR: The maximum amount allowed pursuant to D. C. Code § 2-308.15(f) and /or any other applicable provision of law; reimbursement for reasonable expenses which Relator incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TENTH CAUSE OF ACTION
### (Florida False Claims Act) (Fla. Stat. §§ 68.081 et seq.)

356.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

357.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Florida. Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

358.  This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 et seq.

359.  The Florida False Claims Act provides liability for any person who: knowingly presents or causes to be presented to an officer or employee of an agency a

false claim for payment or approval; knowingly makes, uses, or causes to be made or

used a false record or statement to get a false or fraudulent claim paid or approved by

an agency; conspires to submit a false claim to an agency or to deceive an agency for

the purpose of getting a false or fraudulent claim allowed or paid.

360.  Defendants violated the Florida FCA from at least 2001 to the present by

engaging in the fraudulent and illegal practices described herein. Defendants

furthermore violated the Florida FCA and knowingly caused thousands of false claims

to be made, used and presented to the State of Florida from at least 2001 to the present

by its violation of federal and state laws, including the Anti-Kickback Act, and the

Stark Act, as described herein.

361.  The State of Florida, by and through the State of Florida Medicaid

program and other state health care programs, and unaware of Defendants' fraudulent

and illegal practices, paid the claims submitted by health care providers and third

payers in connection therewith.

362.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Florida in

connection with Defendants' fraudulent and illegal practices.

363.  Had the State of Florida known that Defendants were violating the

1   federal and state laws cited herein, it would not have paid the claims submitted by

2   health care providers and third-party payers in connection with Defendants' fraudulent

3   and illegal practices.

4        364.  As a result of Defendants' violations of the Florida FCA the State of

5   Florida has been damaged in an amount far in excess of millions of dollars exclusive

6   of interest.

7        365.  Relator is a private person with direct and independent knowledge of the

8   allegations of this Complaint, who have brought this action pursuant to the Florida

9   FCA on behalf of themselves and the State of Florida.

10       366.  This Court is requested to accept supplemental jurisdiction of this related

11  state claim as it is predicated upon the exact same facts as the federal claim, and

12  merely asserts separate damage to the State of Florida in the operation of its Medicaid

13  program.

14       367.  Pursuant to the Florida False Claims Act, the State of Florida and Relator

15  is entitled to the following damages as against Defendants:

16       368.  To the STATE OF FLORIDA: Three times the amount of actual damages

17  which the State of Florida has sustained as a result of Defendants' fraudulent and

18  illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for

19  each false claim which Defendants caused to be presented to the State of Florida;

20

1    Prejudgment interest; and all costs incurred in bringing this action.

2         369.  To RELATOR: The maximum amount allowed pursuant to West's

3    F.S.A. § 68.085 and /or any other applicable provision of law; Reimbursement for

4    reasonable expenses which Relator incurred in connection with this action; An award

5    of reasonable attorneys' fees and costs; and such further relief as this court deems

6    equitable and just.

7                          **ELEVENTH CAUSE OF ACTION**
     **(Georgia State False Medicaid Claims Act) (Ga. Code Ann. § 49-4-168 et seq.)**

8
9         370.  Relator re-alleges and incorporates by reference each of the paragraphs

10   above as if fully set forth herein and further alleges as follows.

11        371.  Additionally, Relator states that the course of conduct described in this

12   Complaint was a nationwide practice of Defendants. Defendants conduct business in

13   the State of Georgia. Upon information and belief, Defendants' actions described

14   herein occurred in Georgia as well.

15        372.  This is a qui tam action brought by Relator and the State of Georgia to

16   recover treble damages and civil penalties under the Georgia State False Medicaid

17   Claims Act, Ga. Code Ann. § 49-4-168 et seq.

18        373. Ga. Code Ann. § 49-4-168.1 et seq. provides liability for any person who:

19   Knowingly presents or causes to be presented to the Georgia Medicaid program a

20   false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes

to be made or used, a false record or statement to get a false or fraudulent claim paid

or approved by the Georgia Medicaid program; Conspires to defraud the Georgia

Medicaid program by getting a false or fraudulent claim allowed or paid; Knowingly

makes, uses, or causes to be made or used, a false record or statement to conceal,

avoid, or decrease an obligation to pay, repay or transmit money or property to the

State of Georgia.

374. Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused

hundreds of thousands of false claims to be made, used and presented to the State of

Georgia from 2001 to the present by its violation of federal and state laws, including

the Anti-Kickback Act and the Stark Act, as described herein.

375. The State of Georgia, by and through the Georgia Medicaid program and

other state health care programs, and unaware of Defendants' fraudulent and illegal

practices, paid the claims submitted by health care providers and third-party payers in

connection therewith.

376. Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Georgia in

connection with Defendants' fraudulent and illegal practices.

377. Had the State of Georgia known that Defendants were violating the

1  federal and state laws cited herein, it wound not have paid the claims submitted by

2  health care providers and third-party payers in connection with Defendants' fraudulent

3  and illegal practices.

4       378.  As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the

5  State of Georgia has been damaged in an amount far in excess of millions of dollars

6  exclusive of interest.

7       379.  Defendants did not, within 30 days after it first obtained information as to

8  such violations, furnish such information to officials of the State responsible for

9  investigating false claims violations, did not otherwise fully cooperate with any

10  investigation of the violations, and have not otherwise furnished information to the

11  State regarding the claims for reimbursement at issue.

12       380.  Relator is a private person with direct and independent knowledge of the

13  allegations of this Complaint, who have brought this action pursuant to Ga. Code

14  Ann., § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

15       381.  This Court is requested to accept supplemental jurisdiction of this related

16  state claim as it is predicated upon the exact same facts as the federal claim, and

17  merely asserts separate damage to the State of Georgia in the operation of its Medicaid

18  program.

19       382.  Pursuant to the Georgia State False Medicaid Claims Act, the State of

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 144

Georgia and Relator is entitled to the following damages as against Defendants:

383.  To the STATE OF GEORGIA: Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia; Prejudgment interest; and all costs incurred in bringing this action.

384.  To RELATOR: The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWELFTH CAUSE OF ACTION
### (Hawaii False Claims Act) (Haw. Rev. Stat. § 661.21 et seq.)

385.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

386.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Hawaii. Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

387.  This is a qui tam action brought by Relator and the State of Hawaii to

recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.

388. Haw. Rev. Stat. § 661-21(a) provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

389. Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

390. The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

391. Compliance with applicable Medicare, Medicaid and the various other

---

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 146

1    federal state laws cited herein was an implied, and upon information and belief, also

2    an express condition of payment of claims submitted to the State of Hawaii in

3    connection with Defendants' fraudulent and illegal practices.

4          392.  Had the State of Hawaii known that Defendants were violating the

5    federal and state laws cited herein, it would not have paid the claims submitted by

6    health care providers and third-party payers in connection with Defendants' fraudulent

7    and illegal practices.

8          393.  As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the

9    State of Hawaii has been damaged in an amount far in excess of millions of dollars

10   exclusive of interest.

11         394.  Relator is a private person with direct and independent knowledge of the

12   allegations of this Complaint, who have brought this action pursuant to Haw. Rev.

13   Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

14         395.  This Court is requested to accept supplemental jurisdiction of this related

15   state claim as it is predicated upon the exact same facts as the federal claim, and

16   merely asserts separate damage to the State of Hawaii in the operation of its Medicaid

17   program.

18         396.  Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relator

19   is entitled to the following damages as against Defendants:

20

397.  To the STATE OF HAWAII: Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii; Prejudgment interest; and all costs incurred in bringing this action.

398.  To RELATOR: The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; and such further relief as this Court deems equitable and just.

## THIRTEENTH CAUSE OF ACTION
### (Illinois Whistleblower Reward and Protection Act) (740 ILCS 175 et seq.)

399.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

400.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Illinois. Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

401.  This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 et seq.

402. 740 ILCS 175/3(a) provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval; knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

403. In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

404. Defendants violated 305 ILCS 5/8A-3(b) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

405. Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 2001 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

406. The State of Illinois, by and through the Illinois Medicaid program and

1   other state health care programs, and unaware of Defendants' fraudulent and illegal

2   practices, paid the claims submitted by health care providers and third-party payers in

3   connection therewith.

4       407.  Compliance with applicable Medicare, Medicaid and the various other

5   federal and state laws cited herein with an implied, and upon information and belief,

6   also an express condition of payment of claims submitted to the State of Illinois in

7   connection with Defendants' fraudulent and illegal practices.

8       408.  Had the State of Illinois known that Defendants were violating the

9   federal and state laws cited herein, it would not have paid the claims submitted by

10  health care providers and third-party payers in connection with Defendants' fraudulent

11  and illegal practices.

12      409.  As a result of Defendants' violations of 740 ILCS 175/3(a), the State of

13  Illinois has been damaged in an amount far in excess of millions of dollars exclusive

14  of interest.

15      410.  Relator is a private person with direct and independent knowledge of the

16  allegation of this Complaint, who have brought this action pursuant to 740 ILCS

17  175/3(b) on behalf of themselves and the State of Illinois.

18      411.  This court is requested to accept supplemental jurisdiction of this related

19  state claim as it is predicated upon the exact same facts as the federal claim, and

20

merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

412. Pursuant to the Illinois Whistleblower Reward and Protection Act, the State of Illinois and Relator is entitled to the following damages as against Defendants:

413. To the STATE OF ILLINOIS: Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois; Prejudgment interest; and all costs incurred in bringing this action.

414. To RELATOR: The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

**FOURTEENTH CAUSE OF ACTION**
**(Indiana False Claims and Whistleblower Protection Act) (IC 5-11-5.5 et seq.)**

415. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

416. Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Indiana. Upon information and belief, Defendants' actions described herein occurred in Indiana as well.

417.  This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 et seq.

418.  IC 5-11-5.5-2 provides liability for any person who: presents a false claim to the state for payment or approval; makes or uses a false record or statement to obtain payment or approval of a false claim from the state; with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state; with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true; receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property; makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state; conspires with another person to perform an act described in subdivisions (a) through (f); or causes or induces another person to perform an act described in subdivisions (a) through (f).

419.  In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a

kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

420.  Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

421.  Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana from at least 2001 to the present by its violation of federal and state laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

422.  The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

423.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

424.  Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by

health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

425.  As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

426.  Relator is a private person with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to IC 5-11-5.5-4 on behalf of themselves and the State of Indiana.

427.  This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

428.  Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relator is entitled to the following damages as against Defendants:

429.  To the STATE OF INDIANA: Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

Prejudgment interest; and all costs incurred in bringing this action.

430.  To RELATOR: The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## FIFTEENTH CAUSE OF ACTION
### (Iowa False Claims Act) (Iowa Code § 685.1 et seq.)

431.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

432.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Iowa. Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

433.  This is a qui tam action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 et seq.

434.  Iowa Code § 685.2 provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim; Conspires to commit a violation of paragraphs (a), (b), (d)-(g); Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property; Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true; Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the Iowa national guard, who lawfully may not sell or pledge property; Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

435. Defendants violated Iowa Code § 685.2 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

436. Defendants furthermore violated Iowa Code § 685.2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

437.  The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

438.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' fraudulent and illegal practices.

439.  Had the State of Iowa known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

440.  As a result of Defendants' violations of Iowa Code § 685.2, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

441.  Relator is a private person with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to Iowa Code § 685.3(2)(a) on behalf of themselves and the State of Iowa.

442.  This court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

443.  Pursuant to the Iowa False Claims Act, the State of Iowa and Relator is entitled to the following damages as against Defendants:

444.  To the STATE OF IOWA: Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty for each false claim which Defendants caused to be presented to the State of Iowa; Prejudgment interest; and all costs incurred in bringing this action.

445.  To RELATOR: The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## SIXTEENTH CAUSE OF ACTION
### (Louisiana Medical Assistance Programs Integrity Law) (La Rev. Stat. Ann § 437.1 et seq.)

446.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

447.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Louisiana. Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

448.  This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

449.  La. Rev. Stat. Ann. § 438.3 provides: No person shall knowingly present or cause to be presented a false or fraudulent claim; No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds; No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

450.  In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

451.  Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2001 to

1   the present by engaging in the fraudulent and illegal practices described herein.

2       452.  Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and

3   knowingly caused hundreds of thousands of false claims to be made, used and

4   presented to the State of Louisiana from at least 2001 to the present by its violation of

5   federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback

6   Act and Stark Act, as described herein.

7       453.  The State of Louisiana, by and through the Louisiana Medicaid program

8   and other state health care programs, and unaware of Defendants' fraudulent and

9   illegal practices, paid the claims submitted by health care providers and third-party

10  payers in connection therewith.

11      454.  Compliance with applicable Medicare, Medicaid and the various other

12  federal and state laws cited herein was an implied, and upon information and belief,

13  also an express condition of payment of claims submitted to the State of Louisiana in

14  connection with Defendants' fraudulent and illegal practices.

15      455.  Had the State of Louisiana known that Defendants were violating the

16  federal and state laws cited herein, it would not have paid the claims submitted by

17  health care providers and third-party payers in connection with Defendants' fraudulent

18  and illegal practices.

19      456.  As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the

20

State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

457.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev. Stat. Ann. § 439.1(A) on behalf of themselves and the State of Louisiana.

458.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

459.  Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relator is entitled to the following damages as against Defendants:

460.  To the STATE OF LOUISIANA: Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana; Prejudgment interest; and all costs incurred in bringing this action.

461.  To RELATOR: The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law; Reimbursement for

reasonable expenses which Relator incurred in connection with this action; An award or reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## SEVENTEENTH CAUSE OF ACTION
### (Massachusetts False Claims Act) (Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.)

462.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

463.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Massachusetts. Upon information and belief, Defendants' actions described herein occurred in Massachusetts as well.

464.  This is a qui tam action brought by Relator and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.

465.  Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof; Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

1  Is a beneficiary of an inadvertent submission of a false claim to the common wealth or

2  political subdivision thereof, subsequently discovers the falsity of the claim, and fails

3  to disclose the false claim to the commonwealth or political subdivision within a

4  reason able time after discovery of the false claim.

5       466.  In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the

6  solicitation, receipt or offering of any remuneration, including any bribe ore rebate,

7  directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing

8  any good, service or item for which payment may be made in whole or in part under

9  the Massachusetts Medicaid program.

10       467.  Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at

11  least 2001 to the present by engaging in the fraudulent and illegal practices described

12  herein.

13       468.  Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B

14  and knowingly caused hundreds of thousands of false claims to be made, used and

15  presented to the State of Massachusetts from at least 2001 to the present by its

16  violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41,

17  the Anti-Kickback Act and the Stark Act, as described herein.

18       469.  The State of Massachusetts, by and through the Massachusetts Medicaid

19  program and other state health care programs, and unaware of Defendants' fraudulent

20

---

1  and illegal practices, paid the claims submitted by health care providers and third-

2  party payers in connection therewith.

3        470.  Compliance with applicable Medicare, Medicaid and the various other

4  federal and state laws cited herein was an implied, and upon information and belief,

5  also an express condition of payment of claims submitted to the State of

6  Massachusetts in connection with Defendants' fraudulent and illegal practices.

7        471.  Had the State of Massachusetts known that Defendants were violating the

8  federal and state laws cited herein, it would not have paid the claims submitted by

9  health care providers and third-party payers in connection with Defendants' fraudulent

10 and illegal practices.

11        472.  As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12

12 § 5B the State of Massachusetts has been damaged in an amount far in excess of

13 millions of dollars exclusive of interest.

14        473.  Relator is a private person with direct and independent knowledge of the

15 allegations of the Compliant, who have brought this action pursuant to Mass. Gen.

16 Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

17        474.  This Court is requested to accept supplemental jurisdiction of this related

18 state claim as it is predicated upon that exact same facts as the federal claim, and

19 merely asserts separate damage to the State of Massachusetts in the operation of its

20

Medicaid program.

475.  Pursuant to the Massachusetts False Claims Act, the State of

Massachusetts and Relator is entitled to the following damages as against Defendants:

476.  To the STATE OF MASSACHUSETTS: Three times the amount of

actual damages which that State of Massachusetts has sustained as a result of

Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500

and not more than $11,000 for each false claim which Defendants caused to be

presented to the State of Massachusetts; Prejudgment interest; and all costs incurred in

bringing this action.

477.  To RELATOR: The maximum amount allowed pursuant to Mass. Gen.

Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

Reimbursement for reasonable expenses which Relator incurred in connection with

this action; An award of reasonable attorneys' fees and costs; and such further relief as

this court deems equitable and just.

## EIGHTEENTH CAUSE OF ACTION
### (Michigan Medicaid False Claim Act) (M.C.L.A. 400.601 et seq.)

478.  Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

479.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in

---

Michigan. Upon information and belief, Defendants' actions described herein occurred in Michigan as well.

480.  This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 et seq.

481.  M.C.L.A. 400.607 provides liability for any person who, among other things: Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false; Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

482.  In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

483.  Defendants violated M.C.L.A. 400.604 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

484.  Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2001 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

485.  The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

486.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

487.  Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

488.  As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars

1  exclusive of interest.

2      489.  Relator is a private person with direct and independent knowledge of the

3  allegations of the Compliant, who have brought this action pursuant to M.C.L.A.

4  400.610a on behalf of themselves and the State of Michigan.

5      490.  This Court is requested to accept supplemental jurisdiction of this related

6  state claim as it is predicated upon that exact same facts as the federal claim, and

7  merely asserts separate damage to the State of Michigan in the operation of its

8  Medicaid program.

9      491.  Pursuant to the Michigan Medicaid False Claim Act, the State of

10  Michigan and Relator is entitled to the following damages as against Defendants:

11      492.  To the STATE OF MICHIGAN: Three times the amount of actual

12  damages which that State of Michigan has sustained as a result of Defendants'

13  fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more

14  than $10,000 for each false claim which Defendants caused to be presented to the

15  State of Michigan; Prejudgment interest; and all costs incurred in bringing this action.

16      493.  To RELATOR: The maximum amount allowed pursuant to M.C.L.A.

17  400.610a (9) and/or any other applicable provision of law; Reimbursement for

18  reasonable expenses which Relator incurred in connection with this action; an award

19  of reasonable attorneys' fees and costs; and such further relief as this court deems

20

equitable and just.

## NINETEENTH CAUSE OF ACTION
### (Minnesota False Claims Act) (Minnesota Statutes § 15C.01 et seq.)

494.  Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

495.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in

Minnesota. Upon information and belief, Defendants' actions described herein

occurred in Minnesota as well.

496.  This is a qui tam action brought by Relator and the State of Minnesota to

recover treble damages and civil penalties under the Minnesota False Claims Act,

Minnesota Statutes § 15C.01 et seq.

497.  Minnesota Statutes § 15C.02 provides liability for any person who:

Knowingly presents, or causes to be presented, to an officer or employee of the state

or a political subdivision a false or fraudulent claim for payment or approval;

Knowingly makes or uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the state or a political subdivision;

Knowingly conspires to either present a false or fraudulent claim to the state or a

political subdivision for payment or approval or makes, uses, or causes to be made or

used a false record or statement to obtain payment or approval of a false or fraudulent

claim.

498. Defendants violated Minnesota Statutes § 15C.02 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

499. Defendants furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

500. The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

501. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' fraudulent and illegal practices.

502. Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

503.  As a result of Defendants' violations of Minnesota Statutes § 15C.02 the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

504.  Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Minnesota Statutes § 15C.05 on behalf of themselves and the State of Minnesota.

505.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

506.  Pursuant to the Minnesota False Claims Act, the State of Minnesota and Relator is entitled to the following damages as against Defendants:

507.  To the STATE OF MINNESOTA: Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota; Prejudgment interest; and all costs incurred in bringing this action.

508.  To RELATOR: The maximum amount allowed pursuant to Minnesota

1  Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law;

2  Reimbursement for reasonable expenses which Relator incurred in connection with

3  this action; An award of reasonable attorneys' fees and costs; and such further relief as

4  this court deems equitable and just.

### TWENTIETH CAUSE OF ACTION
### (Missouri Health Care Payment Fraud and Abuse Act) (Missouri Revised Statutes § 191.900 et seq.)

7  509.  Relator re-alleges and incorporates by reference each of the paragraphs

8  above as if fully set forth herein and further alleges as follows.

9  510.  Additionally, Relator states that the course of conduct described in this

10  Complaint was a nationwide practice of Defendants. Defendants conduct business in

11  the State of Missouri. Upon information and belief, Defendants' actions described

12  herein occurred in the State of Missouri as well.

13  511.  This is a qui tam action brought by Relator and the State of Missouri to

14  recover treble damages and civil penalties under the Missouri Health Care Payment

15  Fraud and Abuse Act, Missouri Revised Statutes § 191.900 et seq.

16  512.  The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1)

17  provides liability for any person: Knowingly presenting to a health care payer a claim

18  for a health care payment that falsely represents that the health care for which the

19  health care payment is claimed was medically necessary, if in fact it was not;

20

Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care; Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled; Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

513. The Missouri Health Care Payment Fraud and Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

514. Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

515. Purchasing, leasing, ordering or arranging for or recommending purchasing, leasing or ordering any health care.

516. The Missouri Health Care Payment Fraud and Abuse Act § 191-905(3)

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 173

provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

517. Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

518. Defendants furthermore violated Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2001 to the present by its violation of federal and state laws, including Missouri Revised Statutes § 191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

519. Missouri, by and through the Missouri Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

520. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection

with Defendants' fraudulent and illegal practices.

521.  Had the State of Missouri known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

522.  As a result of Defendants' violations of § 191-905(1) & (2) & (3), the State of Missouri has been damaged in an amount far in excess of millions of dollars exclusive of interest.

523.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Missouri Revised Statutes § 191.907 on behalf of themselves and the State of Missouri.

524.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Missouri in the operation of its Medicaid program.

525.  Pursuant to the Missouri Health Care Payment Fraud and Abuse Act, the State of Missouri and Relator is entitled to the following damages as against Defendants:

526.  To the STATE OF MISSOURI: Three times the amount of actual

damages which the State of Missouri has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Missouri; Prejudgment interest; and all costs incurred in bringing this action.

527.  To RELATOR: The maximum amount allowed pursuant to Missouri Revised Statutes § 191.907 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

### TWENTY- FIRST CAUSE OF ACTION
### (Montana False Claims Act) (MT ST 17-8-401 et seq.)

528.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

529.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in Montana. Upon information and belief, Defendants' actions described herein occurred in Montana as well.

530.  This is a qui tam action brought by Relator and State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 et seq.

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 176

531.  MT ST 17-8-403 provides liability for any person: knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval; knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity; conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

532.  In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

533.  Defendants violated MT ST 45-6-313 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

534.  Defendants furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2001 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

535.  The State of Montana, by and through the Montana Medicaid program

and other state health care programs, and unaware of Defendants' fraudulent and

illegal practices, paid the claims submitted by health care providers and third-party

payers in connection therewith.

536.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Montana in

connection with Defendants' fraudulent and illegal practices.

537.  Had the State of Montana known that Defendants were violating the

federal and state laws cited herein, it would not have paid the claims submitted by

health care providers and third-party payers in connection with Defendants' fraudulent

and illegal practices.

538.  As a result of Defendants' violations of MT ST 17-8-403 the State of

Montana has been damaged in an amount far in excess of millions of dollars exclusive

of interest.

539.  Relator is a private person with direct and independent knowledge of the

allegations of the Compliant, who have brought this action pursuant to MT ST 17-8-

406 on behalf of themselves and the State of Montana.

540.  This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon that exact same facts as the federal claim, and

merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

541.  Pursuant to the Montana False Claims Act, the State of Montana and Relator is entitled to the following damages as against Defendants:

542.  To the STATE OF MONTANA: Three times the amount of actual damages which that State of Montana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of between $5,500 and $11,000 (adjusted for inflation) for each false claim which Defendants caused to be presented to the State of Montana; Prejudgment interest; and all costs incurred in bringing this action.

543.  To RELATOR: The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

**TWENTY- SECOND CAUSE OF ACTION**
**(Nevada False Claims Act) (N.R.S. § 357.010 et seq.)**

544.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

545.  Additionally, Relator states that the course of conduct described in this

1   Complaint was a nationwide practice of Defendants. Defendants conduct business in

2   the State of Nevada. Upon information and belief, Defendants' actions described

3   herein occurred in Nevada as well.

4         546.  This is a qui tam action brought by Relator and the State of Nevada to

5   recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S.

6   § 357.010 et. seq.

7         547.  N.R.S. § 357.040(1) provides liability for any person who: Knowingly

8   presents or causes to be presented a false claim for payment or approval; Knowingly

9   makes or uses, or causes to be made or used, a false record or statement to obtain

10  payment or approval of a false claim; Conspires to defraud by obtaining allowance or

11  payment of a false claim; Is a beneficiary of an inadvertent submission of a false claim

12  and, after discovering the falsity of the claim, fails to disclose the falsity to the state or

13  political subdivision within a reasonable time.

14        548.  In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or

15  receipt of anything of value in connection with the provision of medical goods or

16  services for which payment may be made in whole or in part under the Nevada

17  Medicaid program.

18        549.  Defendants violated N.R.S. § 422.560 from at least 2001 to the present

19  by engaging in the fraudulent and illegal practices described herein.

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 180

550.  Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2001 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

551.  The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

552.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' fraudulent and illegal practices.

553.  Had the State of Nevada known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

554.  As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive

1   of interest.

2       555.  Relator is a private person with direct and independent knowledge of the

3   allegations of this Complaint, who have brought this action pursuant to N.R.S. §

4   357.080(1) on behalf of themselves and the State of Nevada.

5       556.  This Court is requested to accept supplemental jurisdiction of this related

6   state claim as it is predicated upon the exact same facts as the federal claim, and

7   merely asserts separate damage to the State of Nevada in the operation of its Medicaid

8   program.

9       557.  Pursuant to the Nevada False Claims Act, the State of Nevada and

10  Relator is entitled to the following damages as against Defendants:

11      558.  To the STATE OF NEVADA: Three times the amount of actual damages

12  which the State of Nevada has sustained as a result of Defendants' fraudulent and

13  illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for

14  each false claim which Defendants caused to be presented to the State of Nevada;

15  Prejudgment interest; and all costs incurred in bringing this action.

16      559.  To RELATOR: The maximum amount allowed pursuant to N.R.S §

17  357.210 and/or any other applicable provision of law; Reimbursement for reasonable

18  expenses which Relator incurred in connection with this action; An award of

19  reasonable attorneys' fees and costs; and such further relief as this Court deems

20

equitable and just.

## TWENTY-THIRD CAUSE OF ACTION
### (New Hampshire False Claims Act) (N.H. Rev. Stat. § 167:61-b et seq.)

560.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

561.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the New Hampshire. Upon information and belief, Defendants' actions described herein occurred in New Hampshire as well.

562.  This is a qui tam action brought by Relator and State of New Hampshire for treble damages and penalties under New Hampshire False Claims Act, N.H. Rev. Stat. § 167:61-b et seq.

563.  N.H. Rev. Stat. § 167:61-b provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department; Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

564.  Defendants violated N.H. Rev. Stat. § 167:61-b and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of

New Hampshire from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act as described herein.

565.  The State of New Hampshire, by and through the New Hampshire Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

566.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with Defendants' fraudulent and illegal practices.

567.  Had the State of New Hampshire known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

568.  As a result of Defendants' violations of N.H. Rev. Stat. § 167:61-b the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

569.  Relator is a private person with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to N.H. Rev. Stat.

1 § 167:61-c on behalf of themselves and the State of New Hampshire.

2 570. This Court is requested to accept supplemental jurisdiction of this related

3 state claim as it is predicated upon that exact same facts as the federal claim, and

4 merely asserts separate damage to the State of New Hampshire in the operation of its

5 Medicaid program.

6 571. Pursuant to the New Hampshire False Claims Act, the State of New

7 Hampshire and Relator is entitled to the following damages as against Defendants:

8 572. To the STATE OF NEW HAMPSHIRE: Three times the amount of

9 actual damages which that State of New Hampshire has sustained as a result of

10 Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000

11 and not more than $10,000 for each false claim which Defendants caused to be

12 presented to the State of New Hampshire; Prejudgment interest; and all costs incurred

13 in bringing this action.

14 573. To RELATOR: The maximum amount allowed pursuant to N.H. Rev.

15 Stat. § 167:61-e and/or any other applicable provision of law; Reimbursement for

16 reasonable expenses which Relator incurred in connection with this action; An award

17 of reasonable attorneys' fees and costs; and such further relief as this Court deems

18 equitable and just.

19 / / /

20

## TWENTY-FOURTH CAUSE OF ACTION
### (New Jersey False Claims Act) (N.J.S.A. 2A:32C-1 et seq.)

574. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

575. Additionally, Defendants conduct business in the New Jersey. Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

576. This is a qui tam action brought by Relator and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.

577. N.J.S.A. 2A:32C-3 provides liability for any person who: Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

578. In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid

1   program, or the furnishing of items or services whose cost is or may be reported in

2   whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

3        579.  Defendants violated N.J.S.A. 30:4D-17 from at least 2001 to the present

4   by engaging in the fraudulent and illegal practices described herein.

5        580.  Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly

6   caused hundreds of thousands of false claims to be made, used and presented to the

7   State of Nevada from at least 2001 to the present by its violation of federal and state

8   laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as

9   described herein.

10        581.  The State of New Jersey, by and through the New Jersey Medicaid

11   program and other state health care programs, and unaware of Defendants' fraudulent

12   and illegal practices, paid the claims submitted by health care providers and third-

13   party payers in connection therewith.

14        582.  Compliance with applicable Medicare, Medicaid and the various other

15   federal and state laws cited herein was an implied, and upon information and belief,

16   also an express condition of payment of claims submitted to the State of New Jersey

17   in connection with Defendants' fraudulent and illegal practices.

18        583.  Had the State of New Jersey known that Defendants were violating the

19   federal and state laws cited herein, it would not have paid the claims submitted by

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 187

1    health care providers and third-party payers in connection with Defendants' fraudulent

2    and illegal practices.

3          584.  As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of

4    New Jersey has been damaged in an amount far in excess of millions of dollars

5    exclusive of interest.

6          585.  Relator is a private person with direct and independent knowledge of the

7    allegations of the Compliant, who have brought this action pursuant to N.J.S.A.

8    2A:32C-5 on behalf of themselves and the State of New Jersey.

9          586.  This Court is requested to accept supplemental jurisdiction of this related

10   state claim as it is predicated upon that exact same facts as the federal claim, and

11   merely asserts separate damage to the State of New Jersey in the operation of its

12   Medicaid program.

13         587.  Pursuant to the New Jersey False Claims Act, the State of New Jersey

14   and Relator is entitled to the following damages as against Defendants:

15         588.  To the STATE OF NEW JERSEY: Three times the amount of actual

16   damages which that State of New Jersey has sustained as a result of Defendants'

17   fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more

18   than $11,000 for each false claim which Defendants caused to be presented to the

19   State of New Jersey; Prejudgment interest; and all costs incurred in bringing this

20

action.

589.  To RELATOR: The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWENTY-FIFTH CAUSE OF ACTION
### (New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act) (N. M. S. A. 1978, § 27-14-1 et seq., and N. M. S. A. 1978, § 44-9-1 et seq.)

590.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

591.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of New Mexico. Upon information and belief, Defendants' actions described herein occurred in the State of New Mexico as well.

592.  This is a qui tam action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 et seq. and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 et seq.

593.  N. M. S. A. 1978, § 27-14-4 provides liability for any person who:

Presents, or causes to be presented, to the state a claim for payment under the

Medicaid program knowing that the person receiving a Medicaid benefit or payment is

not authorized or is not eligible for a benefit under the Medicaid program; Makes,

uses or causes to be made or used a record or statement to obtain a false or fraudulent

claim under the Medicaid program paid for or approved by the state knowing such

record or statement is false; Conspires to defraud the state by getting a claim allowed

or paid under the Medicaid program knowing that such claim is false or fraudulent.

594. N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

595. knowingly presents, or causes to be presented, to an employee, officer or

agent of the state or to a contractor, grantee or other recipient of state funds a false or

fraudulent claim for payment or approval; knowingly makes or uses, or causes to be

made or used, a false, misleading or fraudulent record or statement to obtain or

support the approval of or the payment on a false or fraudulent claim; conspires to

defraud the state by obtaining approval or payment on a false or fraudulent claim;

conspires to make, use or cause to be made or used, a false, misleading or fraudulent

record or statement to conceal, avoid or decrease an obligation to pay or transmit

money or property to the state.

596. Defendants violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 §

44-9-3 from at least 2001 to the present by engaging in the fraudulent and illegal

practices described herein.

597. Defendants furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

598. The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

599. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' fraudulent and illegal practices.

600. Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

601. As a result of Defendants' violations of N. M. S. A. 1978, § 27-14-4 and

N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

602.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of themselves and the State of New Mexico.

603.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

604.  Pursuant to the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, the State of New Mexico and Relator is entitled to the following damages as against Defendants:

605.  To the STATE OF NEW MEXICO: Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico; Prejudgment interest; and all costs incurred in bringing this action.

606.  To RELATOR: The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and N. M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TWENTY-SIXTH CAUSE OF ACTION
### (New York False Claims Act) (N.Y. State Fin. Law § 187 et seq.)

607.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

608.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the New York. Upon information and belief, Defendants' actions described herein occurred in New York as well.

609.  This is a qui tam action brought by Relator and State of New York for treble damages and penalties under New York False Claims Act, N.Y. State Finance Law § 187 et seq.

610.  N.Y. State Finance Law § 189 provides liability for any person who: Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the state or a local government; Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

611. Defendants violated § 189 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

612. Defendants furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

613. The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

614. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Defendants' fraudulent and illegal practices.

615. Had the State of New York known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by

1  health care providers and third-party payers in connection with Defendants' fraudulent

2  and illegal practices.

3      616.  As a result of Defendants' violations of § 189 the State of New York has

4  been damaged in an amount far in excess of millions of dollars exclusive of interest.

5      617.  Relator is a private person with direct and independent knowledge of the

6  allegations of the Compliant, who have brought this action pursuant to N.Y. State

7  Finance Law § 190(2) on behalf of themselves and the State of New York.

8      618.  This Court is requested to accept supplemental jurisdiction of this related

9  state claim as it is predicated upon that exact same facts as the federal claim, and

10  merely asserts separate damage to the State of New York in the operation of its

11  Medicaid program.

12      619.  Pursuant to the New York False Claims Act, the State of New York and

13  Relator is entitled to the following damages as against Defendants:

14      620.  To the STATE OF NEW YORK: Three times the amount of actual

15  damages which that State of New York has sustained as a result of Defendants'

16  fraudulent and illegal practices; A civil penalty of not less than $6,000 and not more

17  than $12,000 for each false claim which Defendants caused to be presented to the

18  State of New York; Prejudgment interest; and all costs incurred in bringing this

19  action.

20

621. To RELATOR: The maximum amount allowed pursuant to N.Y. State Finance Law § 190(6) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWENTY-SEVENTH CAUSE OF ACTION
### (North Carolina False Claims Act) (North Carolina General Statutes § 51-1-605 et seq.)

622. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

623. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of North Carolina. Upon information and belief, Defendants' actions described herein occurred in the State of North Carolina as well.

624. This is a qui tam action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 et seq.

625. North Carolina General Statutes § 51-1-607 provides liability for any person who: Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; Conspires to commit a

1    violation of subdivisions of this section.

2         626.  Defendants violated North Carolina General Statutes § 51-1-607 from at

3    least 2001 to the present by engaging in the fraudulent and illegal practices described

4    herein.

5         627.  Defendants furthermore violated North Carolina General Statutes § 51-1-

6    607 and knowingly caused thousands of false claims to be made, used and presented

7    to the State of North Carolina from at least 2001 to the present by its violation of

8    federal and state laws, including the Anti-Kickback Act, and the Stark Act, as

9    described herein.

10        628.  The State of North Carolina, by and through the State of North Carolina

11   Medicaid program and other state health care programs, and unaware of Defendants'

12   fraudulent and illegal practices, paid the claims submitted by health care providers and

13   third payers in connection therewith.

14        629.  Compliance with applicable Medicare, Medicaid and the various other

15   federal and state laws cited herein was an implied, and upon information and belief,

16   also an express condition of payment of claims submitted to the State of North

17   Carolina in connection with Defendants' fraudulent and illegal practices.

18        630.  Had the State of North Carolina known that Defendants were violating

19   the federal and state laws cited herein, it would not have paid the claims submitted by

20

health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

631.  As a result of Defendants' violations of North Carolina General Statutes § 51-1-607 the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

632.  Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to North Carolina General Statutes § 51-1-608 on behalf of themselves and the State of North Carolina.

633.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

634.  Pursuant to the North Carolina False Claims Act, the State of North Carolina and Relator is entitled to the following damages as against Defendants:

635.  To the STATE OF NORTH CAROLINA: Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina; Prejudgment interest; and all costs incurred

in bringing this action.

636. To RELATOR: The maximum amount allowed pursuant to North Carolina General Statutes § 51-1-610 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

### TWENTY-EIGHTH CAUSE OF ACTION
### (Oklahoma Medicaid False Claims Act) (63 Okl. St. Ann. § 5053 et seq.)

637. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

638. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Oklahoma. Upon information and belief, Defendants' actions described herein occurred in the State of Oklahoma as well.

639. This is a qui tam action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 et seq.

640. 63 Okl. St. Ann. § 5053.1 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval; Knowingly makes,

uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

641.  In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

642.  Defendants violated 56 Okl. St. Ann. § 1005 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

643.  Defendants furthermore violated 63 Okl. St. Ann. § 5053.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2001 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

644.  The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

645.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' fraudulent and illegal practices.

646.  Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

647.  As a result of Defendants' violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

648.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of themselves and the State of Oklahoma.

649.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

650.  Pursuant to the Oklahoma Medicaid False Claims Act, the State of Oklahoma and Relator is entitled to the following damages as against Defendants:

651.  To the STATE OF OKLAHOMA: Three times the amount of actual

damages which the State of Oklahoma has sustained as a result of Defendants'

fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more

than $10,000 for each false claim which Defendants caused to be presented to the

State of Oklahoma; Prejudgment interest; and all costs incurred in bringing this action.

652.  To RELATOR: The maximum amount allowed pursuant 63 Okl. St. Ann.

§ 5053.4 and /or any other applicable provision of law; Reimbursement for reasonable

expenses which Relator incurred in connection with this action; An award of

reasonable attorneys' fees and costs; and such further relief as this court deems

equitable and just.

## TWENTY-NINTH CAUSE OF ACTION
### (Rhode Island False Claims Act) (Gen. Laws 1956, § 9-1.1-1 et seq.)

653.  Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

654.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in

the State of Rhode Island. Upon information and belief, Defendants' actions described

herein occurred in the State of Rhode Island as well.

655.  This is a qui tam action brought by Relator and the State of Rhode Island

to recover treble damages and civil penalties under the Rhode Island False Claims

Act, Gen. Laws 1956, § 9-1.1-1 et seq.

656.  Gen. Laws 1956, § 9-1.1-3 provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

657.  In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt, offer, or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

658.  Defendants violated Gen. Laws 1956, § 40-8.2-3 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

659.  Defendants furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used and presented to the State of Rhode Island from at least 2001 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

660.  The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

661.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' fraudulent and illegal practices.

662.  Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

663.  As a result of Defendants' violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

664.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of themselves and the State of Rhode Island.

665.  This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

666. Pursuant to the Rhode Island False Claims Act, the State of Rhode Island and Relator is entitled to the following damages as against Defendants:

667. To the STATE OF RHODE ISLAND: Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island; Prejudgment interest; and all costs incurred in bringing this action.

668. To RELATOR: The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTIETH CAUSE OF ACTION
### (Tennessee Medicaid False Claims Act) (Tenn. Code Ann. § 71-5-181 et seq.)

669. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

670.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Tennessee. Upon information and belief, Defendants' actions described herein occurred in Tennessee as well.

671.  This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

672.  Section 71-5-182(a)(1) provides liability for any person who: Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent; Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for and approved by the state knowing such record or statement is false; Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

673.  Defendants violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

674.  The State of Tennessee, by and through the Tennessee Medicaid program

and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

675.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' fraudulent and illegal practices.

676.  Had the State of Tennessee known that Defendants violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

677.  As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

678.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

679.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

680.  Pursuant to the Tennessee Medicaid False Claims Act, the State of Tennessee and Relator is entitled to the following damages as against Defendants:

681.  To the STATE OF TENNESSEE: Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendants caused to be presented to the State of Tennessee; Prejudgment interest; and all costs incurred in bringing this action.

682.  To RELATOR: The maximum amount allowed to Tenn. Code Ann. §71-5-183(d) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## THIRTY- FIRST CAUSE OF ACTION
**(Texas False Claims Act) (V.T.C.A. Hum. Res. Code § 36.001 et seq.)**

683.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

684.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in

the State of Texas. Defendants' actions described herein occurred in Texas as well.

685. This is a qui tam action brought by Relator and the State of Texas to recover double damages and civil penalties under the Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 et seq.

686. V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who: knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received; except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program; except as authorized

under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;  knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;  knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

687.  Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas from at least 2001 to the present by its violation of federal and state laws, including, the Anti-Kickback Act and the Stark Act, as described herein.

688.  The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

689.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' fraudulent and illegal practices.

690.  Had the State of Texas known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

691.  As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

692.  Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

693.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

694.  This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

695. Pursuant to the Texas False Claims Act, the State of Texas and Relator is entitled to the following damages as against Defendants:

696. To the STATE OF TEXAS: Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(3) & (4), and a civil penalty of: (1) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or (2) Not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a

1  person described by Paragraph (A); Pre- and post-judgment interest, Tex. Hum. Res.

2  Code § 36.052(a)(2).

3      697.  To RELATOR: The maximum amount allowed pursuant to V.T.C.A.

4  Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

5  Reimbursement for reasonable expenses and costs which Relator incurred in

6  connection with this action, Tex Hum Res. Code §§ 36.007 & 36.110(c); Reasonable

7  attorneys' fees which Relator necessarily incurred in bringing and pressing this case,

8  Tex Hum Res. Code §§ 36.007 & 36.110(c); and such further relief as this Court

9  deems equitable and just.

## THIRTY-SECOND CAUSE OF ACTION
### (Virginia Fraud Against Taxpayers Act) (Va. Code Ann. § 8.01-216.1et seq.)

      698.  Relator re-alleges and incorporates by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

      699.  Additionally, Relator states that the course of conduct described in this

Complaint was a nationwide practice of Defendants. Defendants conduct business in

the Commonwealth of Virginia. Upon information and belief, Defendants' actions

described herein occurred in the Commonwealth of Virginia as well.

      700.  This is a qui tam action brought by Relator and the Commonwealth of

Virginia to recover treble damages and civil penalties under the Virginia Fraud

Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

701.  Va. Code Ann. § 8.01-216.3 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth; Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

702.  Defendants violated Va. Code Ann. § 8.01-216.3 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

703.  Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

704.  The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

705.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of

Virginia in connection with Defendants' fraudulent and illegal practices.

706. Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

707. As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

708. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

709. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

710. Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relator is entitled to the following damages as against Defendants:

711. To the COMMONWEALTH OF VIRGINIA: Three times the amount of

actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia; Prejudgment interest; and all costs incurred in bringing this action.

712. To RELATOR: The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-THIRD CAUSE OF ACTION
### (Washington False Claims Act) (Washington Revised Code § 74 66-005 et seq.)

713. Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

714. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Washington. Upon information and belief, Defendants' actions described herein occurred in the State of Washington as well.

715. This is a qui tam action brought by Relator and the State of Washington

to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.

716.  Washington Revised Code § 74 66-020 provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; Conspires to commit one or more of the violations in this subsection.

717.  Defendants violated Washington Revised Code § 74 66-020 from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

718.  Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2001 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

719.  The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

720.  Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

721.  Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

722.  As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

723.  Relator has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of themselves and the State of Washington.

724.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

725.  Pursuant to the Washington False Claims Act, the State of Washington and Relator is entitled to the following damages as against Defendants:

726.  To the STATE OF WASHINGTON: Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington; Prejudgment interest; and all costs incurred in bringing this action.

727.  To RELATOR: The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-FOURTH CAUSE OF ACTION
### (Wisconsin False Claims for Medical Assistance Act) (W.S.A. 20.931 et seq.)

728.  Relator re-alleges and incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

729.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Wisconsin. Upon information and belief, Defendants' actions described herein occurred in the State of Wisconsin as well.

730.  This is a qui tam action brought by Relator and the State of Wisconsin to

recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, W.S.A. 20.931 et seq.

731.  W.S.A. 20.931(2) provides liability for any person who: Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance; Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance; Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

732.  In addition, W.S.A. 49.49(2) prohibits solicitation or receipt of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any Wisconsin medical assistance program.

733.  Defendants violated W.S.A. 49.49(2) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

734. Defendants furthermore violated W.S.A. 20.931(2) and knowingly caused thousands of false claims to be made, used and presented to the State of

Wisconsin from at least 2001 to the present by its violation of federal and state laws, including W.S.A. 49.49(2), the Anti-Kickback Act, and Stark Act, as described herein.

735.  The State of Wisconsin, by and through the State of Wisconsin Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

736.  Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' fraudulent and illegal practices.

737.  Had the State of Wisconsin known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

738.  As a result of Defendants' violations of W.S.A. 20.931(2) the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

739.  Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to W.S.A.

20.931(5) on behalf of themselves and the State of Wisconsin.

740.  This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

741.  Pursuant to the Wisconsin False Claims for Medical Assistance Act, the State of Wisconsin and Relator is entitled to the following damages as against Defendants:

742.  To the STATE OF WISCONSIN: Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin; Prejudgment interest; and All costs incurred in bringing this action.

743.  To RELATOR: The maximum amount allowed pursuant W.S.A. 20.931(11) and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relator incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

1

2
## IX.   DEMAND FOR JURY TRIAL

3
Relator hereby demands a trial by jury as to all issues.

4
Dated: June 29, 2018                    Respectfully submitted,

5
                                        By: */s/C. Brooks Cutter*

6
                                        CUTTER LAW P.C.
                                        C. Brooks Cutter
7                                       John. R. Parker, Jr.
                                        401 Watt Avenue
8                                       Sacramento, CA 95864
                                        Tel. 916-448-9800
9                                       Fax. 916-669-4499

10                                      Mychal Wilson SBN 236189
                                        The Law Offices of Mychal Wilson
11                                      2425 W. Olympic Blvd. Suite 4000-W
                                        Santa Monica, CA 90404
12                                      Telephone: (424) 252-4232
                                         Facsimile: (310) 424-7116

13

14

15

16

17

18

19

20

THIRD AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL - 223

1

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I caused a copy of the foregoing document to be filed electronically via the Court's electronic filing system. Those attorneys who are registered with the Court's electronic filing system may access these filings through the Court's system, and notice of these filings will be sent to these parties by operation of the Court's electronic filing system.

*/s/ C. Brooks Cutter*
C. Brooks Cutter