C. Brooks Cutter (SBN 121407)
John R. Parker (SBN 257761)
Celine Cutter (SBN 312622)
**CUTTER LAW P.C.**
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
Facsimile: 916-588-9330
Email: bcutter@cutterlaw.com
       jparker@cutterlaw.com
       ccutter@cutterlaw.com

Mychal Wilson (SBN 236189)
**THE LAW OFFICES OF MYCHAL WILSON**
2425 W. Olympic Blvd., Suite 4000-W
Santa Monica, CA 90404
Telephone: (424) 252-4232
Facsimile: (310) 424-7116
Email: mychal@mychalwilsonesq.com

*Attorneys for Relator*

**IN THE UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>and<br><br>THE STATES OF ARKANSAS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSSETTES, MICHIGAN, MINNESOTA, MISSOURI, MONTANA, NEVADA, NEW MEXICO, NEW YORK, NORTH CAROLIINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, AND WISCONSIN<br><br>ex rel.<br><br>THE DAN ABRAMS COMPANY, LLC<br><br>                    Relators, | Case No.: 2:15-cv-01212-JAK (ASx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF SIDNEY BLUM**<br><br>Date: February 27, 2023<br>Time: 8:30am<br>Judge: Honorable John A. Kronstadt<br>Courtroom: 10B<br><br>Complaint Filed: February 19, 2015<br>Trial Date: |

vs.

MEDTRONIC, INC., MEDTRONIC PLC, MEDTRONIC SOFAMOR DANEK DEGGENDORF GMBH, AND MEDTRONIC PUERTO RICO OPERATIONS CO., HUACAO,

           Defendants.

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................ 1
II. SIDNEY BLUM'S EXPERT REPORT ................................................... 1
III. RELATOR'S THEORY AND DAMAGES ............................................ 2
IV. ARGUMENT .............................................................................................. 3
   A. The Daubert Standard in a Non-Scientific Context. ..................... 3
   B. Daubert in the Context of Damages Experts. ................................ 5
   C. Blum Reliably Calculated Damages to the Federal Government Based Upon Direct Payments From the VA to Medtronic. .......... 6
   D. Blum Relies Upon Medtronic's Own Sales Data and United States Government Databases—the Best Available Data to Calculate Damages Here. ................................................................................... 7
   E. Blum Is A Well-Qualified Damages Expert. .................................. 9
V. CONCLUSION ........................................................................................ 10

# **TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*Armer v. CSAA Gen. Ins. Co.*,
  No. CV-19-04402-PHX-DWL, 2020 U.S. Dist. LEXIS 101851 (D. Ariz. June
  10, 2020) .................................................................................................................. 5

*Bauman v. Centex Corp.*,
  611 F.2d 1115 (5th Cir. 1980) ................................................................................. 5

*Compton v. Subaru of Am., Inc.*,
  82 F.3d 1513, 1518 (10th Cir. 1996) ....................................................................... 5

*Higley v. Cessna Aircraft Co.*,
  CV 10-3345-JCG, 2013 WL 12112167 (C.D. Cal. July 8, 2013) ....................... 5, 9

*Int'l Adhesive Coating Co. v. Bolton Emerson Intern.*,
  851 F.2d 540 (1st Cir. 1988) ................................................................................... 5

*Jahn v. Equine Servs., PSC*,
  233 F.3d 382 (6th Cir. 2000) ............................................................................. 6, 10

*Kumho Tire v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................ 4, 6

*Milward v. Acuity Specialty Prods. Group*,
  639 F.3d 11 (1st Cir. 2011) ..................................................................................... 4

*More, JC, Inc. v. Nutone Inc.*,
  No. A-05-CA-338, 2007 U.S. Dist. LEXIS 102151, 2007 WL 4754173 (W.D.
  Tex. Mar. 21, 2007) ................................................................................................. 6

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
  461 F. Supp. 2d 271 (D.N.J. 2006) ......................................................................... 6

*Poosh v. Philip Morris USA, Inc.*,
  287 F.R.D. 543 (N.D. Cal. 2012) ............................................................................ 4

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ............................................................................... 4, 9

*Rural Water Dist. No. 5 Wagoner Cty., Okla. v. City of Coweta*,
  No. 08-CV-252-JED-FHM, 2013 U.S. Dist. LEXIS 145312, 2013 WL
  5558390 (N.D. Okla. Oct. 8, 2013) ......................................................................... 5

*Total Control, Inc. v. Danaher Corp.*,
  338 F. Supp. 2d 566 (E.D. Pa. 2004) ...................................................................... 5

*United States ex rel. Humane Society of the United States ("Humane Society")*,
 No. EDCV 08-00221-VAP-(OPx), 2013 U.S. Dist. LEXIS 126949, 2013 WL
 5753784, at *8 (C.D. Cal. Apr. 30, 2013) .................................................................. 3

*United States v. Sci. Applications Int'l Corp.* (*"SAIC III"*),
 626 F.3d 1257 (D.C. Cir. 2010) ................................................................................ 3

*United States v. Woodbury*,
 359 F.2d 370 (9th Cir. 1966) ..................................................................................... 2

*Wendell v. GlaxoSmithKline LLC*,
 858 F.3d 1227 (9th Cir. 2017) ................................................................................... 4

**Other Authorities**

45 C.F.R. § 162 .............................................................................................................. 3, 8

Fed. R. Evid. 702 ............................................................................................................... 4

Fed. R. Evid. 703 ............................................................................................................... 5

Relator submits the following memorandum of points and authorities in opposition to Defendant Medtronic's motion to exclude the testimony of Relator's expert Sidney Blum.

## I. INTRODUCTION

Medtronic seeks to exclude Sidney Blum, first, on the grounds that his damages calculations do not rely upon the data Medtronic would prefer for him to rely upon. However, the data Medtronic would have Mr. Blum rely upon does not exist and is not obtainable. Mr. Blum relied upon the best data available to him and Relator to estimate damages in this matter, and Medtronic's arguments about whether that data is sufficient should be made to the jury and are not the basis for exclusion. Medtronic's second quarrel with Mr. Blum, that he is not qualified as an expert about data and information that he did not use and is not available to him in this matter is also without merit. While Medtronic may not like or agree with Mr. Blum or the underlying information upon which he relies, those are issues of credibility and weight for the jury to decide. They are not the proper basis for a *Daubert* challenge.

## II. SIDNEY BLUM'S EXPERT REPORT

Sidney Blum's calculation of damages in this matter used Medtronic's own sales data in two different sets. First, Mr. Blum looked at Medtronic's sales data for the Verte-Stack Cornerstone PSR and the Verte-Stack Anatomic PEEK ("Subject Devices") paid to Medtronic directly by Veterans Health Administration ("VA") hospitals. *See* Blum Report, attached to Declaration of John R. Parker, Jr. in Opposition to Motion to Exclude ("Parker Decl.") as Exhibit 1 ("Blum Report") ¶¶ 36-38, Because all of these devices were sold to the federal government and paid for by the federal government, he calculated the amounts paid by the United States of America for the devices Relator contends were approved by FDA based upon Medtronic's fraudulent misrepresentations to FDA.

Next, Mr. Blum looked at Medtronic's data regarding sales of the Subject Devices to non-VA hospitals and surgery centers. Blum Report ¶¶ 39-66. Mr. Blum reasonably assumed that hospitals and surgery centers are not losing money every time they purchase Medtronic's devices. *Id.* ¶¶ 28-29. Mr. Blum then reduced these numbers to account for Federal and State government payors, based upon United States government databases that showed the percentage of Medicare and Medicaid utilization for spinal surgeries, and applied those percentages to Medtronic's sales data to come up with an estimate of total damages.

Medtronic does not contest the percentages used or calculations made by Mr. Blum, *i.e.*, his methodology, which is logical and sound. Nowhere in Medtronic's Memorandum in support of its motion does Medtronic address Mr. Blum's calculation of interest or of statutory damages. Instead, Medtronic's quarrel is that Mr. Blum did not rely upon claims data that does not exist and is not available. And, Medtronic argues that Mr. Blum is not an expert in, *e.g.*, spinal surgery or internal hospital accounting, issues that have nothing to do with the data he used or the calculations he made in his Report.

### III. RELATOR'S THEORY AND DAMAGES

Relator's case is premised upon a fraud on the FDA theory. Relator contends that Medtronic misled the FDA about the appropriate use and contraindicated use of the Subject Devices. In this context, the measure of damage to the United States under the False Claims Act and the equivalent state False Claims Acts is what the United States paid for these Subject Devices when they were implanted. Generally, the measure of the government's actual damages under the FCA (as opposed to the civil penalties/statutory damages) is "the amount that it paid out by reason of the false statements over and above what it would have paid if the claim had been truthful." *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966). Accordingly, "[p]roper application of this benefit-of-the-bargain measure depends

on the particular circumstances of the case." *United States v. Sci. Applications Int'l Corp.* (*"SAIC III"*), 626 F.3d 1257, 1278, (D.C. Cir. 2010).

Some courts find where it is impossible to determine the value of the nonconforming goods, the court must award the full amount of the Government's payments for the goods as the appropriate measure of the government's damages." *See United States ex rel. Humane Society of the United States ("Humane Society")*, No. EDCV 08-00221-VAP-(OPx), 2013 U.S. Dist. LEXIS 126949, 2013 WL 5753784, at *8 (C.D. Cal. Apr. 30, 2013) (citing *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78 (2nd Cir. 2012).

The fraud alleged by Relator is that Medtronic deliberately misstated the intended use and contraindications of the Subject Devices to FDA. The devices would not have been approved and eligible for payment at all if Medtronic had accurately stated the devices' intended use in the cervical spine. Accordingly, because Relator is proceeding on a theory that damages in this case amount to what was paid by government payors for the Subject Devices, Relator retained damages expert Sidney Blum to provide an estimate of damages in this case. However, because (1) government payor data is largely bundled per-procedure in a DRG code and does not indicate what specific device is being paid for as part of a bundled payment; and (2) whatever data hospitals may have is subject to HIPPA and would not be produced pursuant to a Rule 45 subpoena, Relator and Mr. Blum had to rely upon Medtronic's own sales data and U.S. government databases with rates of Medicare and Medicaid payments for spinal surgeries to provide an estimate of damages using Mr. Blum's calculations.

### IV. ARGUMENT

#### A. *The Daubert* Standard in a Non-Scientific Context.

The reliability of an expert's methodology is evaluated with the following non-exhaustive set of factors set forth in *Daubert*: (1) whether the expert's technique or theory can be and has been tested; (2) whether the theory has been

subject to peer review and publication; (3) whether the method has a high known or potential rate of error of the technique or theory when applied and if there are standards and controls controlling the method's operation; and (4) whether the method is generally accepted in a relevant scientific community. *Kumho Tire v. Carmichael*, 526 U.S. 137, 149-50 (1999). The Ninth Circuit consistently has stated that "[the *Daubert* factors] are illustrative, and they are not all applicable in each case." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). Indeed, the inquiry is "flexible," *id*. (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993), and "Rule 702 should be applied with a 'liberal thrust' **favoring admission**." *Id*. (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014)) (emphasis added).

Courts begin from a presumption that expert testimony is admissible. *Poosh v. Philip Morris USA, Inc.*, 287 F.R.D. 543, 546 (N.D. Cal. 2012) (citing *Daubert*); *see also* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("[R]ejection of expert testimony is the exception rather than the rule."). Exclusion of expert testimony is appropriate only when such testimony qualifies as irrelevant or unreliable "junk science." *Wendell*, 858 F.3d at 1237. Otherwise, the court should cede complex issues to the jury and rely on the traditional safeguards of the adversary system—cross-examination, presentation of contrary evidence, and instruction on the burden of proof—to test and evaluate weak but otherwise admissible evidence. *See Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 13 (1st Cir. 2011) ("So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities.") (quoting *Daubert*, 509 U.S. at 590, 596). "[T]he interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system." *Wendell*, 858 F.3d at 1237 (internal citations omitted); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*)).

Accordingly, attacks upon the factual underpinnings of an expert's opinions bear on the weight of the opinion, not its admissibility. *Higley v. Cessna Aircraft Co.*, CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013).

Specifically, "[i]t is perfectly permissible for an expert to rely on assumptions when formulating opinions." *Armer v. CSAA Gen. Ins. Co.*, No. CV-19-04402-PHX-DWL, 2020 U.S. Dist. LEXIS 101851, at *29 (D. Ariz. June 10, 2020). "Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony." *Id.* (citing *Marsteller v. MD Helicopter Inc.*, 2018 U.S. Dist. LEXIS 197946, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination.")).

### B. *Daubert* in the Context of Damages Experts.

Damages experts regularly rely on sales data like Medtronic's to calculate damages: "[c]ompany records and statements by company personnel are types of data reasonably relied upon by accountants, and opinions based on those types of information are typically admissible under Rule 703." *Int'l Adhesive Coating Co. v. Bolton Emerson Intern.*, 851 F.2d 540, 544-45 (1st Cir. 1988); *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980) (accountant may rely on files and financial statements of corporation); *Rural Water Dist. No. 5 Wagoner Cty., Okla. v. City of Coweta*, No. 08-CV-252-JED-FHM, 2013 U.S. Dist. LEXIS 145312, 2013 WL 5558390, at *2 (N.D. Okla. Oct. 8, 2013) ("accounting experts may typically base their expert opinions upon data and information provided by others, such as information from a corporation's business or financial records or interviews with employees, because such sources of information are normally and reasonably relied on by accountants."); *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566, 570 (E.D. Pa. 2004) (admitting testimony of plaintiff's damages expert in breach of contract action where the expert relied on business records provided by the plaintiff). *See Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518 (10th Cir.

1996) (stating that if there is a logical basis for an expert's opinion, the weaknesses in the underpinnings of the opinion go to the weight and not the admissibility of the testimony), *overruled on other grounds by Kumho Tire*, 526 U.S. at 147.

Moreover, neither *Daubert* nor its progeny can be read "to require all experts in every case to back his or her opinion with independent tests that unequivocally support his or her conclusions." *More, JC, Inc. v. Nutone Inc.*, No. A-05-CA-338, 2007 U.S. Dist. LEXIS 102151, 2007 WL 4754173, at *12 (W.D. Tex. Mar. 21, 2007) (citing *Kumho Tire*, 526 U.S. at 141). "Moreover, a district court is not required to preclude expert testimony simply because the proposed expert could have performed his or her analysis in a better manner." *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 461 F. Supp. 2d 271, 274 (D.N.J. 2006) (citing *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997)). *See also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (There is no requirement that an expert witness "know the answer to all the questions a case presents—even to the most fundamental questions.").

### C. Blum Reliably Calculated Damages to the Federal Government Based Upon Direct Payments From the VA to Medtronic.

The first part of Mr. Blum's damages model uses Medtronic's data about sales to VA hospitals. Blum Report ¶¶ 36-38. The calculation is relatively simple—Mr. Blum took Medtronic's own sales data for sales of the Subject Devices to VA hospitals (*i.e.*, the United States) during the relevant period and calculated damages accordingly. Medtronic now contends (but has not put in evidence) that the VA hospitals were somehow not expending federal funds when they paid Medtronic for the Subject Devices. The point is ridiculous. Even if, as Medtronic asserts without evidence, some procedures at VA hospitals may have ultimately been reimbursed by private insurers, Mr. Blum is nevertheless basing his damages model on **direct sales** of Medtronic Subject Devices to the United States

of America. Medtronic can argue what weight Mr. Blum's VA damages estimate should be given at trial, but it has not moved for summary judgment or otherwise actually presented an argument for some off-set based on theoretical private insurer reimbursement. Accordingly, there is no basis whatsoever to exclude Mr. Blum's opinions regarding damages derived from VA sales data.

### D. Blum Relies Upon Medtronic's Own Sales Data and United States Government Databases—the Best Available Data to Calculate Damages Here.

Next, Mr. Blum looked at Medtronic's data regarding sales of the Subject Devices to non-VA hospitals and surgery centers. Blum Report ¶¶ 39-66. Mr. Blum reasonably assumed that hospitals and surgery centers are not losing money every time they purchase Medtronic's devices. *Id.* ¶¶ 28-29. Mr. Blum then reduced these numbers to account for Federal and State government payors, based upon United States government databases that showed the percentage of Medicare and Medicaid utilization for spinal surgeries, and applied those percentages to Medtronic's sales data to come up with an estimate of total damages.

Medtronic's main *Daubert* challenge is based upon Medtronic's own data, which Mr. Blum relied upon. *See* Blum Report ¶¶ 31-34. Medtronic misleads the Court about whether Mr. Blum believes this data is reliable for the purposes of his damages calculations. Because the data Mr. Blum used is necessarily indirect, better, direct data could theoretically exist but it is not available to him or to Relator. And Mr. Blum testified as much:

> Based upon my experience, based upon all sources I had available to me, this was the best available evidence that came across me. This comes from a source, a very reliable source. This came from the Healthcare Cost and Utilization Project, and that seems to be a pretty neutral, reliable source, as it was developed through a federal and a state industry partnership. And I didn't find -- and it seems to be of substantial support and sufficient evidential matter that I can use it in a unbiased manner, and nothing else came across my attention that would provide better information. I'm not saying there's not better information out there, but I didn't find any better information.

(Blum transcript, 139:9-23, excerpts of which are attached as Exhibit 2 to the Parker Decl.)

Mr. Blum's fundamental calculations, assumptions, and sources are sound. Mr. Blum understood the data he used to be specifically reliable based upon sound principles used by him and other damage experts. *See* Blum Report ¶¶ 48 and 49 specifically:

> Based on my experience in medical device litigations requiring the use of medical industry statistics and my examination of statistics used by fellow damage experts, I consider the HCUP system to be the most reliable. This is the first litigation where I have used the HCUP system for Medicare and Medicaid percentages. I found no other information that would provide better source data for Medicare and Medicaid percentage reimbursements. As such, HCUP provides the most reliable available information for my damage calculations, in addition to being a trusted source; namely, a data base maintained by the United States government.

Regardless, government claims data from non-VA hospitals still would likely not be useful, because it would constitute bundled DRG charges from hospitals that would not include individual charges for individual Subject Devices. And data from hospitals would be similarly unavailing and unavailable via a Rule 45 subpoena, because the claims data is specifically protected by HIPPA. *See* 45 C.F.R. Part 162.

Again, Medtronic's fundamental quarrel is that Mr. Blum did not use data that was not available to him or to Relator. Medtronic's quarrel that Mr. Blum's assumption that hospitals would not pay Medtronic more for devices than they would ultimately receive in reimbursement for those devices is similarly problematic for Medtronic. Medtronic has not rebutted the assumption with anything other than extremely vague and broad contentions from hospital industry publications that the cost of care generally—for all patients and all forms of care, not spinal medical devices or the Subject Devices, sometime exceeds reimbursement rates. *See* Kopa Report ¶¶ 27-27, fn. 26, 27, at Parker Decl. Exhibit

3. Again, the quibble is with the weight of the evidence, not with Mr. Blum's basic calculations or methodology.

Other particular quibbles by Medtronic about Mr. Blum's analysis are no more availing. Apparently, according to Medtronic, Mr. Blum needed to analyze the data of every single hospital in every single geographical location in the United States. But that is neither reasonable nor how damages estimates are made—while reimbursements or utilization rates may be higher or lower from one area or hospital to another, Medtronic cannot reasonably argue that such granular analysis is necessary for a damages estimate like the one provided by Mr. Blum. If it has some data or information (that it has to date not produced in discovery or identified in its initial disclosures), it can present it at trial if admissible, or argue to the jury against the weight of Mr. Blum's estimate.

Additionally, Medtronic's arguments about "expiration" or "waste" of these very expensive medical devices are (a) not born out by any evidence of such waste and (b) belied by the fact that hospitals themselves do not take legal title of these devices until they are implanted in patients. Given the reasonable assumption that patients are not being implanted with expired devices and once implanted the devices are not being lost or stolen, again, Medtronic's attacks do not meet the muster of *Daubert*. Medtronic can attempt to argue it at trial to the jury.

The law is very clear that Medtronic's quibbles are not properly made in a *Daubert* motion to exclude. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*)) *Higley v. Cessna Aircraft Co.*, CV 10-3345-JCG, 2013 WL 12112167, at *4 (C.D. Cal. July 8, 2013) (attacks upon the factual underpinnings of an expert's opinions bear on the weight of the opinion, not its admissibility).

### E. Blum Is A Well-Qualified Damages Expert.

Sidney Blum's experience includes being a Managing Director of an Auditing firm (Blum Report ¶ 4), serving as Chief Audit Officer of a company with $1 billion of annual revenue (*id.* ¶ 5), partner at a public accounting firm (*id.* ¶ 7),

audit partner at KPMG (*id.* ¶ 8), and leading more than 1,000 royalty audits, including of more than $7 billion in paid royalties in the medical industry. He is a licensed CPA in California and New York, a Certified Fraud Examiner, and Certified in Financial Forensics by the American Institute of Certified Public Accounts. (*Id.* ¶ 12). He has won awards and published two books published by Oxford University Press and LexisNexis. (*Id.* ¶¶ 14-17.) He has testified in more than three dozen occasions at trial and arbitrations as an expert witness, including in a case involving spinal surgery medical devices. (*Id.* ¶ 19.)

Medtronic's attack on Mr. Blum's experience, specifically that he lacks specific experience in hospital internal accounting, is another red herring. The argument is premised on the notion that the only thing he could have and did examine was hospital accounting data, but that data was not available to him and was not the basis of his report. Medtronic's remaining quibbles are similarly discarded—as a damages expert, Mr. Blum need not be an expert in spinal anatomy or surgical procedures. *See*, *e.g.*, *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (There is no requirement that an expert witness "know the answer to all the questions a case presents—even to the most fundamental questions.").

Fundamentally, Medtronic does not attack Mr. Blum's calculations or the data he relied upon. It only argues that he should have done a different analysis based upon different data that Medtronic does not have and is not available to Relator. But that is an argument Medtronic can make in a jury—it is not a tenable ground for excluding an experienced damages expert testimony based upon fundamentally reliable data—Medtronic's own sales data and United States government data bases about Medicare and Medicaid reimbursement rates.

**V. CONCLUSION**

///

///

///

For the reasons set forth above, Medtronic's motion to exclude the opinions of Sidney Blum should be denied.[1]

Dated: January 23, 2023　　　　　　　　CUTTER LAW P.C.

　　　　　　　　　　　　　　　　　　　By:　/s/ John R. Parker, Jr.

　　　　　　　　　　　　　　　　　　　　　C. Brooks Cutter
　　　　　　　　　　　　　　　　　　　　　John R. Parker
　　　　　　　　　　　　　　　　　　　　　Celine Cutter
　　　　　　　　　　　　　　　　　　　　　Cutter Law P.C.
　　　　　　　　　　　　　　　　　　　　　401 Watt Avenue
　　　　　　　　　　　　　　　　　　　　　Sacramento, CA 95864
　　　　　　　　　　　　　　　　　　　　　Telephone: 916-290-9400
　　　　　　　　　　　　　　　　　　　　　Facsimile: 916-588-9330

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Relator*

---

[1] Additionally, Medtronic makes no challenge to Mr. Blum's interest or statutory damage calculations in its opening papers and therefore has waived such a challenge on reply.

# **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Relator, certifies that this brief contains 3,394 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 23, 2023        CUTTER LAW P.C.

By: /s/ John R. Parker, Jr.

C. Brooks Cutter
John R. Parker
Celine Cutter
Cutter Law P.C.
401 Watt Avenue
Sacramento, CA 95864
Telephone: 916-290-9400
Facsimile: 916-588-9330

*Attorneys for Relator*

PLAINTIFFS' MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO MTE